1
2
3
4
5

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
JILL M. PIETRINI (Cal. Bar No. 138335)
   jpietrini@sheppardmullin.com
PAUL A. BOST (Cal. Bar No. 261531)
   pbost@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California  90067-6017
Telephone:  (310) 228-3700
Facsimile:   (310) 228-3701

6
7
8

CHRIS PONDER (Cal Bar. 296546)
   cponder@sheppardmullin.com
379 Lytton Avenue
Palo Alto, California 94301
Telephone:  (650) 815-2676
Facsimile:   (650) 815-2601

9
10

Attorneys for Plaintiff
WARGAMING.NET LIMITED

11
12
13

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

14
15
16
17
18
19
20

| WARGAMING.NET LIMITED, a Cyprus limited company, Plaintiff, v. BLITZTEAM LLC, a Belarus limited liability company; and DOES 1-10, inclusive, Defendants. | Case No. 2:20-cv-2763 **FIRST AMENDED COMPLAINT** **DEMAND FOR JURY TRIAL** |
| --- | --- |

21
22
23
24
25

        Plaintiff Wargaming.net Limited ("Plaintiff") hereby files its first amended complaint against defendants Press Fire Games LLC f/k/a BlitzTeam LLC ("Blitz Team") and Does 1-10 (collectively referred to as "Defendants"), and alleges as follows:

26

**PRELIMINARY STATEMENT**

27
28

        1.      This is a trademark and copyright infringement action against a company formed by former employees of Plaintiff, who are now trading on the

1  goodwill associated with Plaintiff's popular mobile computer games WORLD OF
2  TANKS BLITZ and WORLD OF WARSHIPS BLITZ.  The former employees also
3  started developing a new shooter game while employed by Plaintiff, and later
4  copied and used, without authorization or other permission, Plaintiff's source code
5  to create their own mobile shooter game.

6      2.     Defendants worked for Plaintiff in its WORLD OF TANKS BLITZ
7  ("WOTB") product group and were known as "The Blitz Team" amongst Plaintiff's
8  employees and management and by the community of international computer
9  programmers that develop game properties.

10     3.     Until just before Defendants' separation from Wargaming, the WOTB
11 product group was led by Andrei Karpiuk, Vitali Baradouski, Stsiapan Drozd, and
12 Dzimitry Babraunichy (hereinafter "DAVA Individuals").  The DAVA Individuals
13 were afforded a high-level of autonomy to manage the WOTB product group and
14 were richly compensated for their efforts.  In addition to ordinary employment
15 compensation, the DAVA Individuals received additional payments exceeding
16 $10,000,000, which included a share of WOTB's net revenue.

17     4.     In April 2017, the DAVA Individuals announced that they intended to
18 leave Plaintiff to start their own video game company.  The DAVA Individuals and
19 Plaintiff parted ways in April 2018 after a year of failed negotiations for a new
20 business arrangement.  Within days, Defendants formed a new company called
21 "BlitzTeam LLC," and hired away over thirty of Plaintiff's employees.  Defendants
22 are now using various BLITZ trademarks for mobile computer games and have
23 impermissibly used Plaintiff's source code to develop their BATTLE PRIME
24 mobile computer game.

25                                **JURISDICTION**

26     5.     This action arises under the trademark laws of the United States, 15
27 U.S.C. § 1051, *et seq.*, the copyright laws of the United States, 17 U.S.C. § 101, *et*
28 *seq.*, and under the statutory and common law of unfair competition.  This Court

has jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and (b), and § 1367, 15 U.S.C. § 1121, and 17 U.S.C. § 501.

6.      Venue is proper under 28 U.S.C. §§ 1391(b) and (c) in this case because, on information and belief, Defendants are subject to personal jurisdiction in this District and/or a substantial part of the events or omissions giving rise to the instant claims occurred in this District.

## **PARTIES**

7.      Plaintiff is a Cyprus limited company, having its principal place of business in Nicosia, Cyprus, with United States offices in Austin, TX, Bellevue, WA and Chicago, IL.  Plaintiff is actively engaged in business in the U.S.  For example, Plaintiff has held game competitions in New York under the name Blitz Twister Cup, promoted the 2017 Mobile Masters tournament in Las Vegas, Nevada and 2018 tournament in Seattle, Washington, and engaged in various promotions and hired a U.S. public relations company in order to target U.S. consumers.

8.      On information and belief, Blitz Team is a Belarusian limited liability company, having its principal place of business in Minsk, Belarus, and does not have a regular and established place of business in the United States.  As described below in Paragraphs 15, Defendants distribute their BATTLE PRIME game and related apps on Google Play and Apple App Store to customers and end users in this District and the United States, and Defendants' own websites (www.battleprime.com and www.blitzteam.com) are directed to end users in the United States.  As described below in Paragraph 67, Defendants retained counsel in this District for the purpose of sending a letter warning Plaintiff against interfering with its business in the United States.

9.      On information and belief, subsequent to the filing of the initial complaint, Blitz Team changed its corporate name from BlitzTeam LLC to Press Fire Games, LLC.

10.      Plaintiff and Defendants are subject to personal jurisdiction in this

District because the claims arose in this District in that many of Plaintiff's customers and end users of its BLITZ games are located in this District, and Defendants customers and end users of its BATTLE PRIME game are located in this District.

11.     The true names, identities and capacities, whether individual, associate, corporate or otherwise, of Defendants DOES 1 to 10, inclusive, and each of them ("the DOE Defendants"), are unknown to Plaintiff at this time, who therefore sues the DOE Defendants by such fictitious names.  When the true names and capacities or participation of the DOE Defendants are ascertained, Plaintiff will amend this complaint to assert the true names, identities and capacities.  Plaintiff is informed and believes and thereon alleges that each of the DOE Defendants sued herein is responsible for the wrongful acts alleged herein, and is therefore liable to Plaintiff in some manner for the events and happenings alleged in this complaint.  Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, the DOE Defendants were and are doing business and/or residing in this District.

## **PLAINTIFF'S BUSINESS AND TRADEMARKS**

12.     Plaintiff is recognized internationally as one of the leading developers and publishers of multiplayer online video games that are built upon a "freemium" business model.  Under the "freemium" business model, games are free-to-play, but participants also have the option of paying a fee for use of "premium" features.  Such premium features may be purchased through Plaintiff's own online store located at <https://na.wargaming.net/shop/.>

13.     Plaintiff develops video games for Windows and Mac computers, as well as for mobile devices such as mobile phones and tablets, both Android and Apple devices.

14.     Currently seven of Plaintiff's video games are on the market, which collectively have more than 332,000,000 registered players worldwide.  Attached as **Exhibit A** are true and correct copies of extracts from Plaintiff's websites

1   <Wargaming.com> and <Wargaming.net>, as well as Plaintiff's online shop.

2       15.   Plaintiff's video games are distributed and made available to

3   consumers in the United States and worldwide through Wargaming Game Center,

4   the video game digital distribution service "Steam" operated by Valve Corporation,

5   mobile app platforms such as Google Play (for Android devices) and App Store (for

6   Apple iOS devices), and on such consoles as Xbox 360, Xbox One, and

7   PlayStation 4.

8                   **WORLD OF TANKS BLITZ GAME**

9       16.   One of Plaintiff's video games is WORLD OF TANKS, which was

10   initially launched in 2009.  It focuses on player vs. player gameplay with each

11   player controlling an armored vehicle.  The WORLD OF TANKS game was very

12   successful, and versions of it were later released for play on multiple gaming

13   consoles, such as PlayStation 4, Xbox 360, and Xbox One.

14       17.   In 2013, Plaintiff expanded its WORLD OF TANKS game with the

15   announcement of **WORLD OF TANKS BLITZ**, a mobile game for tablets and

16   smartphones using Windows 10, Android, and iOS.  The WORLD OF TANKS

17   BLITZ game was released (on iOS only) on May 2014 in Europe and on June 27,

18   2014 in North America (again, on iOS only).  The Android version of the WORLD

19   OF TANKS BLITZ game was released worldwide on December 4, 2014. And the

20   Windows 10 version of the WORLD OF TANKS BLITZ game was released in the

21   Windows Store on December 28, 2015.  On November 9, 2016, the PC version of

22   the WORLD OF TANKS BLITZ game was also released on Valve Corporation's

23   Steam, a video game digital distribution service, separately from the standard PC

24   version of the WORLD OF TANKS game, which is also available on Steam.

25   Although the WORLD OF TANKS BLITZ game is based on the WORLD OF

26   TANKS game, it is a different game with different game sessions.

27       18.   Plaintiff's WORLD OF TANKS BLITZ game was developed by a

28   team of computer programmers working within the Wargaming Group that came to

be known as "The Blitz Team."  The Wargaming Group is a group of affiliates of Plaintiff, including, without limitation, Wargaming World Limited, Wargaming.net Limited, and Game Stream JLLC.  Attached hereto as **Exhibit B** are true and correct copies of relevant screenshot extracts from Plaintiff's Facebook Workplace platform, showing the use of the term "Blitz Team."

19.     Plaintiff's WORLD OF TANKS BLITZ game has been a huge success amongst gamers across the United States and worldwide, and is a well-known, if not famous, trademark by reason of its extensive use and reputation.

20.     Since its launch in 2014 and up until the filing of Plaintiff's initial complaint, there have been more than 20 million downloads of the WORLD OF TANKS BLITZ game, generating millions of dollars in revenue.  On average, there are 300,000 monthly active users of the game in the United States.

21.     According to Newzoo, the world's leading provider of market intelligence covering the global games, esports, and mobile markets (www.newzoo.com), Plaintiff is the 7th highest grossing mobile game publisher in Eastern Europe.

22.     The popularity and the success of the WORLD OF TANKS BLITZ game is demonstrated by the significant number of installs the game has had in the United States over the last few years.  In 2014, the game was downloaded nearly 1.1. million times in the U.S.; in 2015, more than 1.3 million downloads; in 2016, more than 1.35 million downloads; in 2017, more than 950,000 downloads; in 2018, almost 800,000 downloads; and in 2019, more than 800,000 downloads.  In the United States, as of January 2020, it is estimated that there are more than 242,000 monthly active users of the WORLD OF TANKS BLITZ game.  At times, there have been more than 400,000 monthly active users of the game.

23.     Due to the popularity of the WORLD OF TANKS BLITZ game, the game is commonly known and referred to as BLITZ.

24.     Since the release of WORLD OF TANKS BLITZ game, Plaintiff has

incurred (and continue to incur) significant promotional, marketing and advertising expenses to establish, maintain and further enhance the reputation of its trademark WORLD OF TANKS BLITZ and for Plaintiff's common rights to the name BLITZ as a standalone trademark to identify certain of its mobile video games.

25.     Plaintiff has held and sponsored special events, published print advertisements, engaged athletes as partners, engaged internet influencers, and sponsored game competitions, all promoting, marketing, and advertising the WORLD OF TANKS BLITZ and BLITZ trademarks in the United States.  One of the most significant promotional and marketing events is the Blitz Twister Cup, which has been running successfully for the past four years.  The Blitz Twister Cup is an international gaming tournament centered around the WORLD OF TANKS BLITZ game, and other Plaintiff's BLITZ games (*see infra*), with various teams from around the globe who compete for a cash prize.  The Blitz Twister Cup is considered the final of the international tournament since teams need to complete the preliminary rounds in order to compete in the Blitz Twister Cup.  In the 2018 Blitz Twister Cup preliminaries, more than 600 teams competed for a ticket to the final.  The Blitz Twister Cup is streamed and broadcasted with thousands of people watching the progression of their team in the tournament.  In November 2019, six teams from around the world participated in the Blitz Twister Cup final.  In total, 223 websites with an online readership of 3.64 billion people covered the 2019 Blitz Twister Cup, with an estimate of 27 million views.

26.     Plaintiff has also promoted its WORLD OF TANKS BLITZ and BLITZ trademarks on social media, including collaborating with various YouTubers and content creators for the promotion of the WORLD OF TANKS BLITZ video game platform in June 2019.  YouTubers Younes Jones, who has a following of 1.1 million subscribers, AviveHD with 1.62 million subscribers, Simon Desue with 4.4 million subscribers, and JuniorTVLife with 1.07 million subscribers, created videos which depicted their experience playing the WORLD

1    OF TANKS BLITZ game.

2        27.    In order to further promote the WORLD OF TANKS BLITZ game,

3    Plaintiff has also initiated a merchandise collaboration with the well-known custom

4    clothing website Spreadshirt.com.  The collaboration enables fans and users of the

5    gaming platform to acquire their favorite merchandise bearing the WORLD OF

6    TANKS BLITZ trademark, such as t-shirts, hoodies, and mugs.  The collaboration

7    is accessible to all, with products created for men, women, and children and with

8    more than 25 different styles for each category.

9        28.    Since its launch, Plaintiff's WORLD OF TANKS BLITZ game has

10    received numerous awards and nominations worldwide.  For example, the WORLD

11    OF TANKS BLITZ game was recently nominated by Pocket Gamer for "Best

12    Mobile Esport" for the year 2020, which is an annual award recognizing and

13    celebrating the most impressively implemented and strategically sustained mobile

14    e-sport experience of the relevant year.  The "Best Mobile Esport" award, together

15    with other video game awards, collectively known as "The Pocket Gamer Mobile

16    Games Awards," are amongst the most prestigious awards in the video game

17    industry.

18                 **WORLD OF WARSHIPS BLITZ GAME**

19        29.    Another well-known video game developed and published by Plaintiff

20    is the game WORLD OF WARSHIPS, a free-to-play naval warfare-themed

21    Massively Multiplayer Online ("MMO") video game.  The WORLD OF

22    WARSHIPS game was released worldwide in September 2015.

23        30.    In 2018, Plaintiff expanded globally WORLD OF WARSHIPS to

24    mobile platforms with the announcement of WORLD OF WARSHIPS BLITZ, a

25    mobile version of WORLD OF WARSHIPS for tablets and smartphones

26    using Windows 10, Android, and iOS.  The WORLD OF WARSHIPS BLITZ game

27    is a free-to-play mobile action MMO that plunges users into intense naval combat

28    of the first half of the 20th century.

31.     On July 14, 2017, Plaintiff completed a beta/soft launch of the WORLD OF WARSHIPS BLITZ mobile video game, and on January 17, 2018, the game was launched globally.  Since its launch, the WORLD OF WARSHIPS BLITZ game has been a huge success amongst gamers in the United States and worldwide and has acquired the status of a famous, or at least well-known, trademark by reason of its extensive use and reputation.

32.     Since its launch in January 2018 and up until the filing of Plaintiff's initial complaint, there have been more than 16.84 million downloads of the WORLD OF WARSHIPS BLITZ game.  Each month, there are approximately one million users actively playing the game.

33.     Since adopting and using the trademark WORLD OF WARSHIPS BLITZ and BLITZ to identify certain of Plaintiff's mobile video games, Plaintiff has incurred (and continues to incur) significant amounts in promotional, marketing, and advertising expenses to establish and maintain the reputation of the WORLD OF WARSHIPS BLITZ trademark and Plaintiff's common law rights to the name BLITZ.

34.     Examples of Plaintiff's marketing, promotional, and advertising efforts for its WORLD OF WARSHIPS BLITZ video game include co-operation agreements, merchandise agreements, publications, organizing of specific events, print advertisements, and social media.  Plaintiff has specifically targeted consumers in the United States as part of its marketing efforts.  For example, as part of a special event called "Victory Blitz," Plaintiff joined forces with professional hockey player, Stanley Cup winner, and three-times world champion Alexander Ovechkin of the Washington Capitals NHL team.  During the limited time period that this version of the game was available, the players had the opportunity to participate in a certain number of battles that enabled them to bring "Ovi" (aka Alexander Ovechkin) aboard.  The players were able to choose between different versions of the Ovechkin avatar, to pick ice hockey-themed camo that could be

applied to the American Tier VIII battleship Alabama, and to add Ovechkin as a commander of their ship and, as a result, receive an upgraded ship in the game.

35.    In 2019, Plaintiff's WORLD OF WARSHIPS BLITZ game was given the People's Choice award at the Mobile Games Awards.  The Mobile Games Awards is a yearly celebration of the greatest games and developers around the world given by the readers of PocketGamer.com, a leading website that focuses on mobile, portable, and handheld games.

36.    The WORLD OF WARSHIPS BLITZ game is the subject of substantial publicity, including descriptions, reviews, and discussions of, and news about, the game on a global basis, including in the United States.

37.    Plaintiff's trademarks WORLD OF TANKS BLITZ, WORLD OF WARSHIPS BLITZ, and BLITZ have acquired secondary meaning in the United States and worldwide, and are instantly recognizable and associated by the relevant consumers in the United States with Plaintiff and its mobile video MMO game products with a military theme.

**ASSOCIATION OF BLITZ ALONE WITH PLAINTIFF**

38.    As a result of the extensive use and exposure of Plaintiff's trademarks WORLD OF TANKS BLITZ and WORLD OF WARSHIPS BLITZ to the relevant public in the United States, and in particular the exposure of the relevant public to the use of the name BLITZ both as a unique characteristic of the trademarks and as a standalone distinctive mark used for Plaintiff's relevant business, the name BLITZ has come to be associated in the mind of the relevant public with Plaintiff and its MMO mobile action video game business and mobile video game products with a military theme.  This has led to Plaintiff acquiring significant international goodwill in the name BLITZ in connection with its relevant MMO mobile action video game business and mobile video game products with a military theme, which goodwill extends to the United States.

39.    Consumers of Plaintiff's games often abbreviate and use the name

BLITZ as a standalone reference to Plaintiff's relevant video games.  Plaintiff facilitates this association by, for example, operating a game forum website called "Won Blitz" where consumers can post their reviews and comments about Plaintiff's BLITZ games.

40.     The name BLITZ has been used extensively by Plaintiff and its "Blitz Team" throughout the last 5 years, in the course of marketing campaigns, in connection with merchandise related to Plaintiff's games, and in promotional videos, events, interviews, and other material published online in a wide range of platforms and websites.  WORLD OF TANKS BLITZ merchandise featured the name BLITZ alone to identify Plaintiff's games.  The Blitz Twister Cup promotional event described above made extensive use of the name BLITZ as the distinctive name for Plaintiff's relevant video games.

41.     Given the success and reputation acquired by Plaintiff's WORLD OF TANKS BLITZ and WORLD OF WARSHIPS BLITZ games, Plaintiff is currently in the process of developing additional BLITZ video games with a military theme.

42.     Plaintiff advertises, promotes, and markets its BLITZ games together such that Plaintiff owns a family of BLITZ trademarks

43.     Plaintiff owns the following federally registered trademarks containing the term BLITZ, and owns common law rights in the term BLITZ alone (collectively "Plaintiff's BLITZ Marks"):

| Mark | Reg. No. | Class and Goods/Services | Reg. Date |
|------|----------|--------------------------|-----------|
| WORLD OF TANKS BLITZ | 4,590,703 | Class 9:  Computer games software; computer game discs; video games software; computer game software for video games and for games machines; computer programs for video and computer games; video discs featuring strategy games relating to armed conflict; optical | August 26, 2014 |

| Mark | Reg. No. | Class and Goods/Services | Reg. Date |
|------|----------|--------------------------|-----------|
|  |  | discs featuring strategy games relating to armed conflict; audio tapes featuring strategy games relating to armed conflict; prerecorded video cassettes featuring strategy games relating to armed conflict; compact discs featuring strategy games relating to armed conflict; blank CD-ROMs for sound or video recording; data bearing record carriers for computers, namely, prerecorded magnetic data carriers featuring strategy games relating to armed conflict; musical sound recordings; video recordings featuring strategy games relating to armed conflict; computer game software for playing video, computer and on-line games; software for enabling video, computer and on-line games to be run on multiple platforms; downloadable software for developing, designing, modifying and customizing video, computer and on-line games; computer game software for use on mobile phones; downloadable electronic publications in the nature of newsletters, journals, magazines and guidebooks in the field of strategy games relating to armed conflict; software for enhancing and developing video games; structural parts and fittings for all the aforesaid goods | |
|  |  | Class 41:  Entertainment provided via the Internet, namely, providing on-line massively multi-player video games; on-line gaming services, namely, providing on-line massively | |

| Mark | Reg. No. | Class and Goods/Services | Reg. Date |
|---|---|---|---|
| | | multi-player war games; entertainment services, namely, providing on-line massively multi-player computer games; organizing online multi-player computer games, namely, matching players of online computer games against each other; on-line entertainment services in the nature of on-line computer game tournaments and leagues; entertainment services in the nature of on-line computer game tournaments and leagues; providing a web-based system and on-line portal for customers to participate in virtual on-line gaming tournaments and leagues, operation and coordination of virtual on-line gaming tournaments and leagues; entertainment services, namely, production and distribution of games shows; providing on-line information in the field of computer gaming entertainment; providing on-line computer games accessed via wireless communication; providing on-line computer games accessed via cellular telephones; providing on-line non-downloadable electronic publications in the nature of newsletters, journals, magazines and guidebooks in the field of strategy games relating to armed conflict | |
| WORLD OF WARSHIPS BLITZ | 5,809,262 | Class 9:  Computer games software; computer games discs; video games cartridges; computer software for playing video games or for operating games machines; computer programs for playing video and computer | July 23, 2019 |

| Mark | Reg. No. | Class and Goods/Services | Reg. Date |
|------|----------|--------------------------|-----------|
|  |  | games; video discs, discs, magnetic tapes, cassettes, compact discs all in the field of strategy and action games relating to armed conflict; blank CD-ROMs for sound or video recordings, data bearing record carriers for computers, all having game software recorded thereon, all in the field of strategy and action games relating to armed conflict; sound recordings and video recordings in the field of strategy and action games relating to armed conflict; software for playing video, computer and on-line games; software for enabling video, computer and on-line games to be run on multiple platforms; downloadable software for developing, designing, modifying and customizing video, computer and on-line games; games software for mobile phones; computer game software for use on mobile phones; downloadable electronic publications in the nature of newsletters, journals, magazines and guidebooks in the field of strategy and action games relating to armed conflict provided on-line from database for the Internet; video games enhancers, namely, high performance computer hardware with specialized features for enhanced game playing ability; structural parts and fittings for all the aforesaid goods<br><br>Class 41:  Entertainment provided via the Internet, namely, providing online massively multi-player video |  |

| Mark | Reg. No. | Class and Goods/Services | Reg. Date |
|---|---|---|---|
| | | games; on-line gaming services, namely, providing online massively multi-player video games; providing on-line computer games, multi-player matching services for computer game tournaments, and on-line entertainment in the nature of online computer game tournaments, virtual or cyber sports leagues relating to armed conflict video games, production and distribution of games shows; providing on-line information in the field of computer gaming entertainment; providing online non-downloadable games by cellular telephone communication; providing online non-downloadable games by or for use on cellular telephones; providing on-line non-downloadable electronic publications in the nature of newsletters, journals, magazines and guidebooks in the field of strategy and action games relating to armed conflict | |

True and correct copies of certificates of registration for Plaintiff's federally registered trademarks, which are valid and subsisting, are attached hereto as **Exhibit C**.

### DEFENDANTS AND THEIR INFRINGING ACTIONS

44. On information and belief, Defendants are using the marks BLITZ TEAM, BLITZ TEAM, and BLITZ ENGINE (collectively the "BLITZ TEAM Marks") in conjunction with goods and services offered in the video game industry, including in the United States, all without Plaintiff's approval, license, or consent.

45. On or about May 2018, Plaintiff received notice for the first time of Defendants' company in Belarus, and of Defendants' efforts to develop and release

a new action mobile video game with a military theme in the global market.

46.     On information and belief, Blitz Team operates, or operated until recently, a website on the URL www.blitzteam.com (the "Blitz Team Website") which use the BLITZ TEAM Marks.

47.     Defendants registered BLITZ TEAM, BLITZ TEAM & Design, and BLITZ ENGINE in Belarus as national trademarks, which then served as the basis for the subsequent filing by Defendants of the following three International BLITZ trademark applications:  IR 1475283 BLITZ TEAM in Class 42; IR 1474692 BLITZ TEAM & Design in Class 42; and IR 1478842 BLITZ ENGINE in Class 9. The International applications were filed with the World Intellectual Property Office ("WIPO") under the Madrid Protocol and were extended to the U.S. and to other jurisdictions.

48.     Plaintiff immediately took steps and is currently in the process of taking further legal steps in Belarus and in other jurisdictions worldwide to oppose Defendants' trademark applications or, as the case may be, to cancel the resulting registrations on the basis of Plaintiff's prior rights in its well-known trademarks WORLD OF TANK BLITZ, WORLD OF WARSHIPS BLITZ, and BLITZ.

49.     On May 29, 2020, Plaintiff filed a consolidated notice of opposition with the Trademark Trial & Appeal Board (the "TTAB") of the U.S. Patent & Trademark Office ("PTO") opposing registration of Blitz Team's pending applications to register BLITZ TEAM, as identified in Paragraph 73 below, which proceeding is captioned *Wargaming.net Limited Liability Company v. Limited Liability Company "BlitzTeam"* and has been assigned Opposition No. 91-256209 (the "TTAB Proceeding").  Plaintiff has filed with the TTAB a motion to suspend the TTAB Proceeding pending the adjudication of this lawsuit, which motion Blitz Team did not oppose.

### DEFENDANTS' PRIOR EMPLOYMENT WITH PLAINTIFF

50.     Plaintiff has reasonable grounds to believe that Blitz Team was set up

by former employees of Plaintiff, who focused on the development of the WORLD OF TANKS BLITZ game when working for Plaintiff.  Attached hereto as **Exhibit D** is a true and correct copy of a letter from the Ministry of Justice of the Republic of Belarus attaching an extract from the Republic of Belarus' Unified State Register of Legal Entities and Individual Entrepreneurs as of October 4, 2018.  The extract supplied by the Belarus authorities shows that Blitz Team was formed and is owned by Kleshchenko Viktor Konstantinovich and Polyakov Kirill Nikolaevich, and that the entity was formed on April 28, 2018.  Before leaving their employment with JLLC GameStream (a company within the Wargaming Group), Mr. Kleschenko was Lead Tools Developer and Mr. Polyakov was the Product Manager for the WORLD OF TANKS BLITZ game.  Mr. Polyakov quit his employment by JLLC GameStream on April 27, 2018, the day before Blitz Team was formed.

51.    Plaintiff has reasonable grounds to suspect that that Defendants, through their agents and employees, improperly encouraged, induced, or solicited more than thirty employees of Plaintiff to join Blitz Team, such former employees being part of Plaintiff's own "Blitz Team" referred to in Paragraph 2 above.  These suspicions are supported, amongst others, by various posts by numerous former employees of Plaintiff on their respective social media profiles, such as Facebook and LinkedIn, reflecting that they were employed with Plaintiff and are now employed by Blitz Team.  For example, the Facebook profile of former employee UX Designer Artem Mazurkevich (Артём Мазуркевич) states that he was an employee of the Wargaming Global Team from December 2015 until October 2018, at which time he became employed at "Blitz Team" as a UX Expert.  Also, Volha Mamul's (Ольга Мамуль) profile reveals that she is an employee of Blitz Team while in the past she worked as a Project Manager for Plaintiff.

52.    Plaintiff's "Blitz Team" was formed in approximately 2013 in connection with an agreement known as the Transfer of Rights & Future Cooperation Agreement ("TRFCA"), a true and correct copy of which is attached

hereto as **Exhibit E**.  By that agreement, Mr. Karpiuk, Mr. Baradouski, Mr. Drozd, and Mr. Babraunichy conveyed certain software to Plaintiff, and agreed to work on the WORLD OF TANKS BLITZ game for Plaintiff.  The agreement also required Plaintiff to employ Mr. Kleschenko and Mr. Polyakov as "Key Personnel" for the development of the WORLD OF TANKS BLITZ game.

53.    Plaintiff has paid the DAVA Individuals in excess of US $10,000,000 under the TRFCA.

54.    The TRFCA required the DAVA Individuals to enter into "Non-Compete and Non-Solicitation Agreements."  Attached hereto as **Exhibit F** are true and correct copies of the executed Non-Compete and Non-Solicitation Agreements.

55.    Section 2.1 of the Non-Competition and Non-Solicitation Agreements obligates the DAVA Individuals not to "personally or through others encourage, induce, attempt to induce, solicit or attempt to solicit (on [their] own behalf or on behalf of any other person or entity), or take any other action which is intended to induce or encourage, or has the effect of inducing or encouraging, any employee of the Wargaming Group to leave his or her employment with the Wargaming Group to engage in a Prohibited Activity with [the DAVA Individuals]."  The DAVA Individuals were obligated not to solicit Plaintiff's employees "commencing on the Effective Date and ending on the one (1)-year anniversary of the Employment Termination."  The "Effective Date" is defined as the date of the execution of the TRFCA (August 27, 2013).

56.    Section 1.2 of the Non-Competition and Non-Solicitation Agreements defines "Prohibited Activity" to include:  "(a) [to] participate or engage, anywhere in the Restricted Territory, in any business (including research and development), operations, activities and/or services, that are or involve the creation, design, development, modification, marketing, licensing, sale or other distribution of (1) any Multiplayer Online Battle Arena (MOBA) electronic or video games, massively multiplayer online games, multi- and single player electronic and video games

(whether for gaming consoles, PCs, hand-held devices, including tablets, mobile and cell phone devices, or any other electronic platforms), where any such games feature the use of tanks, warplanes, battleships, helicopters, or robots, or (2) games that are based in significant part on elements substantially similar to those in the Game and/or [WOTB] (as defined in the  [TRFCA]), and/or any other electronic and video games that are currently are [sic] planned and/or being developed by Wargaming Group, without regard to [the DAVA Individuals'] actual involvement into the development of such ) ('Competing Business Purpose');  (b) be or become an officer, director, stockholder, owner, Affiliate, salesperson, co-owner, partner, trustee, promoter, technician, engineer, analyst, employee, agent, representative, supplier, contractor, consultant, advisor or manager of or to, or otherwise acquire or hold any interest in, or participate in or facilitate the financing, operation, management or control of, or otherwise assist any firm, partnership, corporation, person, entity or business that engages or participates in a Competing Business Purpose in the Restricted Territory."

57.    Over the course of the six months after the DAVA Individuals left Plaintiff's employ, from May 2018 to October 2018, thirty-four (34) employees left Plaintiff and joined Defendants.  The bulk of the improper hires occurred in May 2018 (the same month the DAVA Individuals left Plaintiff), when twenty-three (23) members of Plaintiff's mobile development team joined Defendants.

58.    Plaintiff is informed and believes that the DAVA Individuals, as well as others working in concert with the DAVA Individuals, contacted Plaintiff employees on behalf of Defendants.

59.    On February 20, 2018, Mr. Baradouski told one of Plaintiff's employees that the DAVA Individuals planned to leave Plaintiff to start a new company, and asked the employee to join their new company.  Mr. Baradouski instructed the employee to keep the departure plan secret, and revealed that only eight people knew about the departure plan.  The eight people included the DAVA

Individuals, as well as Mr. Polyakov and Mr. Kleschenko, who are the two former employees that formed Blitz Team LLC less than two months later.  At the time of the conversation, the DAVA Individuals, Mr. Polyakov and Mr. Kleschenko were employed by Plaintiff.

60.     Around that same time, Mr. Karpiuk separately met with another of Plaintiff's employees and, on information and belief, revealed the departure plan. Plaintiff's employee later left his employment, and joined Defendants at Blitz Team LLC.

61.     The selection of the name BLITZ by Defendants, as well as the filing by Defendants of the trademark applications identified in Paragraphs 47 and 73 were made deliberately, in bad faith, and for the sole purpose of taking unfair advantage of the reputation and goodwill of Plaintiff's well-known BLITZ Marks.

62.     The Higher Court of the Republic of Belarus is considering five lawsuits filed by Plaintiff against the former employees of JLLC GameStream who have left JLLC GameStream to work for Defendants.  In these lawsuits, Plaintiff claims that these individuals illegally published and communicated to the public the source code of the technology owned by Plaintiff, namely, the DAVA Framework (aka DAVA Engine).

63.     Since December 12, 2018, the Ministry of Antimonopoly Regulation and Trade of Belarus has been considering JLLC GameStream's application about Defendants' violation of antimonopoly legislation in the form of unfair competition.

64.     Like WORLD OF TANKS BLITZ and WORLD OF WARSHIPS BLITZ video games Defendants' first video game, BATTLE PRIME, is a free-to-play multiplayer shooter with a military theme.  On information and belief, the battles in Defendants' BATTLE PRIME video game last approximately five minutes.  In each game, two teams of up to six players must face each other in a virtual world, where the goal is to earn points and move up the leaderboard by

destroying as many enemies as possible.  Every time a player destroys an enemy, he earns points.  Players play with "primes," i.e., universal war avatars with unique attack abilities.  Every prime has its own tactics and characteristics.  Each time the player joins a new battle or rejoins a battle after the player's avatar is killed, the player switches to another one of the player's prime avatars.

65.     As with Plaintiff's WORLD OF TANKS BLITZ and WORLD OF WARSHIPS BLITZ video games, Defendants' BATTLE PRIME game is available for download via Google Play (for Android devices) and App Store (for Apple iOS devices).  BATTLE PRIME's total worldwide revenue is $183,694, and the single largest source of revenue was $70,023 from the United States.  As such, Defendants' BATTLE PRIME game is advertised and marketed to the same public as the one targeted by Plaintiff for its own BLITZ video games.

66.     Plaintiff suspects that Defendants used the DAVA Framework (aka DAVA Engine) source code while developing Defendants' BATTLE PRIME game.  Plaintiff, through its affiliate JLLC GameStream, has made numerous requests to Defendants to provide it with the computer code of the BATTLE PRIME game for the purpose of its comparison by experts in order to ascertain if it includes any part of the computer code of the DAVA Framework.  So far, Defendants have failed to respond to JLLC GameStream's requests.

67.     On July 19, 2019, Defendants' U.S. attorneys, located in this District, addressed a letter to Plaintiff, informing it of their clients' intention to release to market a test version of their BATTLE PRIME mobile game.  The letter alleged, amongst other things, that the BATTLE PRIME game would not infringe Plaintiff's copyright and warned Plaintiff not to unlawfully interfere with their clients' contractual or business relationships.  Defendants' counsel also alleged and explained the reasons why, in their opinion, the overall elements of the BATTLE PRIME game software are noticeably distinct from the WORLD OF TANKS BLITZ software and invited Plaintiff's U.S. attorneys to contact them should they

have any intellectual property concerns about the BATTLE PRIME game. A true and correct copy of Defendants' July 19, 2019 letter to Plaintiff is attached hereto as **Exhibit G.**

68. On August 6, 2019, Plaintiff's U.S. attorneys replied, denying any allegations to the effect that Plaintiff acted unreasonably in defending its legal and intellectual property rights in Belarus or anywhere else and making it clear that Plaintiff's concerns are not limited to the potential claim for copyright infringement on the part of Defendants, but also to misappropriation of other intellectual property rights of Plaintiff, including Plaintiff's BLITZ Marks. With this letter, it was also made clear to Defendants' lawyers that Plaintiff did not authorize Defendants' use of BLITZ TEAM or BLITZ GAME or the use of the name of BLITZ, and Plaintiff demanded that Defendants cease use of the BLITZ mark. A true and correct copy of Plaintiff's August 6, 2019 letter to Defendants is attached hereto as **Exhibit H.**

69. On December 11, 2019, Defendants responded to Plaintiff's August 6, 2019 letter. Defendants denied Plaintiff's requests, and denied that Defendants have wrongfully solicited or induced former employees of Plaintiff to join Blitz Team.

70. Defendants have not ceased their unlawful activities and continue to infringe and otherwise violate Plaintiff's BLITZ Marks.

71. On December 11, 2019, Defendants proceeded with the launch and release of the final version of the BATTLE PRIME video game app in the United States and worldwide, which can be downloaded and played by consumers in the United States and worldwide on Android and iOS mobile devices.

72. Defendants' BATTLE PRIME game and related apps on Google Play and Apple App Store, as well as Defendants' own websites (www.battleprime.com and www.blitzteam.com), are directed to end users in the United States, and they all make use of the name BLITZ, either as part of Defendants' corporate name Blitz Team or as part of the trademarks BLITZ TEAM, BLITZ ENGINE, **BLITZ TEAM**,

and .  Attached hereto as **Exhibit I** are true and correct copies of screenshots and extracts from Google Play, the Apple App Store, Defendants' websites www.battleprime.com and www.blitzteam.com, and www.battleprime.com's "Terms of Use" "Privacy Policy," all showing Defendants' unauthorized use of the BLITZ mark and corporate name in the United States. Specifically, www.battleprime.com's Terms of Use states:

> **For United States residents**, these Terms of Use contain a binding arbitration clause in Section 8 and a class-action waiver that affects your rights about how to resolve disputes. **If you live in the United States**, please read it carefully. Except where you opt out, and except for certain types of disputes described in Section 8, you agree that any disputes arising between you and Blitz Team will be resolved by binding, individual arbitration and you waive your right to participate in any class-action lawsuit or class-wide arbitration.
> . . .
> 8.  Dispute Resolution and Governing Law
>
> If a dispute arises between you and BLITZ TEAM, we you shall first contact us directly to seek a resolution by going to our customer support site at https://blitzteam.helpshift.com/a/battle-prime/  You agree to exhaust all reasonable resolution efforts with the BLITZ TEAM before seeking dispute resolution elsewhere.  **If you are a resident of the United States of America**, these Terms of Use and any unresolved material dispute arising out of or related to it or Privacy Policy or the Service shall be governed in all respects by the laws of the state of New York, without regard to conflicts of law provisions.  You agree that any unresolved material claim or dispute that you may have against us must be resolved exclusively by a court located in Manhattan, New York.  If you are not a resident of the United States, you agree that all unresolved material disputes between you and us shall be governed by the laws of Belarus without regard to conflict of law provisions.  You agree that any unresolved material claim or dispute you may have against us may be resolved exclusively by a court located in Minsk, Belarus.

**If you are a United States resident or otherwise make any claim against us in the United States**, you expressly agree that any legal claim, dispute or other controversy between you and BLITZ TEAM arising out of or otherwise relating in any way to Services, including controversies relating to the applicability, enforceability or validity of any provision of these Terms of Use or our Privacy Policy (collectively "Disputes"), shall be resolved in confidential binding arbitration conducted before one commercial arbitrator from the American Arbitration Association ("AAA"), rather than in a court, as described herein.  The arbitration will be governed by the AAA's commercial arbitration rules and, if the arbitrator deems them applicable, the supplementary procedures for consumer related disputes (collectively "Rules and Procedures").  You acknowledge that you are voluntarily and knowingly forfeiting your right to a trial by jury and to otherwise proceed in a lawsuit in state or federal court.

(Emphasis added.)

73.   Defendants have also filed, through their International applications with the WIPO, the following applications to register the BLITZ TEAM Marks with the PTO:

| **Mark** | **Ser. No.**<br>**Filing Date** | **Class and Services** |
|---|---|---|
| BLITZ TEAM | 79/262,236<br><br>March 11, 2019<br><br>Priority Date based on International Application<br><br>Nov. 12, 2018 | Class 42:  Scientific and technological services and research and design relating thereto; industrial analysis and industrial research services; design and development of computer hardware and software; water analysis; computer system analysis; handwriting analysis [graphology]; chemical analysis; energy auditing; architectural services; recovery of computer data; interior design; industrial design; graphic arts design; oil-field surveys; geological surveys; engineering; computer virus protection services; installation of computer software; meteorological |

| Mark | Ser. No. Filing Date | Class and Services |
|------|----------------------|--------------------|
|      |                      | information; material testing; textile testing; bacteriological research; biological research; geological research; research in the field of environmental protection; cosmetic research; mechanical research; chemical research; research and development of new products for others; scientific research; analysis for oil-field exploitation; underwater exploration; technical research; calibration [measuring]; web site design consultancy; computer security consultancy; information technology [IT] consultancy; consultancy in the design and development of computer hardware; architectural consultancy; Internet security consultancy; computer software consultancy; data security consultancy; technological consultancy; oil-well testing; quality control; vehicle roadworthiness testing; land surveying; dress designing; updating of computer software; monitoring of computer systems to detect breakdowns; monitoring of computer systems for detecting unauthorized access or data breach; monitoring of computer systems by remote access; software as a service [SaaS]; maintenance of computer software; authenticating works of art; design of interior decor; quality evaluation of standing timber; quality evaluation of wool; digitization of documents [scanning]; conversion of data or documents from physical to electronic media; urban planning; providing information on computer technology and programming via a web site / providing information on computer technology and programming via a website; provision of scientific information, advice and consultancy in relation to carbon offsetting; providing search engines for the Internet; conversion of computer programs and data, |

| Mark | Ser. No.<br>Filing Date | Class and Services |
|---|---|---|
| | | other than physical conversion; conducting technical project studies; computer system design; rental of web servers; computer rental; rental of computer software; unlocking of mobile phones; geological prospecting; oil prospecting; hosting computer sites [web sites]; server hosting; construction drafting; cloud seeding; consultancy in the field of energy-saving; creating and designing website-based indexes of information for others [information technology services]; creating and maintaining web sites for others; computer programming; technical writing; duplication of computer programs; cloud computing; chemistry services; outsource service providers in the field of information technology; packaging design; off-site data backup; computer technology consultancy; telecommunications technology consultancy; scientific laboratory services; weather forecasting; styling [industrial design]; cartography services; data encryption services; research in the field of physics; electronic data storage; surveying; electronic monitoring of credit card activity to detect fraud via the Internet; electronic monitoring of personally identifying information to detect identity theft via the Internet |
| BLITZ TEAM | 79/261,988<br><br>March 11, 2019<br><br>Priority Date based on International Application | Class 42:  Scientific and technological services and research and design relating thereto; industrial analysis and industrial research services; design and development of computer hardware and software; water analysis; computer system analysis; handwriting analysis [graphology]; chemical analysis; energy auditing; architectural services; recovery of computer data; interior design; industrial |

| Mark | Ser. No. Filing Date | Class and Services |
|---|---|---|
| | Nov. 12, 2018 | design; graphic arts design; oil-field surveys; geological surveys; engineering; computer virus protection services; installation of computer software; meteorological information; material testing; textile testing; bacteriological research; biological research; geological research; research in the field of environmental protection; cosmetic research; mechanical research; chemical research; research and development of new products for others; scientific research; analysis for oil-field exploitation; underwater exploration; technical research; calibration [measuring]; web site design consultancy; computer security consultancy; information technology [IT] consultancy; consultancy in the design and development of computer hardware; architectural consultancy; Internet security consultancy; computer software consultancy; data security consultancy; technological consultancy; oil-well testing; quality control; vehicle roadworthiness testing; land surveying; dress designing; updating of computer software; monitoring of computer systems to detect breakdowns; monitoring of computer systems for detecting unauthorized access or data breach; monitoring of computer systems by remote access; software as a service [SaaS]; maintenance of computer software; authenticating works of art; design of interior decor; quality evaluation of standing timber; quality evaluation of wool; digitization of documents [scanning]; conversion of data or documents from physical to electronic media; urban planning; providing information on computer technology and programming via a web site / providing information on computer technology and programming via a website; |

| Mark | Ser. No.<br>Filing Date | Class and Services |
|------|------------------------|--------------------|
| | | provision of scientific information, advice and consultancy in relation to carbon offsetting; providing search engines for the Internet; conversion of computer programs and data, other than physical conversion; conducting technical project studies; computer system design; rental of web servers; computer rental; rental of computer software; unlocking of mobile phones; geological prospecting; oil prospecting; hosting computer sites [web sites]; server hosting; construction drafting; cloud seeding; consultancy in the field of energy-saving; creating and designing website-based indexes of information for others [information technology services]; creating and maintaining web sites for others; computer programming; technical writing; duplication of computer programs; cloud computing; chemistry services; outsource service providers in the field of information technology; packaging design; off-site data backup; computer technology consultancy; telecommunications technology consultancy; scientific laboratory services; weather forecasting; styling [industrial design]; cartography services; data encryption services; research in the field of physics; electronic data storage; surveying; electronic monitoring of credit card activity to detect fraud via the Internet; electronic monitoring of personally identifying information to detect identity theft via the Internet |
| BLITZ ENGINE | 79/263,707<br><br>March 11, 2019<br><br>Priority Date based on | Class 9:  Scientific, nautical, surveying, photographic, cinematographic, optical, weighing, measuring, signalling, checking (supervision), life-saving and teaching apparatus and instruments; apparatus and |

| Mark | Ser. No. Filing Date | Class and Services |
|---|---|---|
| | International Application Nov. 23, 2018 | instruments for conducting, switching, transforming, accumulating, regulating or controlling electricity; apparatus and instruments for recording, transmitting, reproducing sound or images; magnetic data media, sound recording discs; compact discs, DVDs and other digital recording media; mechanisms for coin-operated apparatus; cash registers, calculating devices, data processing equipment and computers; computer software; fire-extinguishing apparatus; 3D spectacles; DVD players; ticket dispensers; coin-operated musical automata (juke boxes); fire engines; answering machines; electrical adapters; batteries for electronic cigarettes; accumulators, electric; accumulators, electric, for vehicles; accelerometers; actinometers; alidades; altimeters; ammeters; anemometers; anodes; antennas; anticathodes; apertometers [optics]; high-frequency apparatus; testing apparatus not for medical purposes; electro-dynamic apparatus for the remote control of railway points; remote control apparatus; electro-dynamic apparatus for the remote control of signals; monitoring apparatus, other than for medical purposes; Global Positioning System [GPS] apparatus; distillation apparatus for scientific purposes; diffraction apparatus [microscopy]; air analysis apparatus; apparatus to check stamping mail; sound transmitting apparatus; apparatus for fermentation [laboratory apparatus]; breathing apparatus for underwater swimming; breathing apparatus, except for artificial respiration; apparatus and installations for the production of X-rays, not for medical purposes; cash registers; electric apparatus for commutation; intercommunication apparatus; stills for |

| Mark | Ser. No.<br>Filing Date | Class and Services |
|------|------|------|
| | | laboratory experiments; projection apparatus; radiological apparatus for industrial purposes; X-ray apparatus not for medical purposes; blueprint apparatus; flashing lights [luminous signals]; stereoscopic apparatus; telephone apparatus; facsimile machines; phototelegraphy apparatus; igniting apparatus, electric, for igniting at a distance; acid hydrometers; salinometers; acidimeters for batteries; aerometers; beacons, luminous; accumulator jars; barometers; anode batteries; galvanic batteries; batteries for lighting; solar batteries; solar panels for the production of electricity; batteries, electric; balances [steelyards]; betatrons; binoculars; biochips; electronic tags for goods; lens hoods; magnetic tape units for computers; computer memory devices; fire hose nozzles; encoded identification bracelets, magnetic; connected bracelets [measuring instruments]; safety tarpaulins; electronic key fobs being remote control apparatus; bullet-proof clothing; signalling buoys; life buoys; marking buoys; directional compasses; vacuum gauges; electrolysers; variometers; verniers; scales; baby scales; bathroom scales; letter scales; weighbridges; precision balances; scales with body mass analysers; levelling staffs [surveying instruments]; rods [surveying instruments]; camcorders; video baby monitors; video cassettes; video telephones; video screens; viewfinders, photographic; electric plugs; electric sockets; couplings, electric; micrometer screws for optical instruments; viscosimeters; circuit closers; wavemeters; voltmeters; mechanical signs; signs, luminous; switchboxes [electricity]; current rectifiers; gas testing instruments; gasometers [measuring instruments]; |

| Mark | Ser. No. Filing Date | Class and Services |
|------|----------------------|---------------------|
|      |                      | galvanometers; hands-free kits for telephones; heliographic apparatus; hygrometers; hydrometers; weights; peepholes [magnifying lenses] for doors; holograms; plotters; loudspeakers; sounding leads; plumb bobs; range finders; densimeters; densitometers; parts of optical goods; detectors; smoke detectors; infrared detectors; counterfeit [false] coin detectors; joysticks for use with computers, other than for video games; transparencies [photography]; slide projectors; diaphragms [photography]; dictating machines; dynamometers; light-emitting diodes [LED]; floppy disks; disks, magnetic; optical discs; circular slide rules; disk drives for computers; juke boxes for computers; DNA chips; electronic interactive whiteboards; electronic notice boards; bullet-proof waistcoats; life jackets; reflective safety vests; identification threads for electric wires; nose clips for divers and swimmers; locks, electric; bells [warning devices]; alarm bells, electric; electric door bells; signal bells; audio interfaces; acoustic conduits; mirrors for inspecting work; road signs, luminous or mechanical; marine depth finders; probes for scientific purposes; buzzers; needles for surveying compasses; needles for record players; measures; pressure measuring apparatus; simulators for the steering and control of vehicles; inverters [electricity]; pressure indicators; temperature indicators; incubators for bacteria culture; cosmographic instruments; mathematical instruments; levelling instruments; instruments containing eyepieces; surveying instruments; azimuth instruments; interfaces for computers; ionization apparatus not for the treatment of air or water; spark-guards; coaxial cables; fibre |

| Mark | Ser. No. Filing Date | Class and Services |
|---|---|---|
| | | optic cables; cables, electric; calipers; slide calipers; screw-tapping gauges; calorimeters; calculating machines; pocket calculators; decompression chambers; cinematographic cameras; thermal imaging cameras; mouth guards for sports; life-saving capsules for natural disasters; electronic pens [visual display units]; holders for electric coils; identity cards, magnetic; video game cartridges; toner cartridges, unfilled, for printers and photocopiers; memory cards for video game machines; encoded magnetic cards; riding helmets; protective helmets; carriers for dark plates [photography]; automated teller machines [ATM]; cathodes; spools [photography]; choking coils [impedance]; coils, electric; electromagnetic coils; cinematographic film, exposed; computer keyboards; solenoid valves [electromagnetic switches]; wire connectors [electricity]; encoded key cards; electronic book readers; electronic agendas; push buttons for bells; magnetic encoders; anti-dazzle shades; collectors, electric; calibrating rings; smart rings; protective suits for aviators; commutators; compact discs [audio-video]; compact discs [read-only memory]; comparators; marine compasses; laptop computers; tablet computers; notebook computers; condensers [capacitors]; contacts, electric; wind socks for indicating wind direction; traffic cones; branch boxes [electricity]; distribution boxes [electricity]; junction boxes [electricity]; connectors [electricity]; accumulator boxes; cabinets for loudspeakers; diving suits; galena crystals [detectors]; reflecting discs for wear, for the prevention of traffic accidents; covers for |

| Mark | Ser. No. Filing Date | Class and Services |
|------|----------------------|--------------------|
|      |                      | electric outlets; logs [measuring instruments]; lasers, not for medical purposes; lactodensimeters; lactometers; vacuum tubes [radio]; darkroom lamps [photography]; thermionic tubes; amplifying tubes; flashlights [photography]; head cleaning tapes [recording]; magnetic tapes; videotapes; surveying chains; fire escapes; rulers [measuring instruments]; square rulers for measuring; slide-rules; contact lenses; correcting lenses [optics]; close-up lenses; optical lenses; optical condensers; sounding lines; electricity conduits; measuring spoons; magnifying glasses [optics]; thread counters; magnets; decorative magnets; crash test dummies; resuscitation mannequins [teaching apparatus]; mouse [computer peripheral]; manometers; security tokens [encryption devices]; divers' masks; solderers' helmets; protective masks; respiratory masks, other than for artificial respiration; materials for electricity mains [wires, cables]; voting machines; money counting and sorting machines; material testing instruments and machines; furniture especially made for laboratories; megaphones; portable media players; diaphragms [acoustics]; diaphragms for scientific apparatus; metal detectors for industrial or military purposes; digital weather stations; metronomes; rules [measuring instruments]; carpenters' rules; dressmakers' measures; mechanisms for coin-operated apparatus; mechanisms for counter-operated apparatus; coin-operated mechanisms for television sets; shutter releases [photography]; micrometers; microprocessors; microscopes; microtomes; microphones; audio mixers; modems; lightning rods; monitors [computer hardware]; monitors [computer programs]; |

| Mark | Ser. No. Filing Date | Class and Services |
|------|----------------------|--------------------|
| | | selfie sticks [hand-held monopods]; terminals [electricity]; junction sleeves for electric cables; teeth protectors; temperature indicator labels, not for medical purposes; knee-pads for workers; headphones; surveyors' levels; sound recording carriers; optical data media; electronic sheet music, downloadable; computer software, recorded; sheaths for electric cables; identification sheaths for electric wires; weighing machines; computer hardware; punched card machines for offices; lifesaving apparatus and equipment; shoes for protection against accidents, irradiation and fire; objectives [lenses] [optics]; lenses for astrophotography; egg-candlers; fire extinguishers; electrified fences; limiters [electricity]; clothing for protection against accidents, irradiation and fire; asbestos clothing for protection against fire; clothing especially made for laboratories; ozonisers [ozonators]; octants; eyepieces; ohmmeters; wrist rests for use with computers; eyeglass frames; frames for pince-nez; oscillographs; plumb lines; mirrors [optics]; eyeglasses; sunglasses; googles for sports; electronic collars to train animals; signalling panels, luminous or mechanical; radio pagers; pince-nez; electronic pocket translators; transmitters [telecommunication]; telephone transmitters; transmitters of electronic signals; switches, electric; periscopes; gloves for divers; gloves for protection against accidents; gloves for protection against X-rays for industrial purposes; asbestos gloves for protection against accidents; ovens for laboratory use; droppers for measuring, other than for medical or household purposes; pyrometers; planimeters; plane tables [surveying instruments]; plates for |

| Mark | Ser. No. Filing Date | Class and Services |
|------|----------------------|--------------------|
|      |                      | batteries; wafers for integrated circuits; printed circuit boards; compact disc players; cassette players; protective films adapted for computer screens; protective films adapted for smartphones; sound recording strips; X-ray films, exposed; films, exposed; life-saving rafts; laboratory trays; digital signs; semi-conductors; polarimeters; fire pumps; graduated glassware; life belts; fuses; circuit breakers; converters, electric; telerupters; food analysis apparatus; diagnostic apparatus, not for medical purposes; distance recording apparatus; distance measuring apparatus; speed measuring apparatus [photography]; apparatus for measuring the thickness of leather; apparatus for measuring the thickness of skins; speed checking apparatus for vehicles; time recording apparatus; apparatus and instruments for astronomy; navigational instruments; apparatus and instruments for physics; chemistry apparatus and instruments; measuring devices, electric; boiler control instruments; meteorological instruments; naval signalling apparatus; observation instruments; navigation apparatus for vehicles [on-board computers]; satellite navigational apparatus; regulating apparatus, electric; precision measuring apparatus; audio- and video-receivers; prisms [optics]; computer software applications, downloadable; printers for use with computers; hemline markers; retorts' stands; apparatus for changing record player needles; drainers for use in photography; cleaning apparatus for sound recording discs; fire beaters; sighting telescopes for firearms; test tubes; pressure indicator plugs for valves; magnetic wires; telegraph wires; telephone wires; wires, electric; conductors, electric; |

| Mark | Ser. No. Filing Date | Class and Services |
|------|----------------------|--------------------|
|      |                      | copper wire, insulated; fuse wire; computer programs, recorded; computer game software; computer programs, downloadable; computer operating programs, recorded; record players; processors [central processing units]; rods for water diviners; electronic publications, downloadable; distribution consoles [electricity]; control panels [electricity]; radar apparatus; baby monitors; masts for wireless aerials; transmitting sets [telecommunication]; radios; vehicle radios; sprinkler systems for fire protection; frames for photographic transparencies; screens for photoengraving; flowmeters; walkie-talkies; voltage surge protectors; voltage regulators for vehicles; stage lighting regulators; light dimmers [regulators], electric; speed regulators for record players; reducers [electricity]; washing trays [photography]; marking gauges [joinery]; T-squares for measuring; time switches, automatic; relays, electric; safety restraints, other than for vehicle seats and sports equipment; X-ray photographs, other than for medical purposes; rheostats; respirators for filtering air; retorts; refractometers; refractors; grids for batteries; humanoid robots with artificial intelligence; speaking tubes; horns for loudspeakers; subwoofers; saccharometers; optical fibers [fibres] [light conducting filaments]; traffic-light apparatus [signalling devices]; dog whistles; signalling whistles; sextants; inductors [electricity]; safety nets; nets for protection against accidents; fire alarms; signals, luminous or mechanical; sirens; electronic access control systems for interlocking doors; scanners [data processing equipment]; integrated circuit cards [smart cards]; smartglasses; smartphones; |

| Mark | Ser. No. Filing Date | Class and Services |
|------|----------------------|--------------------|
|      |                      | smartwatches; connections for electric lines; couplings, electric; sonars; sound locating instruments; lighting ballasts; resistances, electric; spectrograph apparatus; spectroscopes; speed indicators; alcoholmeters; satellites for scientific purposes; protection devices for personal use against accidents; audiovisual teaching apparatus; radiotelegraphy sets; charging stations for electric vehicles; radiotelephony sets; spectacle lenses; anti-glare glasses; optical glass; personal stereos; stereoscopes; stands for photographic apparatus; stroboscopes; fire boats; sulfitometers; bags adapted for laptops; drying racks [photography]; spherometers; integrated circuits; printed circuits; counters; parking meters; kilometer recorders for vehicles; revolution counters; abacuses; egg timers [sandglasses]; taximeters; ear plugs for divers; tachometers; television apparatus; telegraphs [apparatus]; telescopes; teleprompters; teleprinters; mobile telephones; cordless telephones; theodolites; interactive touch screen terminals; thermo-hygrometers; thermometers, not for medical purposes; thermostats; thermostats for vehicles; crucibles [laboratory]; tone arms for record players; totalizators; transistors [electronic]; transponders; protractors [measuring instruments]; transformers [electricity]; step-up transformers; vehicle breakdown warning triangles; triodes; starter cables for motors; discharge tubes, electric, other than for lighting; capillary tubes; neon signs; Pitot tubes; X-ray tubes not for medical purposes; telephone receivers; squares for measuring; gauges; quantity indicators; automatic indicators of low pressure in vehicle tires |

| Mark | Ser. No. Filing Date | Class and Services |
|------|----------------------|--------------------|
|      |                      | [tyres]; gasoline gauges; water level indicators; electric loss indicators; light-emitting electronic pointers; slope indicators; levels [instruments for determining the horizontal]; mercury levels; spirit levels; urinometers; amplifiers; particle accelerators; electric installations for the remote control of industrial operations; balancing apparatus; video recorders; invoicing machines; tape recorders; protection devices against X-rays, not for medical purposes; railway traffic safety appliances; data processing apparatus; oxygen transvasing apparatus; theft prevention installations, electric; film cutting apparatus; drying apparatus for photographic prints; optical character readers; centering apparatus for photographic transparencies; dosage dispensers; battery chargers; chargers for electric batteries; chargers for electronic cigarettes; sound alarms; sounding apparatus and machines; apparatus for editing cinematographic film; cathodic anti-corrosion apparatus; couplers [data processing equipment]; wearable activity trackers; anti-theft warning apparatus; computer peripheral devices; anti-interference devices [electricity]; demagnetizing apparatus for magnetic tapes; acoustic couplers; alarms; fog signals, non-explosive; whistle alarms; adding machines; readers [data processing equipment]; heat regulating apparatus; photocopiers [photographic, electrostatic, thermic]; electric and electronic effects units for musical instruments; bar code readers; downloadable ring tones for mobile phones; downloadable image files; downloadable music files; animated cartoons; filters for use in photography; filters for respiratory masks; |

| Mark | Ser. No. Filing Date | Class and Services |
|------|----------------------|--------------------|
| | | filters for ultraviolet rays, for photography; USB flash drives; magic lanterns; optical lamps; signal lanterns; cameras [photography]; glazing apparatus for photographic prints; shutters [photography]; darkrooms [photography]; photometers; flash-bulbs [photography]; digital photo frames; enlarging apparatus [photography]; photovoltaic cells; containers for contact lenses; eyeglass cases; cases for smartphones; containers for microscope slides; cases especially made for photographic apparatus and instruments; chromatography apparatus for laboratory use; chronographs [time recording apparatus]; laboratory centrifuges; eyeglass chains; cyclotrons; compasses for measuring; frequency meters; time clocks [time recording devices]; petri dishes; sleeves for laptops; covers for personal digital assistants [PDAs]; covers for tablet computers; covers for smartphones; fire blankets; chips [integrated circuits]; jigs [measuring instruments]; pedometers; meteorological balloons; electrified rails for mounting spot lights; asbestos screens for firemen; fire hose; virtual reality headsets; protective helmets for sports; head guards for sports; cell phone straps; eyeglass cords; tripods for cameras; switchboards; distribution boards [electricity]; equalizers [audio apparatus]; screens [photography]; workmen's protective face-shields; projection screens; radiology screens for industrial purposes; fluorescent screens; exposure meters [light meters]; ducts [electricity]; galvanic cells; epidiascopes; ergometers; armatures [electricity]; black boxes [data recorders] |

74.     Defendants' use of, and applications to register, the BLITZ TEAM Marks are likely to cause consumers to mistakenly and erroneously believe that Defendants, their marks, and/or the goods and services offered thereunder have their source or origin with Plaintiff, are affiliated or connected with Plaintiff, or are endorsed or approved or licensed by Plaintiff.

**DEFENDANTS' INFRINGEMENT OF PLAINTIFF'S SOURCE CODE**

75.     Beginning no later than 2017, the DAVA Individuals began developing a new game engine – incorporating, among other things, NVIDIA's Gameworks PhysX Code, which has robust support for 3D-human characters – and a new server, neither of which were necessary for the development or operation of WORLD OF TANKS BLITZ.

76.     In September 2017, once those two technologies were sufficiently developed, the DAVA Individuals began writing the game code for a new shooter game that would feature animated, 3D-human characters.  Work on the game code for a new shooter game is memorialized in Jira tickets that were created on September 13, 2017, which included comments from the DAVA Individuals:  (a) indicating that they wanted to make a game akin to *Battlefield*, a popular first-person shooter game franchise; and (b) suggesting that they build the prototype directly in "NetworkTestGame."  NetworkTestGame refers to a set of source code in the new server branch of the source code repository, which is used for a 3D multiplayer shooter game.

77.     The DAVA Individuals expended significant effort and manpower developing NetworkTestGame.  On information and belief, a team of at least 20 individuals developed the code for the new engine over nearly a year, creating or modifying more than 250,000 lines of code.  Also, on information and belief, at least 14 individuals contributed source code to the code for the new server and the NetworkTestGame, creating or modifying 182,723 lines of code.

78.     On information and belief, many of the individual developers that worked on NetworkTestGame joined Blitz Team.

79.     *Battle Prime* uses the same NVIDIA PhysX libraries that the DAVA Individuals and their team spent months learning to use at Plaintiff's expense.

80.     Before the DAVA Individuals left Plaintiff, they uploaded the source code for NetworkTestGame to GitHub, a public repository for code and software development, and therefore had access to this source code after their departure. There was no legitimate business reason benefiting Plaintiff to upload the source code for NetworkTestGame to GitHub.

81.     Blitz Team released BATTLE PRIME a mere eighteen months after the termination of the DAVA Individuals.

82.     NetworkTestGame and BATTLE PRIME share numerous areas of similarity in overall game design, graphics, user interface, and environment, all of which is determined, of course, by the code underlying the games.  The below graphic depicts and summarizes just a few of these similarities:



**FIRST CAUSE OF ACTION**

**Trademark Infringement – Against all Defendants**

**(15 U.S.C. §§ 1114)**

83.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 82, above, as though fully set forth herein.

84.    Defendants have used in commerce, without Plaintiff's permission or authorization, Plaintiff's BLITZ Marks or marks confusingly similar thereto – specifically, the BLITZ TEAM Marks and the Blitz Team trade name – in a manner that is likely to cause confusion with respect to the source and origin of Defendants' goods and services and is likely to cause confusion or mistake and to deceive purchasers as to the source or origin of Defendants, their businesses, and/or their goods and services or as to Plaintiff's affiliation, connection, or association with, or approval or sponsorship of, Defendants, their businesses, and/or their goods and services.

85.    Defendants' acts constitute infringement of Plaintiff's BLITZ Marks in violation of 15 U.S.C. § 1114.

86.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff has suffered and continues to suffer and/or is likely to suffer damage to its trademarks, business reputation, and goodwill.  Defendants will continue to use, unless restrained, Plaintiff's BLITZ Marks or marks confusingly similar thereto, and will cause irreparable damage to Plaintiff.  Plaintiff has no adequate remedy at law and is entitled to an injunction restraining Defendants and, as applicable, their officers, members, agents, servants, and employees, and all persons acting in concert with them, from engaging in further acts of infringement.

87.    Plaintiff is further entitled to recover from Defendants the actual damages that Plaintiff has sustained, is sustaining, and/or is likely to sustain as a result of Defendants' wrongful acts.

88.    Plaintiff is further entitled to recover from Defendants the gains,

1    profits, and advantages that Defendants have obtained as a result of their wrongful

2    acts.

3         89.    Because of the willful nature of Defendants' wrongful acts, Plaintiff is

4    entitled to an award of treble damages and increased profits under 15 U.S.C. §

5    1117.

6         90.    Pursuant to 15 U.S.C. § 1117, Plaintiff is also entitled to recover its

7    costs of suit, and its attorneys' fees because this is an exceptional case.

8                         **SECOND CAUSE OF ACTION**

9        **False Designation of Origin and Association – Against all Defendants**

10                              **(15 U.S.C. § 1125(a))**

11        91.    Plaintiff repeats and realleges each and every allegation of paragraphs

12   1 through 90, above, as though fully set forth herein.

13        92.    Defendants' unauthorized use of Plaintiff's BLITZ Marks or marks

14   confusingly similar thereto – specifically, the BLITZ TEAM Marks and the Blitz

15   Team trade name – in conjunction with Defendants' businesses and their offering of

16   goods and services in the video game industry, Defendants' false designation of

17   origin, and Defendants' false and misleading descriptions and representations of

18   fact, as alleged herein, are likely to cause confusion, or to cause mistake, or to

19   deceive as to the source or origin of Defendants' products, services, or commercial

20   activities or as to Plaintiff's affiliation, connection, or association with, or

21   sponsorship or approval of, Defendant, Defendants' products, services, or

22   commercial activities in violation of 15 U.S.C. § 1125(a).

23        93.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff

24   has suffered and continues to suffer and/or is likely to suffer damage to its

25   trademarks, business reputation, and goodwill.  Defendants will continue, unless

26   restrained, to conduct their business and offer goods and services using Plaintiff's

27   BLITZ Marks or other trademarks confusingly similar thereto and will cause

28   irreparable damage to Plaintiff.  Plaintiff has no adequate remedy at law and is

entitled to an injunction restraining Defendants and, as applicable, their officers, members, agents, servants, and employees, and all persons acting in concert with them, from engaging in further acts of false designation of origin or association.

94.   Plaintiff is further entitled to recover from Defendants the actual damages that Plaintiff has sustained, is sustaining, and/or is likely to sustain as a result of Defendants' wrongful acts.  Plaintiff is presently unable to ascertain the full extent of the monetary damages that it has suffered and/or is likely to sustain by reason of Defendants' acts of false designation of origin or affiliation.

95.   Plaintiff is further entitled to recover from Defendants the gains, profits, and advantages that Defendants have obtained as a result of their wrongful acts.  Plaintiff is presently unable to ascertain the extent of the gains, profits, and advantages that Defendants have realized by reason of their acts of false designation of origin or affiliation.

96.   Because of the willful nature of Defendants' wrongful acts, Plaintiff is entitled to an award of treble damages and increased profits pursuant to 15 U.S.C. § 1117.

97.   Pursuant to 15 U.S.C. §1117, Plaintiff is also entitled to recover its costs of suit, and its attorneys' fees because this is an exceptional case.

## THIRD CAUSE OF ACTION

### Trademark Infringement – Common Law – Against all Defendants

98.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 97, above, as though fully set forth herein.

99.   Defendants have used in commerce, without Plaintiff's permission or authorization, Plaintiff's BLITZ Marks or marks confusingly similar thereto – specifically, the BLITZ TEAM Marks and the Blitz Team trade name – in a manner that is likely to cause confusion with respect to the source and origin of Defendants' goods and services and is likely to cause confusion or mistake and to deceive purchasers as to Plaintiff's affiliation, connection, or association with, or approval

1    or sponsorship of, Defendants, their businesses, and/or their goods or services.

2         100.   Defendants' acts constitute infringement of Plaintiff's BLITZ Marks in

3    violation of the common law.

4         101.   As a direct and proximate result of Defendants' wrongful acts, Plaintiff

5    has suffered and continues to suffer and/or is likely to suffer damage to its

6    trademarks, business reputation, and goodwill.  Defendants will continue to use,

7    unless restrained, Plaintiff's BLITZ Marks or marks confusingly similar thereto,

8    and will cause irreparable damage to Plaintiff.  Plaintiff has no adequate remedy at

9    law and is entitled to an injunction restraining Defendants and, as applicable, their

10   officers, members, agents, servants, and employees, and all persons acting in

11   concert with them, from engaging in further acts of infringement.

12        102.   Plaintiff is further entitled to recover from Defendants the actual

13   damages that Plaintiff has sustained, is sustaining, and/or is likely to sustain as a

14   result of Defendants' wrongful acts.

15        103.   Plaintiff is further entitled to recover from Defendants the gains,

16   profits, and advantages that Defendants have obtained as a result of their wrongful

17   acts.

18        104.   Because of the willful nature of Defendants' wrongful acts, Plaintiff is

19   entitled to an award of punitive damages.

20                         **FOURTH CAUSE OF ACTION**

21              **Unfair Competition – Against all Defendants**

22             **(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

23        105.    Plaintiff repeats and realleges each and every allegation of paragraphs

24   1 through 104, above, as though fully set forth herein.

25        106.   By reason of the foregoing, Defendants have been, and are, engaged in

26   "unlawful, unfair or fraudulent business practices" in violation of §§ 17200 *et seq.*

27   of the California Bus. & Prof. Code.

28        107.   Defendants' acts complained of herein have injured and will continue

to injure Plaintiff irreparably.  Plaintiff has no adequate remedy at law for these wrongs and injuries.  The injury to Plaintiff includes harm to Plaintiff's BLITZ Marks, goodwill, and reputation in the marketplace that money cannot compensate. Plaintiff is therefore entitled to:  (a) injunctive relief restraining and enjoining Defendants and, as applicable, their officers, members, agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using Plaintiff's BLITZ Marks or any mark, name, symbol, or logo which is confusingly similar thereto, in connection with the marketing or sale of any services by Defendants; and (b) restitution of Defendants' profits earned from their unauthorized use of Plaintiff's BLITZ Marks or any mark, name, symbol, or logo which is confusingly similar thereto, in which profits Plaintiff has a vested interest.

## FIFTH CAUSE OF ACTION

### Unfair Competition – Common Law – Against Defendants

108.  Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 107, above, as though fully set forth herein.

109.  Plaintiff invested substantial time and money in its development of Plaintiff's BLITZ Marks.

110.  Defendants used Plaintiff's BLITZ Marks or marks confusingly similar thereto – specifically, the BLITZ TEAM Marks and the Blitz Team trade name – to build its business and/or pass off its business as that of Plaintiff's without Plaintiff's authorization.

111.  Likewise, Defendants passed off its goods and services offered under Plaintiff's BLITZ Marks or marks confusingly similar thereto – specifically, the BLITZ TEAM Marks and the Blitz Team trade name – in a manner likely to cause confusion as to the source of Defendants' goods or services or as to Plaintiff's association or affiliation with, or sponsorship of, Defendants' goods and services.

112.  As a direct and proximate result of Defendants' wrongful acts, Plaintiff has suffered and continues to suffer and/or is likely to suffer damage to its

trademarks, trade name, business reputation, and goodwill.  Defendants will continue, unless restrained, to pass off its business as that of Plaintiff's and to conduct their business and offer goods and services using Plaintiff's BLITZ Marks or other trademarks confusingly similar thereto and will cause irreparable damage to Plaintiff.   Plaintiff has no adequate remedy at law and is entitled to an injunction restraining Defendants and, as applicable, their officers, members, agents, servants, and employees, and all persons acting in concert with them, from engaging in further acts of unfair competition.

113.   Plaintiff is further entitled to recover from Defendants the actual damages that Plaintiff has sustained, is sustaining, and/or is likely to sustain as a result of Defendants' wrongful acts.  Plaintiff is presently unable to ascertain the full extent of the monetary damages that it has suffered and/or is likely to sustain by reason of Defendants' acts of unfair competition.

114.   Plaintiff is further entitled to recover from Defendants the gains, profits, and advantages that Defendants have obtained as a result of their wrongful acts.  Plaintiff is presently unable to ascertain the extent of the gains, profits, and advantages that Defendants have realized by reason of their acts of unfair competition.

115.   Because of the willful nature of Defendants' wrongful acts, Plaintiff is entitled to an award of punitive damages.

## **SIXTH CAUSE OF ACTION**

### **Cancellation of Trademark Applications – Against all Defendants**
### **(15 U.S.C. § 1119)**

116.   Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 115, above, as though fully set forth herein.

117.   Defendant's applications to register BLITZ TEAM (Ser. No. 79/262,236), BLITZ TEAM (Ser. No. 79/261,988), and BLITZ ENGINE (Ser. No. 79/263,707) so resemble Plaintiff's BLITZ Marks as to be likely, when used on or

1   in connection with the services identified in the applications, to cause confusion,

2   cause mistake, or deceive, in violation of 15 U.S.C. § 1052(d).  Defendants'

3   applications are also subject to cancellation ,in whole or in part, because

4   Defendants lacked the requisite bona fide intent to use each BLITZ TEAM Mark

5   for all or some of the identified goods and services stated in the applications as of

6   the filing date of the applications.

7       118.   Defendants' applications to register each of the BLITZ TEAM Marks

8   should be canceled pursuant to 15 U.S.C. §1119.

9                    **SEVENTH CAUSE OF ACTION**

10        **Copyright Infringement – Against all Defendants**

11      119.   Plaintiff repeats and realleges each and every allegation of paragraphs

12   1 through 118, above, as though fully set forth herein.

13      120.   Plaintiff is the owner of the copyright in the source code for

14   NetworkTestGame, which is the subject of a valid copyright registration with the

15   U.S. Copyright Office, as reflected below:

| Title | Reg. Date | Reg./App. No. | Status |
|-------|-----------|---------------|--------|
| Network Test Game Release for Dava Framework. | June 30, 2020 | TX0008881797 | Registered |

19      121.   The source code for NetworkTestGame is an original work of

20   authorship owned by Plaintiff, is copyrightable subject matter under the laws of the

21   United States, and was sufficiently fixed in a tangible medium.

22      122.   Defendants had access to the source code for NetworkTestGame.  The

23   source code was developed by former employees of Plaintiff who are now

24   employed by Defendants.  These individuals saved this source code to GitHub so

25   they could access and use it after they left Plaintiff's employ.

26      123.   Defendants' BATTLE PRIME game unlawfully copies and

27   reproduces, and is a derivative work based upon, the source code for

28

1    NetworkTestGame.

2         124.  Upon information and belief, Defendants were at all material times

3    aware that their use of the source code, in the absence of a valid license or other

4    agreement authorizing Defendants to use it and/or to edit, alter, and/or otherwise

5    modify it, or prepare derivative works based upon it, without Plaintiff's prior

6    written approval, would constitute copyright infringement.  Plaintiff has not granted

7    to Defendants any such right or license.

8         125.  Defendants' acts constitute infringement and counterfeiting of

9    Plaintiff's copyright described above in violation of 17 U.S.C. § 501.

10        126.  Plaintiff is informed and believes and on that basis alleges that

11   Defendants had full knowledge that their acts are wrongful and unlawful and have

12   continued to infringe said copyrights, throughout the United States and various

13   other territories of the world.

14        127.  By reason of the foregoing, Plaintiff has suffered damages in an

15   amount to be determined at trial, and is entitled to all damages suffered by Plaintiff,

16   along with all gains, profits and advantages derived by Defendants from the acts of

17   infringement.

18                              **PRAYER FOR RELIEF**

19        WHEREFORE, Plaintiff prays that this Court enter judgment against

20   Defendants as follows:

21        1.    Finding that Defendants have:  infringed Plaintiff's BLITZ Marks

22   under 15 U.S.C. § 1114 and the common law; violated 15 U.S.C. § 1125(a);

23   violated Cal. Bus. & Prof. Code § 17200 by engaging in unlawful, unfair, and

24   fraudulent business practices; committed unfair competition under the common

25   law; and infringed Plaintiff's copyrighted source code under 17 U.S.C. § 501;

26        2.    Ordering the cancellation of Blitz Team's applications to register

27   BLITZ TEAM (Ser. No. 79/262236), BLITZ TEAM (Ser. No. 79/261,988) and

28   BLITZ ENGINE (Ser. No. 79/263,707;

3.   Ordering that Defendants and, as applicable, their officers, agents, servants, directors, employees, servants, partners, representatives, assigns, successors, related companies, and attorneys and all persons in active concert or participation with Defendants or with any of the foregoing be enjoined preliminarily during the pendency of this action and permanently thereafter from:

a.   Manufacturing, transporting, promoting, importing, advertising, publicizing, distributing, offering for sale, or selling any goods or services offered under the BLITZ TEAM Marks, Plaintiff's BLITZ Marks, or any other mark, name, symbol, or logo, which is likely to cause confusion or to cause mistake or to deceive persons into the erroneous belief that any goods or services that Defendants caused to enter the stream of commerce or any of Defendants' commercial activities are sponsored or licensed by Plaintiff, are authorized by Plaintiff, or are connected or affiliated in some way with Plaintiff, Plaintiff's BLITZ Marks, or the goodwill associated therewith;

b.   Manufacturing, transporting, promoting, importing, advertising, publicizing, distributing, offering for sale, or selling any goods or services offered under the BLITZ TEAM Marks, Plaintiff's BLITZ Marks, or any other mark, name, symbol, or logo that is a copy or colorable imitation of, incorporates, or is confusingly similar to Plaintiff's BLITZ Marks;

c.   Implying Plaintiff's approval, endorsement, license, or sponsorship of, or affiliation or connection with, Defendants' goods, services, or commercial activities, passing off Defendants' business as that of Plaintiff, or engaging in any act or series of acts which, either alone or in combination, constitutes unfair methods of competition with Plaintiff and from otherwise interfering with or injuring Plaintiff's BLITZ Marks or the goodwill associated therewith;

d.   Representing or implying that Defendants are in any way sponsored by, affiliated with, or licensed by Plaintiff;

e.      Using "Blitz Team LLC," Plaintiff's BLITZ Marks, or any other mark, name, symbol, or logo that is a copy or colorable imitation of, incorporates, or is confusingly similar to Plaintiff's BLITZ Marks, as a trade name.

f.      Copying or creating derivative works based on Plaintiff's source code or any other copyrightable subject matter related to NetworkTestGame, or any works substantially similar thereto, or engaging in any act in violation of Plaintiff's copyrights, including, but not limited to, inducing, causing, or materially contributing to the infringing conduct of any third party copying or creating derivative works based on Plaintiff's source code or any other copyrightable subject matter related to NetworkTestGame, or any works substantially similar thereto;

g.      Knowingly assisting, inducing, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in paragraphs 3(a) to (f) above.

4.      Ordering that Plaintiff is the exclusive owner of Plaintiff's BLITZ Marks and that such marks are valid and protectable;

5.      Ordering that Plaintiff is the exclusive owner of the copyright in the source code for NetworkTestGame and that such copyright is valid and protectable;

6.      Ordering that Defendants be required to deliver to Plaintiff for destruction any and all digital files, packaging, printed graphics, promotional materials, business cards, signs, labels, advertisements, flyers, circulars, and any other items in any of their possession, custody, or control bearing the BLITZ TEAM Marks, the trade name Blitz Team, Plaintiff's BLITZ Marks, or any other mark, name, symbol, or logo that is a copy or colorable imitation of, incorporates, or is confusingly similar to Plaintiff's BLITZ Marks;

7.      Ordering that Defendants be required to permanently delete any works of authorship, including source code, in their possession, custody, or control copying or derived from the source code for NetworkTestGame;

8.      Ordering the transfer of the domain name <www.blitzteam.com>, and

1   any other domain names confusingly similar to Plaintiff's BLITZ Marks, to
2   Plaintiff;

3       9.     Granting an award of damages suffered by Plaintiff according to proof
4   at the time of trial;

5       10.    Ordering that Defendants account to Plaintiff for any and all profits
6   earned as a result of Defendants' acts in violation of Plaintiff's rights under the
7   Lanham Act, the Copyright Act, and the common law;

8       11.    Granting an award of three times the amount of compensatory
9   damages and increased profits pursuant to 15 U.S.C. § 1117;

10      12.    Ordering restitution of Defendants' profits earned from their
11  unauthorized use of Plaintiff's BLITZ Marks or any mark, name, symbol, or logo
12  which is confusingly similar thereto, in which profits Plaintiff has a vested interest,
13  pursuant to Cal. Bus. & Prof. Code § 17200, *et seq.*;

14      13.    Granting an award of punitive damages for the willful and wanton
15  nature of Defendants' aforesaid acts under the common law;

16      14.    For pre-judgment interest on any recovery by Plaintiff;

17      15.    Granting an award of Plaintiff's costs, expenses, and reasonable
18  attorneys' fees; and

19      16.    Granting such other and further relief as is just and proper.

20                  Respectfully submitted,

21                  SHEPPARD MULLIN RICHTER & HAMPTON LLP

22

23  Dated:  August 20, 2020       By: /s/Jill M. Pietrini
24                     Jill M. Pietrini
                       Paul A. Bost
25                     Attorneys for Plaintiff
                       WARGAMING.NET LIMITED

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable by jury.

Respectfully submitted,

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Dated:  August 20, 2020

By: /s/Jill M. Pietrini

Jill M. Pietrini
Chris Ponder
Paul A. Bost
Attorneys for Plaintiff
WARGAMING.NET LIMITED

SMRH:4844-1703-0344.1

# EXHIBIT A

**Screen Shots from Wargaming.com**





## Screen Shots from NA.Wargaming.net





## Screen Shot from NA.Wargaming.net/shop/



# EXHIBIT B



J████ N'███
April 22, 2016 · 🏢

Shout out to Blitz Team for their manifesto. Two years old+ and counting....
----------------
As I promised:
Corporate manifesto of Mobile Development.... See More

👍 /████████, ████████ and 9 others

| 👍 Like | 💬 Comment | ↪ Share |



C████ D████████ shared a link.
July 14, 2016

US-based developers for now, but maybe Apple will expand this globally if its a hit and we can get the Blitz Team on it!

PLANETOFTHEAPPS.COM
**Planet of the Apps**
A groundbreaking new television series about apps and their creators.

V▮▮▮▮▮▮▮ Gl▮▮▮▮▮▮▮ to **Wargaming News**

March 11, 2016 · 🖼

Hi guys.

Yesterday WoT Blitz Team launched a Video Ads feature: a player can get gold for watching an ad video.

🖉 M▮▮▮▮▮▮▮▮ from **Monetization & Payment Solutions** developed interaction between mobile clients and Payment System plus reward mechanism to send gold to user accounts.

Nice job ▮▮▮▮!

The feature is in a pilot mode as far as I know. Only for NA cluster but judging by number of rewards it is very popular 😊





**C‌‌ D‌‌**
June 24, 2016

To everyone on the Blitz team. Wherever you are, whatever you do, I would like to take the time to say THANK YOU! I am proud of what you have accomplished these past 2 years. Most of us will never meet due to the global nature of our organization but we are all connected in the love we pour into this game. Blitz is both a joy to work on and to play and I am excited about whats coming for the rest of the year. Looking forward to Year 3!!!

Спасибо
ありがとうございました
Je vous remercie... See More

👍 ‌‌, ‌‌ and 11 others                    Seen by 559



**J‌‌ M‌‌** to **Wargaming News**
November 4, 2016 ·

Blitz Win 32 F&F winners

#news_WG
The Blitz Win32 F&F test is coming to an end, and we'd like to congratulate the most active participants. The Blitz team chose 12 people who played the most battles. They will receive Steam certificates in appreciation of their help on the project. Here they are:

Congratulati...
See More
See Translation



Keith Kawahata to **Wargaming News**
November 11, 2016 · 😊                                    ···

Hi Wargamers,

Mobile is a hot topic for the gaming industry, and a burning one for
Wargaming. We realize that we have skills, will and people to make a leap
in this direction, so we are starting to act.

efforts and tactics we have decided to form Mobile department that will
be built to include Blitz, our (mobile) investments and new mobile
product development.

----

**Q: What Mobile initiatives do we currently have at WG?**

A: We have Blitz, our (mobile) investments and new mobile product

----

**Q: How are these initiatives connected to each other, or do they each
have their own strategies?**

----

**Q: How are these initiatives connected to each other, or do they each have their own strategies?**

----

**Q: Why are we changing our mobile structure?**

A: You'll notice in the above answer that the structure we've had until now remains very similar going forward in that we will have various teams with various levels of independence and focus, all highly flexible.  The Blitz team will continue to be the Blitz team, etc.  The key difference is that we all now connect within a single department.  This will allow us to do a large number of things differently, like identify and eliminate cross - departmental roadblocks, create investment in central technology used across multiple studios, coordinate product strategies among teams to maximize portfolio impact, and much more.

----

**Q: How will this change affect the established development and publishing of Wargaming's mobile titles/projects?**

----

**Q: When will these changes take effect?**

----

**Q: You listed two main directions for mobile: scaling Blitz and expanding the Wo(X)-universe. Do they fit into our strategic goal of finding new "blue oceans"?**

A: Yes.  Blitz is an amazing product with significant growth opportunities including new distribution channels, geographies, and gameplay.  Supporting the Blitz leadership team to make these opportunities a reality is a core focus of the mobile department.

Expanding the Wo(X) universe is another huge opportunity, big franchises

 to **World of Tanks Blitz**

December 12, 2016 · 🖼

Good day, Wargamers! #wotblitz is live on Steam since Nov 9, so it's been more than a month since release. We accumulated 750K+ installs since then and the trend looks positive.

However, there is a small little thing that makes the Blitz team sad. Our review rating is mixed (written in sad yellow) and it's 69% at the moment. BUT, if was 70% then it would become 'Mostly Positive' (written in joyful skyblue).

Dear Wargamer, please bring happiness and joy to the Blitz team: le...

See More









# EXHIBIT C



# United States of America
## United States Patent and Trademark Office

# WORLD OF TANKS BLITZ

**Reg. No. 4,590,703**

**Registered Aug. 26, 2014**

**Int. Cls.: 9 and 41**

**TRADEMARK**

**SERVICE MARK**

**PRINCIPAL REGISTER**

WARGAMING.NET LLP (UNITED KINGDOM LIMITED PARTNERSHIP)
OFFICE 415, 60 CANNON STREET
LONDON EC4N 6NP
UNITED KINGDOM

FOR: COMPUTER GAMES SOFTWARE; COMPUTER GAME DISCS; VIDEO GAMES SOFTWARE; COMPUTER GAME SOFTWARE FOR VIDEO GAMES AND FOR GAMES MACHINES; COMPUTER PROGRAMS FOR VIDEO AND COMPUTER GAMES; VIDEO DISCS FEATURING STRATEGY GAMES RELATING TO ARMED CONFLICT; OPTICAL DISCS FEATURING STRATEGY GAMES RELATING TO ARMED CONFLICT; AUDIO TAPES FEATURING STRATEGY GAMES RELATING TO ARMED CONFLICT; PRERECORDED VIDEO CASSETTES FEATURING STRATEGY GAMES RELATING TO ARMED CONFLICT; COMPACT DISCS FEATURING STRATEGY GAMES RELATING TO ARMED CONFLICT; BLANK CD-ROMS FOR SOUND OR VIDEO RECORDING; DATA BEARING RECORD CARRIERS FOR COMPUTERS, NAMELY, PRERECORDED MAGNETIC DATA CARRIERS FEATURING STRATEGY GAMES RELATING TO ARMED CONFLICT; MUSICAL SOUND RECORDINGS; VIDEO RECORDINGS FEATURING STRATEGY GAMES RELATING TO ARMED CONFLICT; COMPUTER GAME SOFTWARE FOR PLAYING VIDEO, COMPUTER AND ON-LINE GAMES; SOFTWARE FOR ENABLING VIDEO, COMPUTER AND ON-LINE GAMES TO BE RUN ON MULTIPLE PLATFORMS; DOWNLOADABLE SOFTWARE FOR DEVELOPING, DESIGNING, MODIFYING AND CUSTOMIZING VIDEO, COMPUTER AND ON-LINE GAMES; COMPUTER GAME SOFTWARE FOR USE ON MOBILE PHONES; DOWNLOADABLE ELECTRONIC PUBLICATIONS IN THE NATURE OF NEWS-LETTERS, JOURNALS, MAGAZINES AND GUIDEBOOKS IN THE FIELD OF STRATEGY GAMES RELATING TO ARMED CONFLICT; SOFTWARE FOR ENHANCING AND DEVEL-OPING VIDEO GAMES; STRUCTURAL PARTS AND FITTINGS FOR ALL THE AFORESAID GOODS, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FOR: ENTERTAINMENT PROVIDED VIA THE INTERNET, NAMELY, PROVIDING ON-LINE MASSIVELY MULTI-PLAYER VIDEO GAMES; ON-LINE GAMING SERVICES, NAMELY, PROVIDING ON-LINE MASSIVELY MULTI-PLAYER WAR GAMES; ENTER-TAINMENT SERVICES, NAMELY, PROVIDING ON-LINE MASSIVELY MULTI-PLAYER COMPUTER GAMES; ORGANIZING ONLINE MULTI-PLAYER COMPUTER GAMES, NAMELY, MATCHING PLAYERS OF ONLINE COMPUTER GAMES AGAINST EACH OTHER; ON-LINE ENTERTAINMENT SERVICES IN THE NATURE OF ON-LINE COMPUTER GAME TOURNAMENTS AND LEAGUES; ENTERTAINMENT SERVICES IN THE NATURE OF ON-LINE COMPUTER GAME TOURNAMENTS AND LEAGUES; PROVIDING A WEB-



Deputy Director of the United States
Patent and Trademark Office

**Reg. No. 4,590,703**   BASED SYSTEM AND ON-LINE PORTAL FOR CUSTOMERS TO PARTICIPATE IN VIRTUAL ON-LINE GAMING TOURNAMENTS AND LEAGUES, OPERATION AND COORDINATION OF VIRTUAL ON-LINE GAMING TOURNAMENTS AND LEAGUES; ENTERTAINMENT SERVICES, NAMELY, PRODUCTION AND DISTRIBUTION OF GAMES SHOWS; PROVIDING ON-LINE INFORMATION IN THE FIELD OF COMPUTER GAMING ENTERTAINMENT; PROVIDING ON-LINE COMPUTER GAMES ACCESSED VIA WIRELESS COMMUNICATION; PROVIDING ON-LINE COMPUTER GAMES ACCESSED VIA CELLULAR TELEPHONES; PROVIDING ON-LINE NON-DOWNLOADABLE ELECTRONIC PUBLICATIONS IN THE NATURE OF NEWSLETTERS, JOURNALS, MAGAZINES AND GUIDEBOOKS IN THE FIELD OF STRATEGY GAMES RELATING TO ARMED CONFLICT, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

PRIORITY DATE OF 9-18-2012 IS CLAIMED.

OWNER OF INTERNATIONAL REGISTRATION 1168091 DATED 3-1-2013, EXPIRES 3-1-2023.

OWNER OF U.S. REG. NO. 4,008,136.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "TANKS" , APART FROM THE MARK AS SHOWN.

SER. NO. 79-133,149, FILED 3-1-2013.

CHRISTOPHER BUONGIORNO, EXAMINING ATTORNEY

**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Contacts | eBusiness | eBiz alerts | News

**Trademarks** > **Trademark Electronic Search System (TESS)**

*TESS was last updated on Fri Mar 20 04:12:22 EDT 2020*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout   Please logout when you are done to release system resources allocated for you.

## Record 1 out of 1

| TSDR | ASSIGN Status | TTAB Status |   *( Use the "Back" button of the Internet Browser to return to TESS)*

# WORLD OF TANKS BLITZ

| | |
|---|---|
| **Word Mark** | WORLD OF TANKS BLITZ |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: Computer games software; computer game discs; video games software; computer game software for video games and for games machines; computer programs for video and computer games; video discs featuring strategy games relating to armed conflict; optical discs featuring strategy games relating to armed conflict; audio tapes featuring strategy games relating to armed conflict; prerecorded video cassettes featuring strategy games relating to armed conflict; compact discs featuring strategy games relating to armed conflict; blank CD-ROMs for sound or video recording; data bearing record carriers for computers, namely, prerecorded magnetic data carriers featuring strategy games relating to armed conflict; musical sound recordings; video recordings featuring strategy games relating to armed conflict; computer game software for playing video, computer and on-line games; software for enabling video, computer and on-line games to be run on multiple platforms; downloadable software for developing, designing, modifying and customizing video, computer and on-line games; computer game software for use on mobile phones; downloadable electronic publications in the nature of newsletters, journals, magazines and guidebooks in the field of strategy games relating to armed conflict; software for enhancing and developing video games; structural parts and fittings for all the aforesaid goods |
| | IC 041. US 100 101 107. G & S: Entertainment provided via the Internet, namely, providing on-line massively multi-player video games; on-line gaming services, namely, providing on-line massively multi-player war games; entertainment services, namely, providing on-line massively multi-player computer games; organizing online multi-player computer games, namely, matching players of online computer games against each other; on-line entertainment services in the nature of on-line computer game tournaments and leagues; entertainment services in the nature of on-line computer game tournaments and leagues; providing a web-based system and on-line portal for customers to participate in virtual on-line gaming tournaments and leagues, operation and coordination of virtual on-line gaming tournaments and leagues; entertainment services, namely, production and distribution of games shows; providing on-line information in the field of computer gaming entertainment; providing on-line computer games accessed via wireless communication; providing on-line computer games accessed via cellular telephones; providing on-line non-downloadable electronic publications in the nature of newsletters, journals, magazines and guidebooks in the field of strategy games relating to armed conflict |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 79133149 |
| **Filing Date** | March 1, 2013 |
| **Current Basis** | 66A |
| **Original Filing Basis** | 66A |
| **Published for Opposition** | June 10, 2014 |
| **Registration Number** | **4590703** |
| **International Registration Number** | 1168091 |
| **Registration Date** | August 26, 2014 |
| **Owner** | (REGISTRANT) Wargaming.net LLP LIMITED PARTNERSHIP UNITED KINGDOM Sterling House, Fulbourne Road Walthamstow, London E17 4EE UNITED KINGDOM |
| | (LAST LISTED OWNER) Wargaming.net Limited UNKNOWN 105 Agion Omologiton Avenue, Agioi Omologites CY-1080 Nicosia CYPRUS |
| **Priority Date** | September 18, 2012 |
| **Prior Registrations** | 4008136 |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "TANKS" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP |

| .HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY

**Generated on:** This page was generated by TSDR on 2020-03-20 16:39:38 EDT

**Mark:** WORLD OF TANKS BLITZ



| | | | |
|---|---|---|---|
| **US Serial Number:** | 79133149 | **Application Filing Date:** | Mar. 01, 2013 |
| **US Registration Number:** | 4590703 | **Registration Date:** | Aug. 26, 2014 |
| **Register:** | Principal | | |
| **Mark Type:** | Trademark, Service Mark | | |
| **TM5 Common Status Descriptor:** | | LIVE/REGISTRATION/Issued and Active | |



The trademark application has been registered with the Office.

**Status:** Registered. The registration date is used to determine when post-registration maintenance documents are due.

**Status Date:** Aug. 26, 2014

**Publication Date:** Jun. 10, 2014

## Mark Information

**Mark Literal Elements:** WORLD OF TANKS BLITZ

**Standard Character Claim:** Yes. The mark consists of standard characters without claim to any particular font style, size, or color.

**Mark Drawing Type:** 4 - STANDARD CHARACTER MARK

**Disclaimer:** "TANKS"

## Related Properties Information

**International Registration Number:** 1168091

**International Registration Date:** Mar. 01, 2013

**Claimed Ownership of US Registrations:** 4008136

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:

- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Computer games software; computer game discs; video games software; computer game software for video games and for games machines; computer programs for video and computer games; video discs featuring strategy games relating to armed conflict; optical discs featuring strategy games relating to armed conflict; audio tapes featuring strategy games relating to armed conflict; prerecorded video cassettes featuring strategy games relating to armed conflict; compact discs featuring strategy games relating to armed conflict; blank CD-ROMs for sound or video recording; data bearing record carriers for computers, namely, prerecorded magnetic data carriers featuring strategy games relating to armed conflict; musical sound recordings; video recordings featuring strategy games relating to armed conflict; computer game software for playing video, computer and on-line games; software for enabling video, computer and on-line games to be run on multiple platforms; downloadable software for developing, designing, modifying and customizing video, computer and on-line games; computer game software for use on mobile phones; downloadable electronic publications in the nature of newsletters, journals, magazines and guidebooks in the field of strategy games relating to armed conflict; software for enhancing and developing video games; structural parts and fittings for all the aforesaid goods

**International Class(es):** 009 - Primary Class

**U.S Class(es):** 021, 023, 026, 036, 038

| | |
|---|---|
| **Class Status:** | ACTIVE |
| **Basis:** | 66(a) |

| | |
|---|---|
| **For:** | Entertainment provided via the Internet, namely, providing on-line massively multi-player video games; on-line gaming services, namely, providing on-line massively multi-player war games; entertainment services, namely, providing on-line massively multi-player computer games; organizing online multi-player computer games, namely, matching players of online computer games against each other; on-line entertainment services in the nature of on-line computer game tournaments and leagues; entertainment services in the nature of on-line computer game tournaments and leagues; providing a web-based system and on-line portal for customers to participate in virtual on-line gaming tournaments and leagues; operation and coordination of virtual on-line gaming tournaments and leagues; entertainment services, namely, production and distribution of games shows; providing on-line information in the field of computer gaming entertainment; providing on-line computer games accessed via wireless communication; providing on-line computer games accessed via cellular telephones; providing on-line non-downloadable electronic publications in the nature of newsletters, journals, magazines and guidebooks in the field of strategy games relating to armed conflict |

| | | |
|---|---|---|
| **International Class(es):** | 041 - Primary Class | **U.S Class(es):** 100, 101, 107 |
| **Class Status:** | ACTIVE | |
| **Basis:** | 66(a) | |

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | No | **Currently Use:** | No |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44E:** | No |
| **Filed 44E:** | No | **Currently 66A:** | Yes |
| **Filed 66A:** | Yes | **Currently No Basis:** | No |
| **Filed No Basis:** | No | | |

## Current Owner(s) Information

| | |
|---|---|
| **Owner Name:** | Wargaming.net Limited |
| **Owner Address:** | 105 Agion Omologiton Avenue, Agioi Omologites CY-1080 Nicosia CYPRUS |
| **Legal Entity Type:** | UNKNOWN |
| **State or Country Where Organized:** | No Place Where Organized Found |

## Attorney/Correspondence Information

**Attorney of Record**

| | |
|---|---|
| **Docket Number:** | 007929.00167 |

**Correspondent**

| | |
|---|---|
| **Correspondent Name/Address:** | Ross A. Dannenberg Banner & Witcoff, Ltd. 1100 13th Street, N.W. Suite 1200 Washington, DISTRICT OF COLUMBIA UNITED STATES 20005 |

**Domestic Representative - Not Found**

## Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Oct. 09, 2019 | COURTESY REMINDER - SEC. 71 (6-YR) E-MAILED | |
| Sep. 05, 2019 | NEW REPRESENTATIVE AT IB RECEIVED | |
| Aug. 26, 2019 | COURTESY REMINDER - SEC. 71 (6-YR) E-MAILED | |
| Dec. 28, 2018 | NEW REPRESENTATIVE AT IB RECEIVED | |
| May 12, 2016 | CHANGE OF OWNER RECEIVED FROM IB | |
| Feb. 27, 2015 | FINAL DECISION TRANSACTION PROCESSED BY IB | |
| Feb. 26, 2015 | CHANGE OF NAME/ADDRESS REC'D FROM IB | |
| Feb. 03, 2015 | FINAL DISPOSITION NOTICE SENT TO IB | |
| Feb. 03, 2015 | FINAL DISPOSITION PROCESSED | 68359 |

| | | |
|---|---|---|
| Nov. 26, 2014 | FINAL DISPOSITION NOTICE CREATED, TO BE SENT TO IB | |
| Aug. 26, 2014 | REGISTERED-PRINCIPAL REGISTER | |
| Jun. 10, 2014 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Jun. 10, 2014 | PUBLISHED FOR OPPOSITION | |
| Jun. 06, 2014 | NOTIFICATION PROCESSED BY IB | |
| May 21, 2014 | NOTIFICATION OF POSSIBLE OPPOSITION SENT TO IB | |
| May 21, 2014 | NOTICE OF START OF OPPOSITION PERIOD CREATED, TO BE SENT TO IB | |
| May 21, 2014 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| May 06, 2014 | LAW OFFICE PUBLICATION REVIEW COMPLETED | 73296 |
| May 05, 2014 | ASSIGNED TO LIE | 73296 |
| Apr. 17, 2014 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Apr. 17, 2014 | EXAMINER'S AMENDMENT ENTERED | 88888 |
| Apr. 17, 2014 | NOTIFICATION OF EXAMINERS AMENDMENT E-MAILED | 6328 |
| Apr. 17, 2014 | EXAMINERS AMENDMENT E-MAILED | 6328 |
| Apr. 17, 2014 | EXAMINERS AMENDMENT -WRITTEN | 77299 |
| Apr. 03, 2014 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Apr. 03, 2014 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Mar. 27, 2014 | NEW REPRESENTATIVE AT IB RECEIVED | |
| Jan. 29, 2014 | FINAL REFUSAL MAILED | |
| Jan. 29, 2014 | FINAL REFUSAL WRITTEN | 77299 |
| Jan. 28, 2014 | TEAS/EMAIL CORRESPONDENCE ENTERED | 88889 |
| Jan. 27, 2014 | CORRESPONDENCE RECEIVED IN LAW OFFICE | 88889 |
| Jan. 27, 2014 | TEAS RESPONSE TO OFFICE ACTION RECEIVED | |
| Aug. 18, 2013 | REFUSAL PROCESSED BY IB | |
| Aug. 01, 2013 | NON-FINAL ACTION MAILED - REFUSAL SENT TO IB | |
| Aug. 01, 2013 | REFUSAL PROCESSED BY MPU | 68359 |
| Jul. 31, 2013 | NON-FINAL ACTION (IB REFUSAL) PREPARED FOR REVIEW | |
| Jul. 31, 2013 | APPLICATION FILING RECEIPT MAILED | |
| Jul. 30, 2013 | NON-FINAL ACTION WRITTEN | 77299 |
| Jul. 27, 2013 | ASSIGNED TO EXAMINER | 77299 |
| Jul. 27, 2013 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED IN TRAM | |
| Jul. 25, 2013 | SN ASSIGNED FOR SECT 66A APPL FROM IB | |

## International Registration Information (Section 66a)

| | | | |
|---|---|---|---|
| **International Registration Number:** | 1168091 | **International Registration Date:** | Mar. 01, 2013 |
| **Priority Claimed Flag:** | Yes | **Date of Section 67 Priority Claim:** | Sep. 18, 2012 |
| **Intl. Registration Status:** | REQUEST FOR EXTENSION OF PROTECTION PROCESSED | **Date of International Registration Status:** | Jul. 25, 2013 |
| **Notification of Designation Date:** | Jul. 25, 2013 | **Date of Automatic Protection:** | Jan. 25, 2015 |
| **International Registration Renewal Date:** | Mar. 01, 2023 | | |
| **First Refusal Flag:** | Yes | | |

## TM Staff and Location Information

| |
|---|
| **TM Staff Information - None** |
| **File Location** |

| | | | |
|---|---|---|---|
| **Current Location:** | PUBLICATION AND ISSUE SECTION | **Date in Location:** | Aug. 26, 2014 |

## Assignment Abstract Of Title Information

**Summary**

| | | |
|---|---|---|
| **Total Assignments:** 1 | **Registrant:** Wargaming.net LLP | |

## Assignment 1 of 1

| | | |
|---|---|---|
| **Conveyance:** | CHANGE OF ADDRESS | |
| **Reel/Frame:** | 5540/0662 | **Pages:** 2 |
| **Date Recorded:** | Feb. 26, 2015 | |
| **Supporting Documents:** | assignment-tm-5540-0662.pdf | |

**Assignor**

| | | | |
|---|---|---|---|
| **Name:** | WARGAMING.NET LLP | **Execution Date:** | Dec. 22, 2014 |
| **Legal Entity Type:** | UNKNOWN | **State or Country Where Organized:** | NOT PROVIDED |

**Assignee**

| | | | |
|---|---|---|---|
| **Name:** | WARGAMING.NET LLP | **State or Country Where Organized:** | NOT PROVIDED |
| **Legal Entity Type:** | UNKNOWN | | |
| **Address:** | STERLING HOUSE, FULBOURNE ROAD WALTHAMSTOW, LONDON E17 4EE, UNITED KINGDOM | | |

**Correspondent**

| | |
|---|---|
| **Correspondent Name:** | WARGAMING.NET LLP |
| **Correspondent Address:** | STERLING HOUSE, FULBOURNE ROAD WALTHAMSTOW, LONDON E17 4EE UNITED KINGDOM |

**Domestic Representative - Not Found**

# United States of America

## United States Patent and Trademark Office

## WORLD OF WARSHIPS BLITZ

**Reg. No. 5,809,262**

**Registered Jul. 23, 2019**

**Int. Cl.: 9, 41**

**Service Mark**

**Trademark**

**Principal Register**

Wargaming.net Limited  (CYPRUS Limited Company )
105 Agion Omologiton Avenue,
Agioi Omologites Cy-1080 Nicosia
CYPRUS

CLASS 9: Computer games software; computer games discs; video games cartridges; computer software for playing video games or for operating games machines; computer programs for playing video and computer games; video discs, discs, magnetic tapes, cassettes, compact discs all in the field of strategy and action games relating to armed conflict; blank CD-ROMs for sound or video recordings, data bearing record carriers for computers, all having game software recorded thereon, all in the field of strategy and action games relating to armed conflict; sound recordings and video recordings in the field of strategy and action games relating to armed conflict; software for playing video, computer and on-line games; software for enabling video, computer and on-line games to be run on multiple platforms; downloadable software for developing, designing, modifying and customizing video, computer and on-line games; games software for mobile phones; computer game software for use on mobile phones; downloadable electronic publications in the nature of newsletters, journals, magazines and guidebooks in the field of strategy and action games relating to armed conflict provided on-line from database for the Internet; video games enhancers, namely, high performance computer hardware with specialized features for enhanced game playing ability; structural parts and fittings for all the aforesaid goods

CLASS 41: Entertainment provided via the Internet, namely, providing online massively multi-player video games; on-line gaming services, namely, providing online massively multi-player video games; providing on-line computer games, multi-player matching services for computer game tournaments, and on-line entertainment in the nature of online computer game tournaments, virtual or cyber sports leagues relating to armed conflict video games, production and distribution of games shows; providing on-line information in the field of computer gaming entertainment; providing online non-downloadable games by cellular telephone communication; providing online non-downloadable games by or for use on cellular telephones; providing on-line non-downloadable electronic publications in the nature of newsletters, journals, magazines and guidebooks in the field of strategy and action games relating to armed conflict

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

OWNER OF INTERNATIONAL REGISTRATION 1421850 DATED 03-29-2018, EXPIRES 03-29-2028

SER. NO. 79-240,307, FILED 03-29-2018



Director of the United States
Patent and Trademark Office



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Contacts | eBusiness | eBiz alerts | News

**Trademarks** > **Trademark Electronic Search System (TESS)**

*TESS was last updated on Fri Mar 20 04:12:22 EDT 2020*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout  Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TSDR | ASSIGN Status | TTAB Status |  *( Use the "Back" button of the Internet Browser to return to TESS)*

# WORLD OF WARSHIPS BLITZ

| | |
|---|---|
| **Word Mark** | WORLD OF WARSHIPS BLITZ |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: Computer games software; computer games discs; video games cartridges; computer software for playing video games or for operating games machines; computer programs for playing video and computer games; video discs, discs, magnetic tapes, cassettes, compact discs all in the field of strategy and action games relating to armed conflict; blank CD-ROMs for sound or video recordings, data bearing record carriers for computers, all having game software recorded thereon, all in the field of strategy and action games relating to armed conflict; sound recordings and video recordings in the field of strategy and action games relating to armed conflict; software for playing video, computer and on-line games; software for enabling video, computer and on-line games to be run on multiple platforms; downloadable software for developing, designing, modifying and customizing video, computer and on-line games; games software for mobile phones; computer game software for use on mobile phones; downloadable electronic publications in the nature of newsletters, journals, magazines and guidebooks in the field of strategy and action games relating to armed conflict provided on-line from database for the Internet; video games enhancers, namely, high performance computer hardware with specialized features for enhanced game playing ability; structural parts and fittings for all the aforesaid goods

IC 041. US 100 101 107. G & S: Entertainment provided via the Internet, namely, providing online massively multi-player video games; on-line gaming services, namely, providing online massively multi-player video games; providing on-line computer games, multi-player matching services for computer game tournaments, and on-line entertainment in the nature of online computer game tournaments, virtual or cyber sports leagues relating to armed conflict video games, production and distribution of games shows; providing on-line information in the field of computer gaming entertainment; providing online non-downloadable games by cellular telephone communication; providing online non-downloadable games by or for use on cellular telephones; providing on-line non-downloadable electronic publications in the nature of newsletters, journals, magazines and guidebooks in the field of strategy and action games relating to armed conflict |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 79240307 |
| **Filing Date** | March 29, 2018 |
| **Current Basis** | 66A |
| **Original Filing Basis** | 66A |
| **Published for Opposition** | May 7, 2019 |
| **Registration Number** | **5809262** |
| **International Registration Number** | 1421850 |
| **Registration Date** | July 23, 2019 |
| **Owner** | (REGISTRANT) Wargaming.net Limited Limited Company CYPRUS 105 Agion Omologiton Avenue, Agioi Omologites CY-1080 Nicosia CYPRUS |
| **Attorney of Record** | Heather Smith-Carra |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP

| .HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY

**Generated on:** This page was generated by TSDR on 2020-03-20 16:41:55 EDT

**Mark:** WORLD OF WARSHIPS BLITZ



| | | | |
|---|---|---|---|
| **US Serial Number:** | 79240307 | **Application Filing Date:** | Mar. 29, 2018 |
| **US Registration Number:** | 5809262 | **Registration Date:** | Jul. 23, 2019 |
| **Register:** | Principal | | |
| **Mark Type:** | Trademark, Service Mark | | |

**TM5 Common Status Descriptor:**



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** Registered. The registration date is used to determine when post-registration maintenance documents are due.

**Status Date:** Jul. 23, 2019

**Publication Date:** May 07, 2019

## Mark Information

**Mark Literal Elements:** WORLD OF WARSHIPS BLITZ

**Standard Character Claim:** Yes. The mark consists of standard characters without claim to any particular font style, size, or color.

**Mark Drawing Type:** 4 - STANDARD CHARACTER MARK

## Related Properties Information

**International Registration Number:** 1421850

**International Registration Date:** Mar. 29, 2018

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Computer games software; computer games discs; video games cartridges; computer software for playing video games or for operating games machines; computer programs for playing video and computer games; video discs, discs, magnetic tapes, cassettes, compact discs all in the field of strategy and action games relating to armed conflict; blank CD-ROMs for sound or video recordings, data bearing record carriers for computers, all having game software recorded thereon, all in the field of strategy and action games relating to armed conflict; sound recordings and video recordings in the field of strategy and action games relating to armed conflict; software for playing video, computer and on-line games; software for enabling video, computer and on-line games to be run on multiple platforms; downloadable software for developing, designing, modifying and customizing video, computer and on-line games; games software for mobile phones; computer game software for use on mobile phones; downloadable electronic publications in the nature of newsletters, journals, magazines and guidebooks in the field of strategy and action games relating to armed conflict provided on-line from database for the Internet; video games enhancers, namely, high performance computer hardware with specialized features for enhanced game playing ability; structural parts and fittings for all the aforesaid goods

**International Class(es):** 009 - Primary Class          **U.S Class(es):** 021, 023, 026, 036, 038

**Class Status:** ACTIVE

**Basis:** 66(a)

**For:** Entertainment provided via the Internet, namely, providing online massively multi-player video games; on-line gaming services, namely,

providing online massively multi-player video games; providing on-line computer games, multi-player matching services for computer game tournaments, and on-line entertainment in the nature of online computer game tournaments, virtual or cyber sports leagues relating to armed conflict video games, production and distribution of games shows; providing on-line information in the field of computer gaming entertainment; providing online non-downloadable games by cellular telephone communication; providing online non-downloadable games by or for use on cellular telephones; providing on-line non-downloadable electronic publications in the nature of newsletters, journals, magazines and guidebooks in the field of strategy and action games relating to armed conflict

| | | | |
|---|---|---|---|
| **International Class(es):** | 041 - Primary Class | **U.S Class(es):** | 100, 101, 107 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 66(a) | | |

# Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | No | **Currently Use:** | No |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44E:** | No |
| **Filed 44E:** | No | **Currently 66A:** | Yes |
| **Filed 66A:** | Yes | **Currently No Basis:** | No |
| **Filed No Basis:** | No | | |

# Current Owner(s) Information

| | |
|---|---|
| **Owner Name:** | Wargaming.net Limited |
| **Owner Address:** | 105 Agion Omologiton Avenue, Agioi Omologites CY-1080 Nicosia CYPRUS |
| **Legal Entity Type:** | Limited Company |
| **State or Country Where Organized** | CYPRUS |

# Attorney/Correspondence Information

**Attorney of Record**

| | | | |
|---|---|---|---|
| **Attorney Name:** | Heather Smith-Carra | **Docket Number:** | 007929.00249 |
| **Attorney Primary Email Address:** | bwptotm@bannerwitcoff.com | **Attorney Email Authorized:** | Yes |

**Correspondent**

| | | | |
|---|---|---|---|
| **Correspondent Name/Address:** | Heather Smith-Carra Banner & Witcoff, Ltd. 1100 13th Street NW Suite 1200 Washington, DISTRICT OF COLUMBIA UNITED STATES 20005 | | |
| **Phone:** | 202-824-3000 | **Fax:** | 202-824-3001 |
| **Correspondent e-mail:** | bwptotm@bannerwitcoff.com | **Correspondent e-mail Authorized:** | Yes |

**Domestic Representative - Not Found**

# Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Dec. 01, 2019 | FINAL DECISION TRANSACTION PROCESSED BY IB | |
| Nov. 12, 2019 | FINAL DISPOSITION NOTICE SENT TO IB | |
| Nov. 12, 2019 | FINAL DISPOSITION PROCESSED | 68359 |
| Oct. 23, 2019 | FINAL DISPOSITION NOTICE CREATED, TO BE SENT TO IB | |
| Sep. 05, 2019 | NEW REPRESENTATIVE AT IB RECEIVED | |
| Jul. 23, 2019 | REGISTERED-PRINCIPAL REGISTER | |
| May 07, 2019 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| May 07, 2019 | PUBLISHED FOR OPPOSITION | |
| May 03, 2019 | NOTIFICATION PROCESSED BY IB | |
| Apr. 17, 2019 | NOTIFICATION OF POSSIBLE OPPOSITION SENT TO IB | |

| | | |
|---|---|---|
| Apr. 17, 2019 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Apr. 17, 2019 | NOTICE OF START OF OPPOSITION PERIOD CREATED, TO BE SENT TO IB | |
| Mar. 27, 2019 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Mar. 27, 2019 | EXAMINER'S AMENDMENT ENTERED | 88888 |
| Mar. 27, 2019 | NOTIFICATION OF EXAMINERS AMENDMENT E-MAILED | 6328 |
| Mar. 27, 2019 | EXAMINERS AMENDMENT E-MAILED | 6328 |
| Mar. 27, 2019 | EXAMINERS AMENDMENT -WRITTEN | 83171 |
| Mar. 25, 2019 | TEAS/EMAIL CORRESPONDENCE ENTERED | 88889 |
| Mar. 24, 2019 | CORRESPONDENCE RECEIVED IN LAW OFFICE | 88889 |
| Mar. 24, 2019 | TEAS RESPONSE TO OFFICE ACTION RECEIVED | |
| Oct. 13, 2018 | REFUSAL PROCESSED BY IB | |
| Sep. 25, 2018 | NON-FINAL ACTION MAILED - REFUSAL SENT TO IB | |
| Sep. 24, 2018 | REFUSAL PROCESSED BY MPU | 70029 |
| Sep. 22, 2018 | NON-FINAL ACTION (IB REFUSAL) PREPARED FOR REVIEW | |
| Sep. 21, 2018 | NON-FINAL ACTION WRITTEN | 83171 |
| Sep. 18, 2018 | APPLICATION FILING RECEIPT MAILED | |
| Sep. 13, 2018 | ASSIGNED TO EXAMINER | 83171 |
| Sep. 13, 2018 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED IN TRAM | |
| Sep. 06, 2018 | SN ASSIGNED FOR SECT 66A APPL FROM IB | |

# International Registration Information (Section 66a)

| | | | |
|---|---|---|---|
| **International Registration Number:** | 1421850 | **International Registration Date:** | Mar. 29, 2018 |
| **Intl. Registration Status:** | REQUEST FOR EXTENSION OF PROTECTION PROCESSED | **Date of International Registration Status:** | Sep. 06, 2018 |
| **Notification of Designation Date:** | Sep. 06, 2018 | **Date of Automatic Protection:** | Mar. 06, 2020 |
| **International Registration Renewal Date:** | Mar. 29, 2028 | | |
| **First Refusal Flag:** | Yes | | |

# TM Staff and Location Information

| | |
|---|---|
| **TM Staff Information - None** | |
| **File Location** | |

| | | | |
|---|---|---|---|
| **Current Location:** | PUBLICATION AND ISSUE SECTION | **Date in Location:** | Jul. 23, 2019 |

# EXHIBIT D

| МІНІСТЭРСТВА ЮСТЫЦЫІ РЭСПУБЛІКІ БЕЛАРУСЬ | МИНИСТЕРСТВО ЮСТИЦИИ РЕСПУБЛИКИ БЕЛАРУСЬ |

вул. Калектарная, 10, 220004, г. Мінск
Тэл./факс: 200-86-87, 200-97-55
E-mail: kanc@minjust.by

ул. Коллекторная, 10, 220004, г. Минск
Тел./факс: 200-86-87, 200-97-55
E-mail: kanc@minjust.by

04.10.2018 № 10-11/4650

На № _____

АБ «Сорайнен»

ул. Интернациональная, 36-1
220030, г. Минск

О предоставлении информации

Управление Единого государственного регистра юридических лиц и индивидуальных предпринимателей Министерства юстиции Республики Беларусь рассмотрело запрос от 28.09.2018 и сообщает, что в базе данных Единого государственного регистра юридических лиц и индивидуальных предпринимателей по состоянию на 04.10.2018 значится действующее общество с ограниченной ответственностью «БлицТим».

Приложение: на 1 л. в 1 экз.

Начальник управления                                    И.В.Леус

10 Лёля 200 02 07
О пред. инф.

**Выписка из Единого государственного регистра юридических лиц и индивидуальных предпринимателей о юридическом лице по состоянию на 04.10.2018**

| № п/п | Наименование показателя | Значение показателя |
|---|---|---|
| 1 | Регистрационный номер | 193072653 |
| 2 | Состояние | **Действующий** |
| 3 | Регистрирующий орган (на дату формирования выписки) | Минский горисполком |
| | **Наименование юридического лица** | |
| 4 | Полное наименование на русском языке | Общество с ограниченной ответственностью "БлицТим" |
| 5 | Сокращенное наименование на русском языке (при наличии) | ООО "БлицТим" |
| 6 | Полное наименование на белорусском языке | Таварыства з абмежаванай адказнасцю "БлiцТым" |
| 7 | Сокращенное наименование на белорусском языке (при наличии) | ТАА "БлiцТым" |
| | **Сведения о государственной регистрации юридического лица** | |
| 8 | Государственный орган (иная организация), осуществивший государственную регистрацию | Минский горисполком |
| 9 | Дата государственной регистрации и номер решения* | 28.04.2018 |
| 10 | Дата внесения в ЕГР последней записи по субъекту | 08.05.2018 |
| 11 | Способ создания | Создание |
| | **Сведения о правопредшественнике(ах)\*\*** | |
| | | |
| | **Местонахождение и контактная информация юридического лица** | |
| 12 | Местонахождение | Республика Беларусь, 220005, г. Минск, ул. Платонова, д. 49, пом. 24 |
| 13 | Контактные телефоны | +37529 784 85 19 |
| 14 | Электронный адрес (www, e-mail) | |
| | **История местонахождения** | |
| 15 | с 28.04.2018 | по 08.05.2018 | Республика Беларусь, 220035, г. Минск, ул. Тимирязева, д. 67, пом. 274 (офис 3) |
| | Ведомственная подчиненность | Прочие юридические лица без ведомственной подчиненности |
| 16 | Форма собственности | Собственность негосударственных юридических лиц |
| | **Основной вид деятельности юридического лица** | |
| 17 | Код вида деятельности по ОКЭД и его наименование | 62010 - Деятельность в области компьютерного программирования |
| | **Сведения об уставном фонде юридического лица** | |
| 18 | Сумма | 1000 |
| 19 | Вид валюты | Белорусский рубль (BYN) |
| | **Сведения о собственнике имущества (учредителях, участниках)\*\*\*** | |
| | **Физические лица\*\*\*\*** | |
| | **1** | |
| | Фамилия, собственное имя, отчество (если таковое имеется) (страна гражданства) | Клещенко Виктор Константинович (Республика Беларусь) |
| | Дата включения в ЕГР | 28.04.2018 |
| | Размер доли (в процентном соотношении или в виде дроби) и вклада (с указанием вида вклада) в уставном фонде, вид валюты | 50%, 500 (денежный), Белорусский рубль (BYN) |
| | **2** | |
| | Фамилия, собственное имя, отчество (если таковое имеется) (страна гражданства) | Поляков Кирилл Николаевич (Республика Беларусь) |
| | Дата включения в ЕГР | 28.04.2018 |
| | Размер доли (в процентном соотношении или в виде дроби) и вклада (с указанием вида вклада) в уставном фонде, вид валюты | 50%, 500 (денежный), Белорусский рубль (BYN) |
| | **Сведения о ликвидации юридического лица** | |
| 20 | Орган, принявший решение о ликвидации | |
| 21 | Дата и номер решения* | |
| | **Сведения об экономической несостоятельности (банкротстве) юридического лица** | |
| 22 | Наименование суда | |
| 23 | Информация о вынесенных судом, рассматривающим экономические дела, постановлениях по делу об экономической несостоятельности (банкротстве) (дата и номер* постановления) | |
| | **Сведения о руководителе (председателе ликвидационной комиссии (ликвидаторе), временном (антикризисном) управляющем в производстве по делу об экономической несостоятельности (банкротстве))\*\*\*\*** | |
| 24 | Должность | Руководитель |

| 25 | Фамилия, собственное имя, отчество (если таковое имеется) (полное наименование юридического лица) | Поляков Кирилл Николаевич |
|----|----|----|
| 26 | Дата начала полномочий | 28.04.2018 |
| 27 | Контактные телефоны, e-mail | +37529 784 85 19 |
| 28 | Местонахождение председателя ликвидационной комиссии (ликвидатора), временного (антикризисного) управляющего в производстве по делу об экономической несостоятельности (банкротстве)***** | |
| | **Сведения о прекращении деятельности юридического лица в результате реорганизации** | |
| 29 | Регистрирующий орган, внесший запись в ЕГР о прекращении деятельности | |
| 30 | Дата прекращения деятельности | |
| 31 | Форма реорганизации, повлекшая прекращение деятельности | |
| | **Сведения о правопреемнике(ах)******** | |
| | **Сведения об исключении юридического лица из ЕГР** | |
| 32 | Регистрирующий орган, принявший решение об исключении из ЕГР | |
| 33 | Дата и номер решения | |
| 34 | Основание исключения из ЕГР | |
| 35 | **Сведения об изменениях, внесенных в учредительный документ юридического лица********** | |
| | **Сведения об иных записях, внесенных в ЕГР*********** | |
| | **Дата** | **Наименование записи** |
| | 08.05.2018 | Уведомление об изменении местонахождения (ЮЛ) |
| | **Сведения об обособленных подразделениях (филиалах, представительствах) юридического лица*********** | |

* Указывается при наличии.
** Указывается в случае создания юридического лица в результате реорганизации в форме слияния, разделения, выделения.
*** За исключением акционерных обществ, товариществ собственников, потребительских кооперативов, садоводческих товариществ, ассоциаций (союзов), государственных объединений, торгово-промышленных палат.
**** Сведения о месте жительства, номере домашнего телефона, данные документа, удостоверяющего личность руководителя, председателя ликвидационной комиссии (ликвидатора), собственников имущества (учредителей, участников) - физических лиц, представляются только по запросам государственных органов и иных лиц, имеющих в соответствии с законодательными актами право на получение персональных данных физических лиц.
***** Указывается, если юридическое лицо находится в стадии ликвидации (экономической несостоятельности (банкротства)).
****** Указывается в случае прекращения деятельности юридического лица в результате реорганизации в форме слияния, разделения, присоединения.
******* Информация представляется по необходимости согласно представленному заявлению (запросу).

# EXHIBIT E

**CONFIDENTIAL**



**TRANSFER OF RIGHTS & FUTURE COOPERATION AGREEMENT**

This Transfer of Rights & Future Cooperation Agreement (the "**Agreement**") is made as of **August 27, 2013** (the "**Effective Date**")

**BY AND BETWEEN:**

(1)     **WARGAMING WORLD LIMITED**, a company incorporated in Cyprus with its principal place of business at 105, Agion Omologiton Avenue 1080 Nicosia CYPRUS (referred to as "**WARGAMING**"), in the person of its pro tempore legal representative, Director Nick Katselapov, and

(2)     the following individuals:

**ANDREI KARPIUK** an individual with the registration number ⬛⬛⬛⬛⬛ having passport ⬛⬛⬛⬛ residing in ⬛⬛⬛⬛ Lesnoy, Republic of Belarus, acting as a sole proprietorship with the registration number ⬛⬛⬛⬛

**VITALI BARADOUSKI** an individual with the registration number ⬛⬛⬛⬛⬛ having passport ⬛⬛⬛⬛ residing in ⬛⬛⬛⬛ Minsk, Republic of Belarus, acting as a sole proprietorship with the registration number ⬛⬛⬛⬛;

**STSIAPAN DROZD** an individual with the registration number ⬛⬛⬛⬛⬛ having passport ⬛⬛⬛⬛ residing in ⬛⬛⬛⬛ Minsk, Republic of Belarus, acting as a sole proprietorship with the registration number ⬛⬛⬛⬛

**DZMITRY BABRAUNICHY** an individual with the registration number ⬛⬛⬛⬛⬛ having passport ⬛⬛⬛⬛ residing in ⬛⬛⬛⬛ Minsk, Belarus, acting as a sole proprietorship with the registration number ⬛⬛⬛⬛

(sometimes referred to each as an **"INDIVIDUAL"** and collectively as **"INDIVIDUALS")**.

**RECITALS:**

WHEREAS, WARGAMING is in the business of operating a massively multiplayer online game under the title of "*World of Tanks*" (the "**Game**");

# CONFIDENTIAL

WHEREAS, the INDIVIDUALS have technical expertise in the field of the development of software technologies for various mobile platforms (the "**Mobile Platforms**") as well as creating interactive entertainment software products for the Mobile Platforms and for other platforms; and

WHEREAS, the INDIVIDUALS were involved in the creation and development of the technology (the "**Engine**") to be used in the interactive entertainment software product based on the Game and developed for the Mobile Platforms under the title of "World of Tanks. Blitz" ("*World of Tanks. Blitz*"); and

WHEREAS, WARGAMING wishes to acquire certain rights to the Engine from the INDIVIDUALS, and to establish new terms, conditions and grounds for further cooperation with the INDIVIDUALS in the field of further development of *World of Tanks. Blitz*;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agreed as follows:

1.     **Complementary Agreements**. Concurrently with the execution of the present Agreement WARGAMING and INDIVIDUALS shall enter into the following agreements (the "**Complementary Agreements**"):

     a)     Non-disclosure agreements;
     b)     Non-compete and non-solicitation agreements.

     It is hereby understood and agreed that INDIVIDUALS will enter into the Complementary Agreements as individuals (natural persons) and shall not be acting as sole proprietorships.

2.     **Engine Transfer.** Subject to the payment of the Advance as set forth herein, INDIVIDUALS will grant the following rights to the Engine and will transfer all necessary source materials of the Engine to WARGAMING as follows:

ii.

iii.

iv.

v.

vi.

vii.

viii.

ix.

x.

xi.

xii.

xiii.



**CONFIDENTIAL**

3.     **Confirmation**. INDIVIDUALS hereby confirm that:

4.     **Compensation.** WARGAMING shall pay INDIVIDUALS compensation hereunder as follows:

    4.1.    **Advance payment for the rights to the Engine.**

**CONFIDENTIAL**

    4.2.   **Revenue Share**:

5.    **Net Revenue**. For the purpose of this Agreement, the term **Net Revenue** shall be

      i.

      ii.

      iii.

      iv.

      v.

**CONFIDENTIAL**

WARGAMING WORLD LIMITED / DAVA                    TRANSFER OF RIGHTS & FUTURE COOPERATION AGREEMENT

vi.

vii.

viii.

Deduction of the Marketing Spend shall be subject to the following limitations:

6.    **Reporting**.

7.      **Payments; Withholding Taxes.**

8.      **Audit Rights**. Not more than once per calendar year, at INDIVIDUALS's expense,

# CONFIDENTIAL

9.    **Performance Bonuses.** From the Effective Date through the date that the Target Level (as

10.   **Key Personnel**. Key employees that are participating in the development of *World of Tanks. Blitz* and participated in the development of the Engine are listed in the Attachment A to the Agreement (the "**Key Personnel**"). WARGAMING shall continue to employ the Key Personnel to assist INDIVIDUALS in the development of *World of Tanks. Blitz* on terms that are fair (at the market level) in one of the companies affiliated with WARGAMING, at the sole discretion of WARGAMING, and WARGAMING shall use reasonable, good faith efforts to keep such Key Personnel reasonably satisfied with such employment. Key Personnel shall not be terminated by WARGAMING without prior written consent of a majority of INDIVIDUALS still working with WARGAMING.

11.   **Contribution of Individuals.** INDIVIDUALS hereby acknowledge and accept that their

**CONFIDENTIAL**

12.    **Termination without Cause.** Section 11, and the limitations set forth therein, shall not

**CONFIDENTIAL**

13. **Termination of Agreement Due to WARGAMING'S Breach**.  In the event WARGAMING

14. **Termination of Agreement Due to INDIVIDUAL's Breach**.  In the event an INDIVIDUAL

15. **Death or Disability of INDIVIDUALS**.  In the event of the death or disability of any

16. **Contribution of Wargaming.** WARGAMING hereby guarantees to INDIVIDUALS that it

**CONFIDENTIAL**

17.    **Participation in Future Projects.** INDIVIDUALS shall have an exclusive right of First

Said rights shall be exercised in the following manner.

18.    **No Change of Development Team**. WARGAMING shall not have the right to change key members of the current development team that works on the development of *World of Tanks. Blitz* until September 1st, 2014 without consent of a majority of the INDIVIDUALS still working with WARGAMING. Further, WARGAMING may only change key members if the ready-to-release version of *World of Tanks. Blitz* does not meet the requirements set by producers of WARGAMING for such version (the "**Acceptable Quality Product**"). For the purpose of clarity, once *World of Tanks. Blitz* is commercially released by WARGAMING, the development team shall be deemed to have delivered the Acceptable Quality Product.

19.    **Effect of Termination of the Agreement**. In the event of termination of this Agreement

This Section 19 shall survive any termination of this Agreement.

20.    **Mutual Termination**. The Parties may terminate the present Agreement at any time by

21.    **Jurisdiction**. This Agreement and the Complementary Agreements shall be construed and interpreted pursuant to the laws of Republic of Cyprus, without regard to conflicts of laws principles. The Parties hereto voluntarily and irrevocably submit and consent to the binding jurisdiction of the International Center of Dispute Resolution ("**ICDR**") sitting in Nicosia, Cyprus in any action brought to enforce (or otherwise relating to) this Agreement, and waive any objection thereto on the basis of personal jurisdiction or venue. The ICDR arbitration proceedings will be conducted by a single arbitrator and in the English language. Parties and witnesses residing outside of Cyprus may testify telephonically or via such other audio/visual means approved by the arbitrator. If any legal action or any other proceeding is brought for the enforcement of this Agreement, or if a dispute arises under this Agreement, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it may be entitled. Any Party in whose favor a judgment has been entered shall also be entitled to recovery of its attorneys' fees and costs in enforcing such judgment. The decision of the ICDR shall be final and non-appealable, and may be entered in any court of competent jurisdiction.

# CONFIDENTIAL

22.    **Amendments**. This Agreement may only be amended by a document in writing signed by all Parties to this Agreement.

23.    **Successors and Assigns**. This Agreement shall be binding on the heirs, successors and assigns of the undersigned.

24.    **Neutral Interpretation**. All Parties were represented by counsel in the negotiation of this Agreement and, in the event of a dispute, it shall be neutrally interpreted.

25.    **Notices**. All notices which either Party is required or may desire to serve the other Party with shall be served in writing and shall be sent as set forth under Section 26 below. Any notification, having legal status shall be written in the English language and shall be addressed to the Party to be served to the following addresses:

> Wargaming World Limited
> 105, Agion Omologiton Avenue, 1080, Nicosia CYPRUS
>
> Mail address: P.O. Box 23885, Nicosia 1687, Cyprus

> INDIVIDUALS:

> Andrei Karpiuk
> 8
> L
> E

> Vitali Baradouski
> 4
> N
> E

> Stsiapan Drozd

> Dzmitry Babraunichy
> 1
> N
> E

with a copy (which shall not constitute notice) to:

**CONFIDENTIAL**

or to such other address as any party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall only be effective upon receipt.

26.    **Notice Receipt**. Notice shall be deemed received within ten (10) business days of the time when such notice is sent if by registered mail or within two (2) business days of delivery confirmation issued by a recognized carrier such as FedEx, DHL, UPS, etc. Email notice shall be deemed effective upon the active acceptance and acknowledgment of the Party receiving said notice.

27.    **No Unapproved or Unpermitted Assignments**. INDIVIDUALS may not without WARGAMING's prior written approval, such approval to be granted or withheld in the sole discretion of WARGAMING, assign, license or otherwise transfer any of its rights or obligations under the present Agreement or sub-contract any of its obligations. WARGAMING may assign all or any of its rights and obligations under this Agreement at its will fully or partially at any time.

28.    **Indemnification**. INDIVIDUALS will indemnify, defend and hold harmless WARGAMING and its subsidiaries and other affiliates, and successors and permitted assigns, and the respective officers, directors, employees, agents and representatives of any of such entities, from and against all third-party claims arising out of or in connection with: (i) any violation of applicable laws by the indemnifying party, or any of its respective officers, directors, employees, contractors, agents or representatives; and (ii) any breach of any of its limited representations or warranties expressly set forth in this Agreement.

29.    **Confidentiality.**  The provisions of the Non-Disclosure Agreements dated as of August 23, 2013 by and between WARGAMING and INDIVIDUALS (the **"NDA"**) are incorporated by reference fully into this Agreement. Confidential Information (as defined in the NDA) disclosed by WARGAMING to INDIVIDUALS in the furtherance of this Agreement shall be subject to the NDA and shall not be disseminated or disclosed to any third party without the express written consent of WARGAMING, except as needed to perform obligations hereunder or as otherwise permitted under the NDA, and subject to the Open Source License. The obligations of this Section 29 shall survive the termination of this Agreement.

30.    **Severability**.  In the event that any provision of this Agreement or the application thereof becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as to reasonably to effect the intent of the parties hereto.  The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

31.    **Entire Agreement.** This Agreement and the other agreements referred to herein between the parties hereto constitute the entire agreement between the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.  In the event of any conflict between the terms and conditions of this Agreement and the terms and conditions of the other

**CONFIDENTIAL**

agreements referred to herein (including the Complementary Agreements and the Currency Control Related Documents), the terms and conditions of this Agreement shall prevail.

**WARGAMING WORLD LIMITED:**       **INDIVIDUALS:**

**ANDREI KARPIUK**

Signed:             Signed: ...............

Full Name:

Title:                          **VITALI BARADOUSKI**

Signed: ...............

**STSIAPAN DROZD**

Signed: ...............

**DZMITRY BABRAUNICHY**

Signed: ...............

**CONFIDENTIAL**

**Attachment A**
**Key Personnel**

2.  Viktor Kleschenko

5.  Kiryl Polyakov

# AMENDMENT #1
## to TRANSFER OF RIGHTS & FUTURE COOPERATION AGREEMENT
### dated 27/08/2013

This document is an amendment (the "**Amendment**") to the TRANSFER OF RIGHTS & FUTURE COOPERATION AGREEMENT dated 27/08/2013 (the "**Agreement**") and is entered into as of **01/06/2016** ("**Effective Date**"), by and between:

(1)    **WARGAMING WORLD LIMITED**, a company incorporated in Cyprus with its principal place of business at 105, Agion Omologiton Avenue 1080 Nicosia CYPRUS (referred to as "**WARGAMING**"), and

(2)    the following individuals:

**ANDREI KARPIUK** an individual with the registration number ⬛⬛⬛ having passport ⬛⬛⬛ residing in ⬛⬛⬛ Lesnoy, Republic of Belarus, acting as a sole proprietorship with the registration number ⬛⬛⬛

**VITALI BARADOUSKI** an individual with the registration number ⬛⬛⬛ having passport ⬛⬛⬛ residing in ⬛⬛⬛ t., Minsk, Republic of Belarus, acting as a sole proprietorship with the registration number ⬛⬛⬛

**STSIAPAN DROZD** an individual with the registration number ⬛⬛⬛ having passport ⬛⬛⬛ residing in ⬛⬛⬛ ., Minsk, Republic of Belarus, acting as a sole proprietorship with the registration number ⬛⬛⬛;

**DZMITRY BABRAUNICHY** an individual with the registration number ⬛⬛⬛ passport ⬛⬛⬛ in ⬛⬛⬛ Minsk, Belarus, acting as a sole proprietorship with the registration number 191176302;

(sometimes referred to each as an "**INDIVIDUAL**" and collectively as "**INDIVIDUALS**").

Each of Wargaming and the individuals listed above shall herein be referred to individually as a "**Party**", and jointly as the "**Parties**".

### RECITALS:

WHEREAS, WARGAMING and the INDIVIDUALS are parties to that certain Transfer of Rights & Future Cooperation Agreement effective as of August 27, 2013 (the "**Cooperation Agreement**"), providing, among other things, for the provision of certain services to WARGAMING in connection with the game *World of Tanks. Blitz*; and

WHEREAS, INDIVIDUALS agreed in Section 11 of the Cooperation Agreement that their regular, full-time, first priority participation in the development and support of *World of Tanks. Blitz* prior and after its Commercial Release is a material condition for the payment of the Revenue Share.

1



WHEREAS, in the period from the Effective Date of the Cooperation Agreement and to January 1, 2016 (the "**Settlement Period**") INDIVIDUALS provided their services to WARGAMING (as further detailed in this Amendment) and therefore are entitled to receive the Revenue Share due for the same period;

WHEREAS, the Parties have reached certain settlement agreement to replace the payment of the Revenue Share due to the INDIVIDUALS for the Settlement Period with the fixed amount, specified in the present Amendment;

WHEREAS, the Parties agreed to clarify the scope of the services that were provided and to be provided by the INDIVIDUALS under the Cooperation Agreement as a prerequisite for the payment of the Revenue Share;

WHEREAS, the Minimum Contribution Period (as defined in the Cooperation Agreement) terminated on June 26, 2016; and

WHEREAS, the Parties desire to amend the Cooperation Agreement to reflect the foregoing changes, to make further changes, and to clarify certain terms of their relationship, all as set forth below;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.   **General.** The terms defined in the Agreement shall have the same meaning when used in this Amendment, unless expressly defined otherwise in this Amendment.

2.   **Contribution of INDIVIDUALS.** The parties hereby add the following <u>Section 3[A]</u> "**Contribution of INDIVIDUALS**" to the Cooperation Agreement:

"**3[A] Contribution of INDIVIDUALS.** INDIVIDUALS are engaged in the development and support of *World of Tanks. Blitz* <u>in the form of employment and provision of services as independent contractors</u>.

**Employment.** INDIVIDUALS shall work for WARGAMING or one of its subsidiaries or affiliates, or its respective successors or assigns, as decided by WARGAMING (the "**WARGAMING Group**") on the further development of *World of Tanks. Blitz* for compensation commensurate with their expertise and experience as well as the overall market context of the games industry in the particular location where such employment shall be carried on (and which salaries would not be lower than the respective salaries received by INDIVIDUALS prior to the Effective Date).

**Provision of Services.** INDIVIDUALS shall provide the following services as independent contractors (the "**Services**"):

a)   Development Supervision Activities:

2



      i.    Development strategy and *World of Tanks. Blitz* roadmap;

      ii.   Business processes of the development team;

  b)   Technical Supervision Activities:

      i.    Technical vision of *World of Tanks. Blitz;*

      ii.   Technical processes of the development team;

  c)   Art Supervision Activities:

      i.    Art vision of *World of Tanks. Blitz*

      ii.   Art processes of the development team;

  d)   Game-design/ *World of Tanks. Blitz* Supervision Activities:

      i.    Game design vision of *World of Tanks. Blitz."*

3.   **Minimum Contribution Period**. The Minimum Contribution Period ended on June 26, 2016, and WARGAMING expressly acknowledges that it is satisfied with the performance of the INDIVIDUALS through the end of the Minimum Contribution Period. INDIVIDUALS hereby expressly acknowledge the receipt of the Advance payment provided in section 4.1 of the Cooperation Agreement.

4.   **Settlement Amount**. As consideration for the provision of the Services by INDIVIDUALS in the Settlement Period (as defined in the preamble) and INDIVIDUALS' waiver of their accounting and audit rights for the Settlement Period, WARGAMING shall pay INDIVIDUALS a non-recoupable amount of *four million US Dollars (US$4,000,000.00)* (the "**Settlement Amount**"). This Settlement Amount shall be payable in one instalment within thirty (30) business days following the Effective Date.

The Settlement Amount is the gross amount that INDIVIDUALS shall actually receive in their bank accounts before payment of any taxes that are applicable to such kind of income under the laws of Republic of Belarus; the INDIVIDUALS shall be responsible for payment of the INDIVIDUALS' taxes in Belarus associated with the Settlement Amount.

5.   **Restatement of Section 4.2 "Revenue Share"**. The Parties hereby replace <u>Section 4.2</u> "**Revenue Share**" of the Cooperation Agreement in its entirety with the new <u>Section 4.2</u> **Revenue Share** as follows:



The INDIVIDUALS' Revenue Share shall be calculated as follows:









**WARGAMING WORLD
LIMITED:**

Signed:

Full Name:

Title:

**INDIVIDUALS:**

**ANDREI KARPIU**

Signed: ....

**VITALI BARADO**

Signed: ....

**STSIAPAN DROZ**

Signed: ..A

**DZMITRY BABRA**

Signed: ....



7

## AMENDMENT #2
## to TRANSFER OF RIGHTS & FUTURE COOPERATION AGREEMENT
### dated 27/08/2013

This document is an amendment (the "**Amendment**") to the TRANSFER OF RIGHTS & FUTURE COOPERATION AGREEMENT dated 27/08/2013 (the "**Agreement**") and is entered into as of **05/06/2017** ("**Effective Date**"), by and between:

(1)     **WARGAMING WORLD LIMITED**, a company incorporated in Cyprus with its principal place of business at 105, Agion Omologiton Avenue 1080 Nicosia CYPRUS (referred to as "**WARGAMING**"), and

(2)     the following individuals:

**ANDREI KARPIUK** an individual with the registration number          having passport         Lesnoy, Republic of Belarus, acting as a sole proprietorship with the registration number         );

**VITALI BARADOUSKI** an individual with the registration number          having          Minsk, Republic of Belarus, acting as a sole proprietorship with the registration number         

**STSIAPAN DROZD** an individual with the registration number          having passport         Minsk, Republic of Belarus, acting as a sole proprietorship with the registration number         

**DZMITRY BABRAUNICHY** an individual with the registration number 3         having passport         Minsk, Belarus, acting as a sole proprietorship with the registration number         

(sometimes referred to each as an "**INDIVIDUAL**" and collectively as "**INDIVIDUALS**")**.**

Each of Wargaming and the individuals listed above shall herein be referred to individually as a "**Party**", and jointly as the "**Parties**".

### RECITALS:

WHEREAS, WARGAMING and the INDIVIDUALS are parties to that certain Transfer of Rights & Future Cooperation Agreement effective as of August 27, 2013 (the "**Cooperation Agreement**"), providing, among other things, for the provision of certain services to WARGAMING in connection with the game *World of Tanks. Blitz*; and

WHEREAS, INDIVIDUALS agreed in Section 11 of the Cooperation Agreement that their regular, full-time, first priority participation in the development and support of *World of Tanks. Blitz* prior and after its Commercial Release is a material condition for the payment of the Revenue Share

EXECUTION COPY APPROVED

WHEREAS, in the period from January 1, 2016 and to December 31, 2016 (the "**Settlement Period**") INDIVIDUALS provided their services to WARGAMING and therefore are entitled to receive the Revenue Share due for the same period;

WHEREAS, the Parties have reached certain settlement agreement to replace the payment of the Revenue Share due to the INDIVIDUALS for the Settlement Period with the fixed amount, specified in the present Amendment;

WHEREAS, the Parties desire to amend the Cooperation Agreement to reflect the foregoing changes, to make further changes, and to clarify certain terms of their relationship, all as set forth below;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  **General**. The terms defined in the Agreement shall have the same meaning when used in this Amendment, unless expressly defined otherwise in this Amendment.

2.  **Settlement Amount**. As consideration for the provision of the Services by INDIVIDUALS in the Settlement Period (as defined in the preamble) and INDIVIDUALS' waiver of their accounting and audit rights for the Settlement Period, WARGAMING shall pay INDIVIDUALS a non-recoupable amount of *four million US Dollars (US$4,000,000.00)* (the "**Settlement Amount**"). This Settlement Amount shall be payable in one instalment within thirty (30) business days following the Effective Date.

    The Settlement Amount is the gross amount that INDIVIDUALS shall actually receive in their bank accounts before payment of any taxes that are applicable to such kind of income under the laws of Republic of Belarus; the INDIVIDUALS shall be responsible for payment of the INDIVIDUALS' taxes in Belarus associated with the Settlement Amount.





THUS, the Parties executed this amendment as of the Effective Date.

**WARGAMING WORLD LIMITED:**

Signed:                        .

Full Name:

Title:                         .

**INDIVIDUALS:**

**ANDREI KARPI**

Signed:

**VITALI BARAD**

Signed:             .

**STSIAPAN DRO**

Signed:            ..

**DZMITRY BABI**

Signed:            ..

5



# EXHIBIT F

**CONFIDENTIAL**



## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

This Non-Competition and Non-Solicitation Agreement (this **"Agreement"**) is being executed and delivered as of **August 27, 2013**, by and between:

1)   **ANDREI KARPIUK** an individual with the registration number ░░░░░░░░░ having passport ░░ ░░░░░░░░░ residing in ░░░░░░░░░ Lesnoy, Republic of Belarus (the **"INDIVIDUAL"**), in favor and for the benefit of

2)   **WARGAMING WORLD LIMITED**, a limited liability private company registered under the laws of the Republic of Cyprus with registration number HE 317029 (the **"WARGAMING"**);

All capitalized terms used but not defined herein shall have the respective meanings ascribed thereto in the TRANSFER OF RIGHTS & FUTURE COOPERATION AGREEMENT (as defined below).

### RECITALS:

**WHEREAS**, concurrently with the execution of this Agreement, WARGAMING and the INDIVIDUAL are entering into that certain TRANSFER OF RIGHTS & FUTURE COOPERATION AGREEMENT (the **"PRINCIPAL AGREEMENT"**);

**WHEREAS**, WARGAMING is purchasing specific assets of the INDIVIDUAL and is assuming certain specified obligations and liabilities of the INDIVIDUAL on the terms and conditions set forth in the PRINCIPAL AGREEMENT (the **"Transaction"**);

**WHEREAS**, INDIVIDUAL will, as a result of the Transaction, receive significant compensation (as provided in Section 4 of the PRINCIPAL AGREEMENT) (the **"Compensation"**), a portion of which is allocated to the purchase of the INDIVIDUAL's goodwill;

**WHEREAS**, the Parties also agreed, as evidenced in the PRINCIPAL AGREEMENT, that the INDIVIDUAL shall have the obligation to continue his work for the WARGAMING GROUP (as defined in Section 11.1 of the PRINCIPAL AGREEMENT) as related to the further development of *World of Tanks. Blitz* (and as more specifically defined in the PRINCIPAL AGREEMENT), and that WARGAMING GROUP shall pay the INDIVIDUAL a salary that adequately reflects his expertise and his experience as well as the overall market context of the games industry in the particular location where such employment carried on (and which salary shall not be lower than the salary received by INDIVIDUAL prior to the Effective Date);

**WHEREAS**, WARGAMING is presently engaged in the business activities related to the operations and business conducted by the WARGAMING GROUP, including the creation, development, marketing, operation, licensing, sale and other modes of distribution of interactive entertainment for various platforms without any

**CONFIDENTIAL**

WARGAMING WORLD LIMITED / ANDREI KARPIUK        NON-COMPETITION AND NON-SOLICITATION AGREEMENT

limitations and restrictions, online games (including massively multiplayer online games) and other products and services (the "**Business**") in each and every country, province, state, city, and other political subdivision of the world (the "**Restricted Territory**");

**WHEREAS,** WARGAMING is also presently engaged in the business activities related to the operations and business conducted by the WARGAMING GROUP specifically in the area of the creation, development, marketing, operation, licensing, sale and other modes of distribution of interactive entertainment for various mobile, tablet and handheld platforms (the "**Specific Business**") in the Restricted Territory; and at the same time, INDIVIDUAL is also presently engaged the Specific Business of WARGAMING GROUP;

**WHEREAS,** following the execution of the PRINCIPAL AGREEMENT (the "**Effective Date**"), WARGAMING intends to continue to conduct and operate the Business in general, and the Specific Business in particular;

**WHEREAS,** INDIVIDUAL understands that the continuity of the Business and Specific Business is essential to WARGAMING and the INDIVIDUAL's ability to induce WARGAMING to enter into the PRINCIPAL AGREEMENT and complete the transactions contemplated thereby, and that after consummation of the Transaction, WARGAMING would be irreparably injured if the INDIVIDUAL were to enter into any business activity in competition with the Business in general, and in the Specific Business in particular; and

**WHEREAS,** as a condition to WARGAMING's obligations under the PRINCIPAL AGREEMENT and to preserve the value of the Transaction, the PRINCIPAL AGREEMENT contemplates, among other things, that INDIVIDUAL enter into this Agreement and that this Agreement become effective upon the Effective Date.

**NOW, THEREFORE,** in consideration of the mutual promises made herein, the WARGAMING and INDIVIDUAL hereby agree as follows, effective as of the Effective Date (as defined above):

1.      **Non-Competition.**

1.1.    **Non-Competition Obligation.**  The termination of the full-time employment relationship between the WARGAMING GROUP and the INDIVIDUAL shall be defined as an "**Employment Termination**" for purposes of this Agreement.  Further:

1.1.1.   During the period commencing on the Effective Date and ending on the one (1)-year anniversary of the date of the Employment Termination, where (a) WARGAMING GROUP and INDIVIDUAL terminate their relationship by means of mutual execution of the relevant termination agreement; (b) WARGAMING GROUP terminate such employment relationship for cause, or (c) INDIVIDUAL voluntarily terminates such employment relationship through no fault of WARGAMING or WARGAMING GROUP, or (d) INDIVIDUAL terminates such employment relationship for cause (except in the case of termination by the INDIVIDUAL due to WARGAMING's failure to timely pay any amounts due INDIVIDUAL under the PRINCIPAL AGREEMENT (including without limitation Compensation), which termination shall be governed by Section 1.1.3 below),  INDIVIDUAL shall not (other than in connection with his employment services to the WARGAMING GROUP), without the prior written consent of WARGAMING, engage in any Prohibited Activity (as defined below).

1.1.2.   During the period commencing on the Effective Date and ending six (6) months after the date of the Employment Termination, where WARGAMING terminates such employment relationship for no reason (i.e., without cause), the INDIVIDUAL shall not (other than in connection with his employment services to the WARGAMING GROUP), without the prior written consent of WARGAMING, engage in any Prohibited Activity.

**CONFIDENTIAL**

1.1.3.   In the event the employment relationship between the WARGAMING GROUP and the INDIVIDUAL is terminated by INDIVIDUAL due to WARGAMING's failure to timely pay any amounts due to INDIVIDUAL under the PRINCIPAL AGREEMENT (including without limitation the Compensation), the Non-Competition Obligation under these Sections 1.1.1 and 1.1.2 and penalty under Section 1.3 shall not apply and shall be null, void and of no further effect, and INDIVIDUAL shall be free to engage in any so-called Prohibited Activity without any restriction.

1.2.   **Prohibited Activity.** For purposes of this Agreement, "Prohibited Activity" means to:

(a)      participate or engage, anywhere in the Restricted Territory, in any business (including research and development), operations, activities and/or services, that are or involve the creation, design, development, modification, marketing, licensing, sale or other distribution of (1) any Multiplayer Online Battle Arena (MOBA) electronic or video games, massively multiplayer online games, multi- and single player electronic and video games (whether for gaming consoles, PCs, hand-held devices, including tablets, mobile and cell phone devices, or any other electronic platforms), where any such games feature the use of tanks, warplanes, battleships, helicopters, or robots, or (2) games that are based in significant part on elements substantially similar to those in the Game and/or World of Tanks. Blitz (as defined in the PRINCIPAL AGREEMENT), and/or any other electronic and video games that are currently are planned and/or being developed by WARGAMING GROUP, without regard the INDIVIDIAL's actual involvement into the development of such ) ("Competing Business Purpose");

(b)      be or become an officer, director, stockholder, owner, Affiliate, salesperson, co-owner, partner, trustee, promoter, technician, engineer, analyst, employee, agent, representative, supplier, contractor, consultant, advisor or manager of or to, or otherwise acquire or hold any interest in, or participate in or facilitate the financing, operation, management or control of, or otherwise assist any firm, partnership, corporation, person, entity or business that engages or participates in a Competing Business Purpose in the Restricted Territory;

(c)      approach, contact or solicit the WARGAMING's or any of its Subsidiaries' or Affiliates' customers, suppliers, developers, resellers or other business partners in connection with a Competing Business Purpose; or

(d)      affirmatively authorize INDIVIDUAL's name or reputation to be used in connection with a business that has a Competing Business Purpose.

1.3.   **Effect of Failure to Comply with Non-Competition Obligation.**

1.3.1.   In the event that INDIVIDUAL fails to comply with the Non-Competition Obligation as provided in Sections 1.1 *and* 1.2 above and fails to cure such failure within thirty (30) days of his receipt of written notice from WARGAMING of such failure, WARGAMING shall be entitled to receive from the INDIVIDUAL a penalty of Twelve and One-Half percent (12.5%) of the Compensation that is paid or is due to be paid to the INDIVIDUAL under the PRINCIPAL AGREEMENT from the Effective Date and up to such date that WARGAMING is obliged to pay the Compensation under the terms of the PRINCIPAL AGREEMENT (the **"Final Payment Date"**), which Final Payment Date varies depending on the cause for the Employment Termination. Such penalty shall be due and payable by the INDIVIDUAL immediately upon receipt of the corresponding notice from WARGAMING that is served by WARGAMING upon INDIVIDUAL's failure to timely cure such breach of the Non-Competition Obligation. WARGAMING shall have the right to set-off such penalty against the Compensation that is still due to be paid to the INDIVIDUAL.  The foregoing penalty shall only apply for an uncured violation of the Non-Competition Obligation that occurs during the period commencing on the Effective Date up through the end of the Minimum Contribution Period.

**CONFIDENTIAL**

WARGAMING WORLD LIMITED / ANDREI KARPIUK          NON-COMPETITION AND NON-SOLICITATION AGREEMENT

    1.3.2.    For an uncured violation of the Non-Competition Obligation that occurs during the first 12-month immediately following the end of the Minimum Contribution Period, the penalty shall be Five percent (5.0%) of the Compensation that is paid or is due to be paid to the INDIVIDUAL under the PRINCIPAL AGREEMENT from the Effective Date up to the Final Payment Date.

    1.3.3.    For an uncured violation of the Non-Competition Obligation that occurs during the period following the expiration of the first 12-month period as defined in Section 1.3.2 above, the penalty shall be Two and One-Half percent (2.5%) of the Compensation that is paid or is due to be paid to the INDIVIDUAL under the PRINCIPAL AGREEMENT from the end of the Minimum Contribution Period up to the Final Payment Date.

2.    **Non-Solicitation**.

2.1.    **Non-Solicitation Obligation**. INDIVIDUAL further agrees that INDIVIDUAL shall not during the period commencing on the Effective Date and ending on the one (1)-year anniversary of the Employment Termination personally or through others encourage, induce, attempt to induce, solicit or attempt to solicit (on INDIVIDUAL's own behalf or on behalf of any other person or entity), or take any other action which is intended to induce or encourage, or has the effect of inducing or encouraging, any employee of the WARGAMING GROUP to leave his or her employment with the WARGAMING GROUP to engage in a Prohibited Activity with INDIVIDUAL. For the avoidance of doubt, in the event any employee of the WARGAMING GROUP leaves his or her employment with the WARGAMING GROUP on his or her own, and not as a result of any inducement, attempt to induce, solicitation or attempt to solicit by INDIVIDUAL or any other person or entity acting on behalf of INDIVIDUAL, such departure shall not be deemed a violation of the Non-Solicitation Obligation.

2.2.    **Effect of Failure to Comply with Non-Solicitation Obligation**. In the event that INDIVIDUAL fails to comply with the Non-Solicitation Obligation as provided in Section 2.1 above, WARGAMING shall be entitled to receive from the INDIVIDUAL a penalty of one hundred thousand US Dollars (USD $100.000,00) for each such employee. Such penalty shall be due and payable by the INDIVIDUAL immediately upon receipt of the corresponding notice from WARGAMING that is served by WARGAMING upon INDIVIDUAL's breach of Non-Solicitation Obligation. WARGAMING shall have the right to set-off such penalty against the Compensation that is still due to be paid to the INDIVIDUAL.

2.3.    **Non-applicability of Non-Solicitation Obligation**. In the event the employment relationship between the WARGAMING GROUP and the INDIVIDUAL is terminated by INDIVIDUAL due to WARGAMING's failure to timely pay any amounts due INDIVIDUAL under the PRINCIPAL AGREEMENT (including without limitation Compensation), the Non-Solicitation Obligation and penalty set forth in Section 2.1 and Section 2.2 shall not apply and shall be null, void and of no further effect.

3.    **Severability of Covenants**. The covenants contained in Sections 1 *and* 2 hereof shall be construed as a series of separate covenants, one for each country, province, state, city or other political subdivision of the Restricted Territory. Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenant contained in Sections 1 *and* 2 hereof. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In the event that the provisions of Sections 1 *and* 2 are deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, permitted by applicable law.

4.    **Independence of Obligations**. The covenants and obligations of INDIVIDUAL set forth in this Agreement shall be construed as independent of any other agreement or arrangement between INDIVIDUAL, on the one hand, and the WARGAMING on the other.



DAVA_WG_NonCompet_NonSolicitation_Agreement_Andrew_Karpiuk_8-27-13_FINAL&CLEAN          Page 4 of 6

**CONFIDENTIAL**

WARGAMING WORLD LIMITED / ANDREI KARPIUK          NON-COMPETITION AND NON-SOLICITATION AGREEMENT

5.      **INDIVIDUAL Acknowledgement**. INDIVIDUAL acknowledges that (i) INDIVIDUAL is a key employee of a division of WARGAMING GROUP engaged into the Specific Business; (ii) the goodwill associated with the existing Specific Business, customers and assets of WARGAMING GROUP prior to the Transaction is an integral component of the value of INDIVIDUAL to WARGAMING GROUP and is reflected in the Compensation payable to INDIVIDUAL in connection with the Transaction; and (iii) INDIVIDUAL's agreement as set forth herein is necessary to preserve the value of the Transaction for WARGAMING GROUP following the Effective Date. INDIVIDUAL also acknowledges that the limitations of time, geography and scope of activity agreed to in this Agreement are reasonable because, among other things: (A) WARGAMING GROUP is engaged in a highly competitive industry, (B) INDIVIDUAL has unique access to, and will continue to have access to, the trade secrets and know-how of WARGAMING GROUP, including, without limitation, the plans and strategy (and, in particular, the competitive strategy) of WARGAMING GROUP, (C) INDIVIDUAL is accepting employment with WARGAMING GROUP on favorable terms in connection with the Transaction, (D) this Agreement provides no more protection than is necessary to protect WARGAMING's and WARGAMING GROUP's interests in its goodwill, trade secrets and confidential information. INDIVIDUAL's obligations under Sections 1, 2 and 3 of this Agreement shall remain in effect for the time period set forth herein, subject to the terms and conditions hereof.

6.      **Non-Exclusivity**. The rights and remedies of WARGAMING hereunder are not exclusive of or limited by any other rights or remedies that WARGAMING may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative (and not alternative),. Without limiting the generality of the foregoing, the rights and remedies of WARGAMING hereunder, and the obligations and liabilities of INDIVIDUAL hereunder, are in addition to their respective rights, remedies, obligations and liabilities under the law of unfair competition, misappropriation of trade secrets and the like. This Agreement does not limit either party's obligations or the rights of either party under the terms of any other agreement between INDIVIDUAL and WARGAMING/WARGAMING GROUP.

7.      **Notices**. *All notices and other communications hereunder shall be in writing and shall be served* according to the rules set out in the PRINCIPAL AGREEMENT.

8.      **Severability**. In the event that any provision of this Agreement or the application thereof becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto. The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

9.      **Jurisdiction**. This Agreement shall be construed and interpreted pursuant to the laws of Republic of Cyprus, without regard to conflicts of laws principles. The Parties hereto voluntarily and irrevocably submit and consent to the binding jurisdiction of the International Center of Dispute Resolution ("**ICDR**") sitting in Nicosia, Cyprus in any action brought to enforce (or otherwise relating to) this Agreement, and waive any objection thereto on the basis of personal jurisdiction or venue. The ICDR arbitration proceedings will be conducted by a single arbitrator and in the English language. Parties and witnesses residing outside of Cyprus may testify telephonically or via such other audio/visual means approved by the arbitrator. If any legal action or any other proceeding is brought for the enforcement of this Agreement, or if a dispute arises under this Agreement, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it may be entitled. Any Party in whose favor a judgment has been entered shall also be entitled to recovery of its attorneys' fees and costs in enforcing such judgment. The decision of the ICDR shall be final and non-appealable, and may be entered in any court of competent jurisdiction.

10.      **Waiver**. No failure on the part of WARGAMING to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of WARGAMING in exercising any power, right, privilege or remedy

**CONFIDENTIAL**

WARGAMING WORLD LIMITED / ANDREI KARPIUK          NON-COMPETITION AND NON-SOLICITATION AGREEMENT

under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy. WARGAMING shall not be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such party; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

11.     **Entire Agreement**.  This Agreement and the other agreements referred herein between the parties hereto constitute the entire agreement between the INDIVIDUAL and WARGAMING with respect to the subject matter hereof and supersede all prior agreements and understandings both written and oral, between the parties with respect to the subject matter hereof.  For the avoidance of doubt, this Agreement shall not limit either party's obligations or rights under the PRINCIPAL AGREEMENT or otherwise supersede the PRINCIPAL AGREEMENT.

12.     **Amendments and Modification**.  This Agreement may not be amended, modified, altered, or supplemented except upon the execution and delivery of a written agreement executed by the parties hereto.

13.     **Assignment**.  This Agreement and all obligations hereunder are personal to the INDIVIDUAL and may not be transferred or assigned by INDIVIDUAL at any time.  WARGAMING may assign its rights under this Agreement to any of the companies of the WARGAMING GROUP.

14.     **Binding Nature**.  This Agreement will be binding upon the INDIVIDUAL, and will inure to the benefit of WARGAMING and WARGAMING GROUP.

**WARGAMING WORLD LIMITED:**                    **ANDREI KARPIUK**

Signed:                                          Signed:  ................              ................

Full Name:

Title:

**CONFIDENTIAL**



<u>NON-COMPETITION AND NON-SOLICITATION AGREEMENT</u>

This Non-Competition and Non-Solicitation Agreement (this "**Agreement**") is being executed and delivered as of **August 27, 2013**, by and between:

1) **VITALI BARADOUSKI** an individual with the registration number ▮▮▮▮▮▮ residing ▮▮▮▮▮▮, Minsk, Republic of Belarus (the "**INDIVIDUAL**"), in favor and for the benefit of

2) **WARGAMING WORLD LIMITED**, a limited liability private company registered under the laws of the Republic of Cyprus with registration number HE 317029 (the "**WARGAMING**");

All capitalized terms used but not defined herein shall have the respective meanings ascribed thereto in the TRANSFER OF RIGHTS & FUTURE COOPERATION AGREEMENT (as defined below).

<u>RECITALS:</u>

**WHEREAS**, concurrently with the execution of this Agreement, WARGAMING and the INDIVIDUAL are entering into that certain TRANSFER OF RIGHTS & FUTURE COOPERATION AGREEMENT (the "**PRINCIPAL AGREEMENT**");

**WHEREAS**, WARGAMING is purchasing specific assets of the INDIVIDUAL and is assuming certain specified obligations and liabilities of the INDIVIDUAL on the terms and conditions set forth in the PRINCIPAL AGREEMENT (the "**Transaction**");

**WHEREAS**, INDIVIDUAL will, as a result of the Transaction, receive <u>significant compensation</u> (as provided in <u>Section 4</u> of the PRINCIPAL AGREEMENT) (the "**Compensation**"), a portion of which is allocated to the purchase of the INDIVIDUAL's goodwill;

**WHEREAS**, the Parties also agreed, as evidenced in the PRINCIPAL AGREEMENT, that the INDIVIDUAL shall have the obligation to continue his work for the WARGAMING GROUP (as defined in <u>Section 11.1</u> of the PRINCIPAL AGREEMENT) as related to the further development of *World of Tanks. Blitz* (and as more specifically defined in the PRINCIPAL AGREEMENT), and that WARGAMING GROUP shall pay the INDIVIDUAL a salary that adequately reflects his expertise and his experience as well as the overall market context of the games industry in the particular location where such employment carried on (and which salary shall not be lower than the salary received by INDIVIDUAL prior to the Effective Date);

**WHEREAS,** WARGAMING is presently engaged in the business activities related to the operations and business conducted by the WARGAMING GROUP, including the creation, development, marketing, operation, licensing, sale and other modes of distribution of interactive entertainment for various platforms without any

**CONFIDENTIAL**

limitations and restrictions, online games (including massively multiplayer online games) and other products and services (the "**Business**") in each and every country, province, state, city, and other political subdivision of the world (the "**Restricted Territory**");

**WHEREAS,** WARGAMING is also presently engaged in the business activities related to the operations and business conducted by the WARGAMING GROUP specifically in the area of the creation, development, marketing, operation, licensing, sale and other modes of distribution of interactive entertainment for various mobile, tablet and handheld platforms (the "**Specific Business**") in the Restricted Territory; and at the same time, INDIVIDUAL is also presently engaged the Specific Business of WARGAMING GROUP;

**WHEREAS**, following the execution of the PRINCIPAL AGREEMENT (the "**Effective Date**"), WARGAMING intends to continue to conduct and operate the Business in general, and the Specific Business in particular;

**WHEREAS**, INDIVIDUAL understands that the continuity of the Business and Specific Business is essential to WARGAMING and the INDIVIDUAL's ability to induce WARGAMING to enter into the PRINCIPAL AGREEMENT and complete the transactions contemplated thereby, and that after consummation of the Transaction, WARGAMING would be irreparably injured if the INDIVIDUAL were to enter into any business activity in competition with the Business in general, and in the Specific Business in particular; and

**WHEREAS**, as a condition to WARGAMING's obligations under the PRINCIPAL AGREEMENT and to preserve the value of the Transaction, the PRINCIPAL AGREEMENT contemplates, among other things, that INDIVIDUAL enter into this Agreement and that this Agreement become effective upon the Effective Date.

**NOW, THEREFORE**, in consideration of the mutual promises made herein, the WARGAMING and INDIVIDUAL hereby agree as follows, effective as of the Effective Date (as defined above):

1. **Non-Competition**.

1.1. **Non-Competition Obligation.** The termination of the full-time employment relationship between the WARGAMING GROUP and the INDIVIDUAL shall be defined as an "**Employment Termination**" for purposes of this Agreement. Further:

    1.1.1. During the period commencing on the Effective Date and ending on the one (1)-year anniversary of the date of the Employment Termination, where (a) WARGAMING GROUP and INDIVIDUAL terminate their relationship by means of mutual execution of the relevant termination agreement; (b) WARGAMING GROUP terminate such employment relationship for cause, or (c) INDIVIDUAL voluntarily terminates such employment relationship through no fault of WARGAMING or WARGAMING GROUP, or (d) INDIVIDUAL terminates such employment relationship for cause (except in the case of termination by the INDIVIDUAL due to WARGAMING's failure to timely pay any amounts due INDIVIDUAL under the PRINCIPAL AGREEMENT (including without limitation Compensation), which termination shall be governed by Section 1.1.3 below), INDIVIDUAL shall not (other than in connection with his employment services to the WARGAMING GROUP), without the prior written consent of WARGAMING, engage in any Prohibited Activity (as defined below).

    1.1.2. During the period commencing on the Effective Date and ending six (6) months after the date of the Employment Termination, where WARGAMING terminates such employment relationship for no reason (i.e., without cause), the INDIVIDUAL shall not (other than in connection with his employment services to the WARGAMING GROUP), without the prior written consent of WARGAMING, engage in any Prohibited Activity.

**CONFIDENTIAL**

1.1.3.   In the event the employment relationship between the WARGAMING GROUP and the INDIVIDUAL is terminated by INDIVIDUAL due to WARGAMING's failure to timely pay any amounts due to INDIVIDUAL under the PRINCIPAL AGREEMENT (including without limitation the Compensation), the Non-Competition Obligation under these Sections 1.1.1 and 1.1.2 and penalty under Section 1.3 shall not apply and shall be null, void and of no further effect, and INDIVIDUAL shall be free to engage in any so-called Prohibited Activity without any restriction.

1.2.   **Prohibited Activity.** For purposes of this Agreement, "Prohibited Activity" means to:

(a)   participate or engage, anywhere in the Restricted Territory, in any business (including research and development), operations, activities and/or services, that are or involve the creation, design, development, modification, marketing, licensing, sale or other distribution of (1) any Multiplayer Online Battle Arena (MOBA) electronic or video games, massively multiplayer online games, multi- and single player electronic and video games (whether for gaming consoles, PCs, hand-held devices, including tablets, mobile and cell phone devices, or any other electronic platforms), where any such games feature the use of tanks, warplanes, battleships, helicopters, or robots, or (2) games that are based in significant part on elements substantially similar to those in the Game and/or World of Tanks. Blitz (as defined in the PRINCIPAL AGREEMENT), and/or any other electronic and video games that are currently are planned and/or being developed by WARGAMING GROUP, without regard the INDIVIDIAL's actual involvement into the development of such ) ("Competing Business Purpose");

(b)   be or become an officer, director, stockholder, owner, Affiliate, salesperson, co-owner, partner, trustee, promoter, technician, engineer, analyst, employee, agent, representative, supplier, contractor, consultant, advisor or manager of or to, or otherwise acquire or hold any interest in, or participate in or facilitate the financing, operation, management or control of, or otherwise assist any firm, partnership, corporation, person, entity or business that engages or participates in a Competing Business Purpose in the Restricted Territory;

(c)   approach, contact or solicit the WARGAMING's or any of its Subsidiaries' or Affiliates' customers, suppliers, developers, resellers or other business partners in connection with a Competing Business Purpose; or

(d)   affirmatively authorize INDIVIDUAL's name or reputation to be used in connection with a business that has a Competing Business Purpose.

1.3.   **Effect of Failure to Comply with Non-Competition Obligation.**

1.3.1.   In the event that INDIVIDUAL fails to comply with the Non-Competition Obligation as provided in Sections 1.1 *and* 1.2 above and fails to cure such failure within thirty (30) days of his receipt of written notice from WARGAMING of such failure, WARGAMING shall be entitled to receive from the INDIVIDUAL a penalty of Twelve and One-Half percent (12.5%) of the Compensation that is paid or is due to be paid to the INDIVIDUAL under the PRINCIPAL AGREEMENT from the Effective Date and up to such date that WARGAMING is obliged to pay the Compensation under the terms of the PRINCIPAL AGREEMENT (the "**Final Payment Date**"), which Final Payment Date varies depending on the cause for the Employment Termination. Such penalty shall be due and payable by the INDIVIDUAL immediately upon receipt of the corresponding notice from WARGAMING that is served by WARGAMING upon INDIVIDUAL's failure to timely cure such breach of the Non-Competition Obligation. WARGAMING shall have the right to set-off such penalty against the Compensation that is still due to be paid to the INDIVIDUAL.   The foregoing penalty shall only apply for an uncured violation of the Non-Competition Obligation that occurs during the period commencing on the Effective Date up through the end of the Minimum Contribution Period.

# CONFIDENTIAL

    1.3.2.   For an uncured violation of the Non-Competition Obligation that occurs during the first 12-month immediately following the end of the Minimum Contribution Period, the penalty shall be Five percent (5.0%) of the Compensation that is paid or is due to be paid to the INDIVIDUAL under the PRINCIPAL AGREEMENT from the Effective Date up to the Final Payment Date.

    1.3.3.   For an uncured violation of the Non-Competition Obligation that occurs during the period following the expiration of the first 12-month period as defined in Section 1.3.2 above, the penalty shall be Two and One-Half percent (2.5%) of the Compensation that is paid or is due to be paid to the INDIVIDUAL under the PRINCIPAL AGREEMENT from the end of the Minimum Contribution Period up to the Final Payment Date.

## 2.     **Non-Solicitation**.

2.1.     **Non-Solicitation Obligation.** INDIVIDUAL further agrees that INDIVIDUAL shall not during the period commencing on the Effective Date and ending on the one (1)-year anniversary of the Employment Termination personally or through others encourage, induce, attempt to induce, solicit or attempt to solicit (on INDIVIDUAL's own behalf or on behalf of any other person or entity), or take any other action which is intended to induce or encourage, or has the effect of inducing or encouraging, any employee of the WARGAMING GROUP to leave his or her employment with the WARGAMING GROUP to engage in a Prohibited Activity with INDIVIDUAL. For the avoidance of doubt, in the event any employee of the WARGAMING GROUP leaves his or her employment with the WARGAMING GROUP on his or her own, and not as a result of any inducement, attempt to induce, solicitation or attempt to solicit by INDIVIDUAL, or any other person or entity acting on behalf of INDIVIDUAL, such departure shall not be deemed a violation of the Non-Solicitation Obligation.

2.2.     **Effect of Failure to Comply with Non-Solicitation Obligation**. In the event that INDIVIDUAL fails to comply with the Non-Solicitation Obligation as provided in <u>Section 2.1</u> above, WARGAMING shall be entitled to receive from the INDIVIDUAL a penalty of one hundred thousand US Dollars (USD $100.000,00) for each such employee. Such penalty shall be due and payable by the INDIVIDUAL immediately upon receipt of the corresponding notice from WARGAMING that is served by WARGAMING upon INDIVIDUAL's breach of Non-Solicitation Obligation. WARGAMING shall have the right to set-off such penalty against the Compensation that is still due to be paid to the INDIVIDUAL.

2.3.     **Non-applicability of Non-Solicitation Obligation**. In the event the employment relationship between the WARGAMING GROUP and the INDIVIDUAL is terminated by INDIVIDUAL due to WARGAMING's failure to timely pay any amounts due INDIVIDUAL under the PRINCIPAL AGREEMENT (including without limitation Compensation), the Non-Solicitation Obligation and penalty set forth in Section 2.1 and Section 2.2 shall not apply and shall be null, void and of no further effect.

3.     **Severability of Covenants**. The covenants contained in <u>Sections 1 and 2</u> hereof shall be construed as a series of separate covenants, one for each country, province, state, city or other political subdivision of the Restricted Territory. Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenant contained in <u>Sections 1 and 2</u> hereof. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In the event that the provisions of <u>Sections 1 and 2</u> are deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, permitted by applicable law.

4.     **Independence of Obligations**. The covenants and obligations of INDIVIDUAL set forth in this Agreement shall be construed as independent of any other agreement or arrangement between INDIVIDUAL, on the one hand, and the WARGAMING on the other.

# CONFIDENTIAL

5.      **INDIVIDUAL Acknowledgement**. INDIVIDUAL acknowledges that (i) INDIVIDUAL is a key employee of a division of WARGAMING GROUP engaged into the Specific Business; (ii) the goodwill associated with the existing Specific Business, customers and assets of WARGAMING GROUP prior to the Transaction is an integral component of the value of INDIVIDUAL to WARGAMING GROUP and is reflected in the Compensation payable to INDIVIDUAL in connection with the Transaction; and (iii) INDIVIDUAL's agreement as set forth herein is necessary to preserve the value of the Transaction for WARGAMING GROUP following the Effective Date. INDIVIDUAL also acknowledges that the limitations of time, geography and scope of activity agreed to in this Agreement are reasonable because, among other things: (A) WARGAMING GROUP is engaged in a highly competitive industry, (B) INDIVIDUAL has unique access to, and will continue to have access to, the trade secrets and know-how of WARGAMING GROUP, including, without limitation, the plans and strategy (and, in particular, the competitive strategy) of WARGAMING GROUP, (C) INDIVIDUAL is accepting employment with WARGAMING GROUP on favorable terms in connection with the Transaction, (D) this Agreement provides no more protection than is necessary to protect WARGAMING's and WARGAMING GROUP's interests in its goodwill, trade secrets and confidential information. INDIVIDUAL's obligations under Sections 1, 2 and 3 of this Agreement shall remain in effect for the time period set forth herein, subject to the terms and conditions hereof.

6.      **Non-Exclusivity**. The rights and remedies of WARGAMING hereunder are not exclusive of or limited by any other rights or remedies that WARGAMING may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative (and not alternative),. Without limiting the generality of the foregoing, the rights and remedies of WARGAMING hereunder, and the obligations and liabilities of INDIVIDUAL hereunder, are in addition to their respective rights, remedies, obligations and liabilities under the law of unfair competition, misappropriation of trade secrets and the like. This Agreement does not limit either party's obligations or the rights of either party under the terms of any other agreement between INDIVIDUAL and WARGAMING/WARGAMING GROUP.

7.      **Notices**. All notices and other communications hereunder shall be in writing and shall be served according to the rules set out in the PRINCIPAL AGREEMENT.

8.      **Severability**. In the event that any provision of this Agreement or the application thereof becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto. The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

9.      **Jurisdiction**. This Agreement shall be construed and interpreted pursuant to the laws of Republic of Cyprus, without regard to conflicts of laws principles. The Parties hereto voluntarily and irrevocably submit and consent to the binding jurisdiction of the International Center of Dispute Resolution ("**ICDR**") sitting in Nicosia, Cyprus in any action brought to enforce (or otherwise relating to) this Agreement, and waive any objection thereto on the basis of personal jurisdiction or venue. The ICDR arbitration proceedings will be conducted by a single arbitrator and in the English language. Parties and witnesses residing outside of Cyprus may testify telephonically or via such other audio/visual means approved by the arbitrator. If any legal action or any other proceeding is brought for the enforcement of this Agreement, or if a dispute arises under this Agreement, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it may be entitled. Any Party in whose favor a judgment has been entered shall also be entitled to recovery of its attorneys' fees and costs in enforcing such judgment. The decision of the ICDR shall be final and non-appealable, and may be entered in any court of competent jurisdiction.

10.     **Waiver**. No failure on the part of WARGAMING to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of WARGAMING in exercising any power, right, privilege or remedy

**CONFIDENTIAL**

under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy. WARGAMING shall not be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such party; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

11.      **Entire Agreement**.  This Agreement and the other agreements referred herein between the parties hereto constitute the entire agreement between the INDIVIDUAL and WARGAMING with respect to the subject matter hereof and supersede all prior agreements and understandings both written and oral, between the parties with respect to the subject matter hereof.  For the avoidance of doubt, this Agreement shall not limit either party's obligations or rights under the PRINCIPAL AGREEMENT or otherwise supersede the PRINCIPAL AGREEMENT.

12.      **Amendments and Modification**.  This Agreement may not be amended, modified, altered, or supplemented except upon the execution and delivery of a written agreement executed by the parties hereto.

13.      **Assignment**.  This Agreement and all obligations hereunder are personal to the INDIVIDUAL and may not be transferred or assigned by INDIVIDUAL at any time.  WARGAMING may assign its rights under this Agreement to any of the companies of the WARGAMING GROUP.

14.      **Binding Nature**.  This Agreement will be binding upon the INDIVIDUAL, and will inure to the benefit of WARGAMING and WARGAMING GROUP.

**WARGAMING WORLD LIMITED:**                    **VITALI BARADOUSKI**

Signed:                                          Signed:

Full Name:

Title:

**CONFIDENTIAL**



## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

This Non-Competition and Non-Solicitation Agreement (this "**Agreement**") is being executed and delivered as of **August 27, 2013**, by and between:

1) **STSIAPAN DROZD** an individual with the registration number ▮▮▮▮▮▮▮ having passport ▮▮▮▮▮▮▮ residing in ▮▮▮▮▮▮▮ Minsk, Republic of Belarus (the "**INDIVIDUAL**"), in favor and for the benefit of

2) **WARGAMING WORLD LIMITED**, a limited liability private company registered under the laws of the Republic of Cyprus with registration number HE 317029 (the "**WARGAMING**");

All capitalized terms used but not defined herein shall have the respective meanings ascribed thereto in the TRANSFER OF RIGHTS & FUTURE COOPERATION AGREEMENT (as defined below).

### RECITALS:

**WHEREAS**, concurrently with the execution of this Agreement, WARGAMING and the INDIVIDUAL are entering into that certain TRANSFER OF RIGHTS & FUTURE COOPERATION AGREEMENT (the "**PRINCIPAL AGREEMENT**");

**WHEREAS**, WARGAMING is purchasing specific assets of the INDIVIDUAL and is assuming certain specified obligations and liabilities of the INDIVIDUAL on the terms and conditions set forth in the PRINCIPAL AGREEMENT (the "**Transaction**");

**WHEREAS**, INDIVIDUAL will, as a result of the Transaction, receive <u>significant compensation</u> (as provided in <u>Section 4</u> of the PRINCIPAL AGREEMENT) (the "**Compensation**"), a portion of which is allocated to the purchase of the INDIVIDUAL's goodwill;

**WHEREAS**, the Parties also agreed, as evidenced in the PRINCIPAL AGREEMENT, that the INDIVIDUAL shall have the obligation to continue his work for the WARGAMING GROUP (as defined in <u>Section 11.1</u> of the PRINCIPAL AGREEMENT) as related to the further development of *World of Tanks: Blitz* (and as more specifically defined in the PRINCIPAL AGREEMENT), and that WARGAMING GROUP shall pay the INDIVIDUAL a salary that adequately reflects his expertise and his experience as well as the overall market context of the games industry in the particular location where such employment carried on (and which salary shall not be lower than the salary received by INDIVIDUAL prior to the Effective Date);

**WHEREAS,** WARGAMING is presently engaged in the business activities related to the operations and business conducted by the WARGAMING GROUP, including the creation, development, marketing, operation, licensing, sale and other modes of distribution of interactive entertainment for various platforms without any

**CONFIDENTIAL**

limitations and restrictions, online games (including massively multiplayer online games) and other products and services (the "**Business**") in each and every country, province, state, city, and other political subdivision of the world (the "**Restricted Territory**");

**WHEREAS**, WARGAMING is also presently engaged in the business activities related to the operations and business conducted by the WARGAMING GROUP specifically in the area of the creation, development, marketing, operation, licensing, sale and other modes of distribution of interactive entertainment for various mobile, tablet and handheld platforms (the "**Specific Business**") in the Restricted Territory; and at the same time, INDIVIDUAL is also presently engaged the Specific Business of WARGAMING GROUP;

**WHEREAS**, following the execution of the PRINCIPAL AGREEMENT (the "**Effective Date**"), WARGAMING intends to continue to conduct and operate the Business in general, and the Specific Business in particular;

**WHEREAS**, INDIVIDUAL understands that the continuity of the Business and Specific Business is essential to WARGAMING and the INDIVIDUAL's ability to induce WARGAMING to enter into the PRINCIPAL AGREEMENT and complete the transactions contemplated thereby, and that after consummation of the Transaction, WARGAMING would be irreparably injured if the INDIVIDUAL were to enter into any business activity in competition with the Business in general, and in the Specific Business in particular; and

**WHEREAS**, as a condition to WARGAMING's obligations under the PRINCIPAL AGREEMENT and to preserve the value of the Transaction, the PRINCIPAL AGREEMENT contemplates, among other things, that INDIVIDUAL enter into this Agreement and that this Agreement become effective upon the Effective Date.

**NOW, THEREFORE**, in consideration of the mutual promises made herein, the WARGAMING and INDIVIDUAL hereby agree as follows, effective as of the Effective Date (as defined above):

1. **Non-Competition**.

1.1. **Non-Competition Obligation.** The termination of the full-time employment relationship between the WARGAMING GROUP and the INDIVIDUAL shall be defined as an "**Employment Termination**" for purposes of this Agreement. Further:

1.1.1. During the period commencing on the Effective Date and ending on the one (1)-year anniversary of the date of the Employment Termination, where (a) WARGAMING GROUP and INDIVIDUAL terminate their relationship by means of mutual execution of the relevant termination agreement; (b) WARGAMING GROUP terminate such employment relationship for cause, or (c) INDIVIDUAL voluntarily terminates such employment relationship through no fault of WARGAMING or WARGAMING GROUP, or (d) INDIVIDUAL terminates such employment relationship for cause (except in the case of termination by the INDIVIDUAL due to WARGAMING's failure to timely pay any amounts due INDIVIDUAL under the PRINCIPAL AGREEMENT (including without limitation Compensation), which termination shall be governed by Section 1.1.3 below), INDIVIDUAL shall not (other than in connection with his employment services to the WARGAMING GROUP), without the prior written consent of WARGAMING, engage in any Prohibited Activity (as defined below).

1.1.2. During the period commencing on the Effective Date and ending six (6) months after the date of the Employment Termination, where WARGAMING terminates such employment relationship for no reason (i.e., without cause), the INDIVIDUAL shall not (other than in connection with his employment services to the WARGAMING GROUP), without the prior written consent of WARGAMING, engage in any Prohibited Activity.

## CONFIDENTIAL

1.1.3. In the event the employment relationship between the WARGAMING GROUP and the INDIVIDUAL is terminated by INDIVIDUAL due to WARGAMING's failure to timely pay any amounts due to INDIVIDUAL under the PRINCIPAL AGREEMENT (including without limitation the Compensation), the Non-Competition Obligation under these Sections 1.1.1 and 1.1.2 and penalty under Section 1.3 shall not apply and shall be null, void and of no further effect, and INDIVIDUAL shall be free to engage in any so-called Prohibited Activity without any restriction.

1.2. **Prohibited Activity.** For purposes of this Agreement, "Prohibited Activity" means to:

(a) participate or engage, anywhere in the Restricted Territory, in any business (including research and development), operations, activities and/or services, that are or involve the creation, design, development, modification, marketing, licensing, sale or other distribution of (1) any Multiplayer Online Battle Arena (MOBA) electronic or video games, massively multiplayer online games, multi- and single player electronic and video games (whether for gaming consoles, PCs, hand-held devices, including tablets, mobile and cell phone devices, or any other electronic platforms), where any such games feature the use of tanks, warplanes, battleships, helicopters, or robots, or (2) games that are based in significant part on elements substantially similar to those in the Game and/or World of Tanks. Blitz (as defined in the PRINCIPAL AGREEMENT), and/or any other electronic and video games that are currently are planned and/or being developed by WARGAMING GROUP, without regard the INDIVIDIAL's actual involvement into the development of such ) ("Competing Business Purpose");

(b) be or become an officer, director, stockholder, owner, Affiliate, salesperson, co-owner, partner, trustee, promoter, technician, engineer, analyst, employee, agent, representative, supplier, contractor, consultant, advisor or manager of or to, or otherwise acquire or hold any interest in, or participate in or facilitate the financing, operation, management or control of, or otherwise assist any firm, partnership, corporation, person, entity or business that engages or participates in a Competing Business Purpose in the Restricted Territory;

(c) approach, contact or solicit the WARGAMING's or any of its Subsidiaries' or Affiliates' customers, suppliers, developers, resellers or other business partners in connection with a Competing Business Purpose; or

(d) affirmatively authorize INDIVIDUAL's name or reputation to be used in connection with a business that has a Competing Business Purpose.

1.3. **Effect of Failure to Comply with Non-Competition Obligation.**

1.3.1. In the event that INDIVIDUAL fails to comply with the Non-Competition Obligation as provided in Sections 1.1 and 1.2 above and fails to cure such failure within thirty (30) days of his receipt of written notice from WARGAMING of such failure, WARGAMING shall be entitled to receive from the INDIVIDUAL a penalty of Twelve and One-Half percent (12.5%) of the Compensation that is paid or is due to be paid to the INDIVIDUAL under the PRINCIPAL AGREEMENT from the Effective Date and up to such date that WARGAMING is obliged to pay the Compensation under the terms of the PRINCIPAL AGREEMENT (the "**Final Payment Date**"), which Final Payment Date varies depending on the cause for the Employment Termination. Such penalty shall be due and payable by the INDIVIDUAL immediately upon receipt of the corresponding notice from WARGAMING that is served by WARGAMING upon INDIVIDUAL's failure to timely cure such breach of the Non-Competition Obligation. WARGAMING shall have the right to set-off such penalty against the Compensation that is still due to be paid to the INDIVIDUAL. The foregoing penalty shall only apply for an uncured violation of the Non-Competition Obligation that occurs during the period commencing on the Effective Date up through the end of the Minimum Contribution Period.

Case 2:20-cv-02763-CJC-MRW Document 22 Filed 08/20/20 Page 132 of 159 Page ID #:351

**CONFIDENTIAL**

**WARGAMING WORLD LIMITED / STSIAPAN DROZD**   **NON-COMPETITION AND NON-SOLICITATION AGREEMENT**

1.3.2. For an uncured violation of the Non-Competition Obligation that occurs during the first 12-month immediately following the end of the Minimum Contribution Period, the penalty shall be Five percent (5.0%) of the Compensation that is paid or is due to be paid to the INDIVIDUAL under the PRINCIPAL AGREEMENT from the Effective Date up to the Final Payment Date.

1.3.3. For an uncured violation of the Non-Competition Obligation that occurs during the period following the expiration of the first 12-month period as defined in Section 1.3.2 above, the penalty shall be Two and One-Half percent (2.5%) of the Compensation that is paid or is due to be paid to the INDIVIDUAL under the PRINCIPAL AGREEMENT from the end of the Minimum Contribution Period up to the Final Payment Date.

## 2. **Non-Solicitation**.

2.1. **Non-Solicitation Obligation**. INDIVIDUAL further agrees that INDIVIDUAL shall not during the period commencing on the Effective Date and ending on the one (1)-year anniversary of the Employment Termination personally or through others encourage, induce, attempt to induce, solicit or attempt to solicit (on INDIVIDUAL's own behalf or on behalf of any other person or entity), or take any other action which is intended to induce or encourage, or has the effect of inducing or encouraging, any employee of the WARGAMING GROUP to leave his or her employment with the WARGAMING GROUP to engage in a Prohibited Activity with INDIVIDUAL. For the avoidance of doubt, in the event any employee of the WARGAMING GROUP leaves his or her employment with the WARGAMING GROUP on his or her own, and not as a result of any inducement, attempt to induce, solicitation or attempt to solicit by INDIVIDUAL or any other person or entity acting on behalf of INDIVIDUAL, such departure shall not be deemed a violation of the Non-Solicitation Obligation.

2.2. **Effect of Failure to Comply with Non-Solicitation Obligation**. In the event that INDIVIDUAL fails to comply with the Non-Solicitation Obligation as provided in Section 2.1 above, WARGAMING shall be entitled to receive from the INDIVIDUAL a penalty of one hundred thousand US Dollars (USD $100.000,00) for each such employee. Such penalty shall be due and payable by the INDIVIDUAL immediately upon receipt of the corresponding notice from WARGAMING that is served by WARGAMING upon INDIVIDUAL's breach of Non-Solicitation Obligation. WARGAMING shall have the right to set-off such penalty against the Compensation that is still due to be paid to the INDIVIDUAL.

2.3. **Non-applicability of Non-Solicitation Obligation**. In the event the employment relationship between the WARGAMING GROUP and the INDIVIDUAL is terminated by INDIVIDUAL due to WARGAMING's failure to timely pay any amounts due INDIVIDUAL under the PRINCIPAL AGREEMENT (including without limitation Compensation), the Non-Solicitation Obligation and penalty set forth in Section 2.1 and Section 2.2 shall not apply and shall be null, void and of no further effect.

3. **Severability of Covenants**. The covenants contained in Sections 1 and 2 hereof shall be construed as a series of separate covenants, one for each country, province, state, city or other political subdivision of the Restricted Territory. Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenant contained in Sections 1 and 2 hereof. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In the event that the provisions of Sections 1 and 2 are deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, permitted by applicable law.

4. **Independence of Obligations**. The covenants and obligations of INDIVIDUAL set forth in this Agreement shall be construed as independent of any other agreement or arrangement between INDIVIDUAL, on the one hand, and the WARGAMING on the other.

DAVA_WG_NonCompet_NonSolicitation_Agreement_Stepan_Drozd_8-27-13_FINAL&CLEAN    Page 4 of 6

AB

# CONFIDENTIAL

**WARGAMING WORLD LIMITED / STSIAPAN DROZD**  **NON-COMPETITION AND NON-SOLICITATION AGREEMENT**

under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy. WARGAMING shall not be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such party; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

11.    **Entire Agreement**. This Agreement and the other agreements referred herein between the parties hereto constitute the entire agreement between the INDIVIDUAL and WARGAMING with respect to the subject matter hereof and supersede all prior agreements and understandings both written and oral, between the parties with respect to the subject matter hereof. For the avoidance of doubt, this Agreement shall not limit either party's obligations or rights under the PRINCIPAL AGREEMENT or otherwise supersede the PRINCIPAL AGREEMENT.

12.    **Amendments and Modification**. This Agreement may not be amended, modified, altered, or supplemented except upon the execution and delivery of a written agreement executed by the parties hereto.

13.    **Assignment**. This Agreement and all obligations hereunder are personal to the INDIVIDUAL and may not be transferred or assigned by INDIVIDUAL at any time. WARGAMING may assign its rights under this Agreement to any of the companies of the WARGAMING GROUP.

14.    **Binding Nature**. This Agreement will be binding upon the INDIVIDUAL, and will inure to the benefit of WARGAMING and WARGAMING GROUP.

**WARGAMING WORLD LIMITED:**                    **STSIAPAN DROZD**

Signed:    ........                              Signed:  ...                    ....................
Full Name:  .....
Title:      ........

**CONFIDENTIAL**



## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

This Non-Competition and Non-Solicitation Agreement (this **"Agreement"**) is being executed and delivered as of **August 27, 2013**, by and between:

1) **DZMITRY BABRAUNICHY** an individual with the registration number      having passport I     residing in      Minsk, Belarus (the **"INDIVIDUAL"**), in favor and for the benefit of

2) **WARGAMING WORLD LIMITED**, a limited liability private company registered under the laws of the Republic of Cyprus with registration number HE 317029 (the **"WARGAMING"**);

All capitalized terms used but not defined herein shall have the respective meanings ascribed thereto in the TRANSFER OF RIGHTS & FUTURE COOPERATION AGREEMENT (as defined below).

### RECITALS:

**WHEREAS**, concurrently with the execution of this Agreement, WARGAMING and the INDIVIDUAL are entering into that certain TRANSFER OF RIGHTS & FUTURE COOPERATION AGREEMENT (the **"PRINCIPAL AGREEMENT"**);

**WHEREAS**, WARGAMING is purchasing specific assets of the INDIVIDUAL and is assuming certain specified obligations and liabilities of the INDIVIDUAL on the terms and conditions set forth in the PRINCIPAL AGREEMENT (the **"Transaction"**);

**WHEREAS**, INDIVIDUAL will, as a result of the Transaction, receive <u>significant compensation</u> (as provided in <u>Section 4</u> of the PRINCIPAL AGREEMENT) (the **"Compensation"**), a portion of which is allocated to the purchase of the INDIVIDUAL's goodwill;

**WHEREAS**, the Parties also agreed, as evidenced in the PRINCIPAL AGREEMENT, that the INDIVIDUAL shall have the obligation to continue his work for the WARGAMING GROUP (as defined in <u>Section 11.1</u> of the PRINCIPAL AGREEMENT) as related to the further development of *World of Tanks. Blitz* (and as more specifically defined in the PRINCIPAL AGREEMENT), and that WARGAMING GROUP shall pay the INDIVIDUAL a salary that adequately reflects his expertise and his experience as well as the overall market context of the games industry in the particular location where such employment carried on (and which salary shall not be lower than the salary received by INDIVIDUAL prior to the Effective Date);

**WHEREAS,** WARGAMING is presently engaged in the business activities related to the operations and business conducted by the WARGAMING GROUP, including the creation, development, marketing, operation, licensing, sale and other modes of distribution of interactive entertainment for various platforms without any

Case 2:20-cv-02763-CJC-MRW Document 22 Filed 08/20/20 Page 136 of 159 Page ID
#:355

ical**CONFIDENTIAL**

WA**WARGAMING WORLD LIMITED / DZMITRY BABRAUNICHY NON-COMPETITION AND NON-SOLICITATION AGREEMENT**

limitations and restrictions, online games (including massively multiplayer online games) and other products and services (the "**Business**") in each and every country, province, state, city, and other political subdivision of the world (the "**Restricted Territory**");

**WHEREAS,** WARGAMING is also presently engaged in the business activities related to the operations and business conducted by the WARGAMING GROUP specifically in the area of the creation, development, marketing, operation, licensing, sale and other modes of distribution of interactive entertainment for various mobile, tablet and handheld platforms (the "**Specific Business**") in the Restricted Territory; and at the same time, INDIVIDUAL is also presently engaged the Specific Business of WARGAMING GROUP;

**WHEREAS**, following the execution of the PRINCIPAL AGREEMENT (the "**Effective Date**"), WARGAMING intends to continue to conduct and operate the Business in general, and the Specific Business in particular;

**WHEREAS**, INDIVIDUAL understands that the continuity of the Business and Specific Business is essential to WARGAMING and the INDIVIDUAL's ability to induce WARGAMING to enter into the PRINCIPAL AGREEMENT and complete the transactions contemplated thereby, and that after consummation of the Transaction, WARGAMING would be irreparably injured if the INDIVIDUAL were to enter into any business activity in competition with the Business in general, and in the Specific Business in particular; and

**WHEREAS**, as a condition to WARGAMING's obligations under the PRINCIPAL AGREEMENT and to preserve the value of the Transaction, the PRINCIPAL AGREEMENT contemplates, among other things, that INDIVIDUAL enter into this Agreement and that this Agreement become effective upon the Effective Date.

**NOW, THEREFORE**, in consideration of the mutual promises made herein, the WARGAMING and INDIVIDUAL hereby agree as follows, effective as of the Effective Date (as defined above):

1. **Non-Competition**.

1.1. **Non-Competition Obligation.** The termination of the full-time employment relationship between the WARGAMING GROUP and the INDIVIDUAL shall be defined as an "**Employment Termination**" for purposes of this Agreement. Further:

    1.1.1. During the period commencing on the Effective Date and ending on the one (1)-year anniversary of the date of the Employment Termination, where (a) WARGAMING GROUP and INDIVIDUAL terminate their relationship by means of mutual execution of the relevant termination agreement; (b) WARGAMING GROUP terminate such employment relationship for cause, or (c) INDIVIDUAL voluntarily terminates such employment relationship through no fault of WARGAMING or WARGAMING GROUP, or (d) INDIVIDUAL terminates such employment relationship in the case of termination by the INDIVIDUAL due to WARGAMING's failure to timely pay any amounts due INDIVIDUAL under the PRINCIPAL AGREEMENT (including without limitation Compensation), which termination shall be governed by Section 1.1.3 below), INDIVIDUAL shall not (other than in connection with his employment services to the WARGAMING GROUP), without the prior written consent of WARGAMING, engage in any Prohibited Activity (as defined below).

    1.1.2. During the period commencing on the Effective Date and ending six (6) months after the date of the Employment Termination, where WARGAMING terminates such employment relationship for no reason (i.e., without cause), the INDIVIDUAL shall not (other than in connection with his employment services to the WARGAMING GROUP), without the prior written consent of WARGAMING, engage in any Prohibited Activity.

DAVA_WG_NonCompet_NonSolicitation_Agreement_Dmitry_Bobrovnichiy_8-27-13_FINAL&CLEAN    Page 2 of 6

# CONFIDENTIAL

**WARGAMING WORLD LIMITED / DZMITRY BABRAUNICHY NON-COMPETITION AND NON-SOLICITATION AGREEMENT**

1.1.3. In the event the employment relationship between the WARGAMING GROUP and the INDIVIDUAL is terminated by INDIVIDUAL due to WARGAMING's failure to timely pay any amounts due to INDIVIDUAL under the PRINCIPAL AGREEMENT (including without limitation the Compensation), the Non-Competition Obligation under these Sections 1.1.1 and 1.1.2 and penalty under Section 1.3 shall not apply and shall be null, void and of no further effect, and INDIVIDUAL shall be free to engage in any so-called Prohibited Activity without any restriction.

1.2. **Prohibited Activity.** For purposes of this Agreement, "Prohibited Activity" means to:

(a) participate or engage, anywhere in the Restricted Territory, in any business (including research and development), operations, activities and/or services, that are or involve the creation, design, development, modification, marketing, licensing, sale or other distribution of (1) any Multiplayer Online Battle Arena (MOBA) electronic or video games, massively multiplayer online games, multi- and single player electronic and video games (whether for gaming consoles, PCs, hand-held devices, including tablets, mobile and cell phone devices, or any other electronic platforms), where any such games feature the use of tanks, warplanes, battleships, helicopters, or robots, or (2) games that are based in significant part on elements substantially similar to those in the Game and/or World of Tanks. Blitz (as defined in the PRINCIPAL AGREEMENT), and/or any other electronic and video games that are currently are planned and/or being developed by WARGAMING GROUP, without regard the INDIVIDIAL's actual involvement into the development of such ) ("Competing Business Purpose");

(b) be or become an officer, director, stockholder, owner, Affiliate, salesperson, co-owner, partner, trustee, promoter, technician, engineer, analyst, employee, agent, representative, supplier, contractor, consultant, advisor or manager of or to, or otherwise acquire or hold any interest in, or participate in or facilitate the financing, operation, management or control of, or otherwise assist any firm, partnership, corporation, person, entity or business that engages or participates in a Competing Business Purpose in the Restricted Territory;

(c) approach, contact or solicit the WARGAMING's or any of its Subsidiaries' or Affiliates' customers, suppliers, developers, resellers or other business partners in connection with a Competing Business Purpose; or

(d) affirmatively authorize INDIVIDUAL's name or reputation to be used in connection with a business that has a Competing Business Purpose.

1.3. **Effect of Failure to Comply with Non-Competition Obligation.**

1.3.1. In the event that INDIVIDUAL fails to comply with the Non-Competition Obligation as provided in Sections 1.1 and 1.2 above and fails to cure such failure within thirty (30) days of his receipt of written notice from WARGAMING of such failure, WARGAMING shall be entitled to receive from the INDIVIDUAL a penalty of Twelve and One-Half percent (12.5%) of the Compensation that is paid or is due to be paid to the INDIVIDUAL under the PRINCIPAL AGREEMENT from the Effective Date and up to such date that WARGAMING is obliged to pay the Compensation under the terms of the PRINCIPAL AGREEMENT (the **"Final Payment Date"**), which Final Payment Date varies depending on the cause for the Employment Termination. Such penalty shall be due and payable by the INDIVIDUAL immediately upon receipt of the corresponding notice from WARGAMING that is served by WARGAMING upon INDIVIDUAL's failure to timely cure such breach of the Non-Competition Obligation. WARGAMING shall have the right to set-off such penalty against the Compensation that is still due to be paid to the INDIVIDUAL. The foregoing penalty shall only apply for an uncured violation of the Non-Competition Obligation that occurs during the period commencing on the Effective Date up through the end of the Minimum Contribution Period.

#:357

# CONFIDENTIAL

1.3.2.   For an uncured violation of the Non-Competition Obligation that occurs during the first 12-month immediately following the end of the Minimum Contribution Period, the penalty shall be Five percent (5.0%) of the Compensation that is paid or is due to be paid to the INDIVIDUAL under the PRINCIPAL AGREEMENT from the Effective Date up to the Final Payment Date.

1.3.3.   For an uncured violation of the Non-Competition Obligation that occurs during the period following the expiration of the first 12-month period as defined in Section 1.3.2 above, the penalty shall be Two and One-Half percent (2.5%) of the Compensation that is paid or is due to be paid to the INDIVIDUAL under the PRINCIPAL AGREEMENT from the end of the Minimum Contribution Period up to the Final Payment Date.

## 2.   **Non-Solicitation**.

2.1.   **Non-Solicitation Obligation**. INDIVIDUAL further agrees that INDIVIDUAL shall not during the period commencing on the Effective Date and ending on the one (1)-year anniversary of the Employment Termination personally or through others encourage, induce, attempt to induce, solicit or attempt to solicit (on INDIVIDUAL's own behalf or on behalf of any other person or entity), or take any other action which is intended to induce or encourage, or has the effect of inducing or encouraging, any employee of the WARGAMING GROUP to leave his or her employment with the WARGAMING GROUP to engage in a Prohibited Activity with INDIVIDUAL. For the avoidance of doubt, in the event any employee of the WARGAMING GROUP leaves his or her employment with the WARGAMING GROUP on his or her own, and not as a result of any inducement, attempt to induce, solicitation or attempt to solicit by INDIVIDUAL, or any other person or entity acting on behalf of INDIVIDUAL, such departure shall not be deemed a violation of the Non-Solicitation Obligation.

2.2.   **Effect of Failure to Comply with Non-Solicitation Obligation**. In the event that INDIVIDUAL fails to comply with the Non-Solicitation Obligation as provided in Section 2.1 above, WARGAMING shall be entitled to receive from the INDIVIDUAL a penalty of one hundred thousand US Dollars (USD $100.000,00) for each such employee. Such penalty shall be due and payable by the INDIVIDUAL immediately upon receipt of the corresponding notice from WARGAMING that is served by WARGAMING upon INDIVIDUAL's breach of Non-Solicitation Obligation. WARGAMING shall have the right to set-off such penalty against the Compensation that is still due to be paid to the INDIVIDUAL.

2.3.   **Non-applicability of Non-Solicitation Obligation**. In the event the employment relationship between the WARGAMING GROUP and the INDIVIDUAL is terminated by INDIVIDUAL due to WARGAMING's failure to timely pay any amounts due INDIVIDUAL under the PRINCIPAL AGREEMENT (including without limitation Compensation), the Non-Solicitation Obligation and penalty set forth in Section 2.1 and Section 2.2 shall not apply and shall be null, void and of no further effect.

3.   **Severability of Covenants**. The covenants contained in Sections 1 *and* 2 hereof shall be construed as a series of separate covenants, one for each country, province, state, city or other political subdivision of the Restricted Territory. Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenant contained in Sections 1 *and* 2 hereof. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In the event that the provisions of Sections 1 *and* 2 are deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, permitted by applicable law.

4.   **Independence of Obligations**. The covenants and obligations of INDIVIDUAL set forth in this Agreement shall be construed as independent of any other agreement or arrangement between INDIVIDUAL, on the one hand, and the WARGAMING on the other.

# CONFIDENTIAL

**WARGAMING WORLD LIMITED / DZMITRY BABRAUNICHY NON-COMPETITION AND NON-SOLICITATION AGREEMENT**

5.     **INDIVIDUAL Acknowledgement**. INDIVIDUAL acknowledges that (i) INDIVIDUAL is a key employee of a division of WARGAMING GROUP engaged into the Specific Business; (ii) the goodwill associated with the existing Specific Business, customers and assets of WARGAMING GROUP prior to the Transaction is an integral component of the value of INDIVIDUAL to WARGAMING GROUP and is reflected in the Compensation payable to INDIVIDUAL in connection with the Transaction; and (iii) INDIVIDUAL's agreement as set forth herein is necessary to preserve the value of the Transaction for WARGAMING GROUP following the Effective Date. INDIVIDUAL also acknowledges that the limitations of time, geography and scope of activity agreed to in this Agreement are reasonable because, among other things: (A) WARGAMING GROUP is engaged in a highly competitive industry, (B) INDIVIDUAL has unique access to, and will continue to have access to, the trade secrets and know-how of WARGAMING GROUP, including, without limitation, the plans and strategy (and, in particular, the competitive strategy) of WARGAMING GROUP, (C) INDIVIDUAL is accepting employment with WARGAMING GROUP on favorable terms in connection with the Transaction, (D) this Agreement provides no more protection than is necessary to protect WARGAMING's and WARGAMING GROUP's interests in its goodwill, trade secrets and confidential information. INDIVIDUAL's obligations under Sections 1, 2 and 3 of this Agreement shall remain in effect for the time period set forth herein, subject to the terms and conditions hereof.

6.     **Non-Exclusivity**. The rights and remedies of WARGAMING hereunder are not exclusive of or limited by any other rights or remedies that WARGAMING may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative (and not alternative),. Without limiting the generality of the foregoing, the rights and remedies of WARGAMING hereunder, and the obligations and liabilities of INDIVIDUAL hereunder, are in addition to their respective rights, remedies, obligations and liabilities under the law of unfair competition, misappropriation of trade secrets and the like. This Agreement does not limit either party's obligations or the rights of either party under the terms of any other agreement between INDIVIDUAL and WARGAMING/WARGAMING GROUP.

7.     **Notices**. All notices and other communications hereunder shall be in writing and shall be served according to the rules set out in the PRINCIPAL AGREEMENT.

8.     **Severability**. In the event that any provision of this Agreement or the application thereof becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto. The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

9.     **Jurisdiction**. This Agreement shall be construed and interpreted pursuant to the <u>laws of Republic of Cyprus</u>, without regard to conflicts of laws principles. The Parties hereto voluntarily and irrevocably submit and consent to the binding jurisdiction of <u>the International Center of Dispute Resolution ("**ICDR**") sitting in Nicosia, Cyprus</u> in any action brought to enforce (or otherwise relating to) this Agreement, and waive any objection thereto on the basis of personal jurisdiction or venue. The ICDR arbitration proceedings will be conducted by a single arbitrator and in the English language. Parties and witnesses residing outside of Cyprus may testify telephonically or via such other audio/visual means approved by the arbitrator. If any legal action or any other proceeding is brought for the enforcement of this Agreement, or if a dispute arises under this Agreement, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it may be entitled. Any Party in whose favor a judgment has been entered shall also be entitled to recovery of its attorneys' fees and costs in enforcing such judgment. The decision of the ICDR shall be final and non-appealable, and may be entered in any court of competent jurisdiction.

10.     **Waiver**. No failure on the part of WARGAMING to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of WARGAMING in exercising any power, right, privilege or remedy

# CONFIDENTIAL

**WARGAMING WORLD LIMITED / DZMITRY BABRAUNICHY NON-COMPETITION AND NON-SOLICITATION AGREEMENT**

under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy. WARGAMING shall not be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such party; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

11. **Entire Agreement**. This Agreement and the other agreements referred herein between the parties hereto constitute the entire agreement between the INDIVIDUAL and WARGAMING with respect to the subject matter hereof and supersede all prior agreements and understandings both written and oral, between the parties with respect to the subject matter hereof. For the avoidance of doubt, this Agreement shall not limit either party's obligations or rights under the PRINCIPAL AGREEMENT or otherwise supersede the PRINCIPAL AGREEMENT.

12. **Amendments and Modification**. This Agreement may not be amended, modified, altered, or supplemented except upon the execution and delivery of a written agreement executed by the parties hereto.

13. **Assignment**. This Agreement and all obligations hereunder are personal to the INDIVIDUAL and may not be transferred or assigned by INDIVIDUAL at any time. WARGAMING may assign its rights under this Agreement to any of the companies of the WARGAMING GROUP.

14. **Binding Nature**. This Agreement will be binding upon the INDIVIDUAL, and will inure to the benefit of WARGAMING and WARGAMING GROUP.

**WARGAMING WORLD LIMITED:**                    **DZMITRY BABRAUNICHY**

Signed: .....                                   Signed: ....                          ...............

Full Name: ....

Title: .....

# EXHIBIT G

**EMANUEL LAW FIRM**

FROM THE DESK OF
SACHA V. EMANUEL, APC

Direct E-mail:
semanuel@emanuel.law

1100 GLENDON AVENUE, 15th FLOOR
LOS ANGELES, CALIFORNIA  90024
TELEPHONE (310) 881-6814
FACSIMILE (310) 881-6801

July 19, 2019

*VIA EMAIL ONLY*

Roman Zanin
General Counsel
Wargaming World Limited
105, Agion Omologiton Avenue 1080
Nicosia, Cyprus
R_zanin@wargaming.net

> **Re:**   **Blitz Team's release of the new mobile game tentatively entitled**
> ***Battle Prime***

Dear Mr. Zanin,

We represent the Belarusian company BlitzTeam LLC ("**Blitz Team**").

I am writing today to give you notice that our client will soon be releasing a test version of its new mobile game tentatively called ***Battle Prime***.

I am informed that Wargaming World Limited ("**Wargaming**") and its affiliate **Game Stream JLLC ("Game Stream")** have been quite aggressive in their efforts in the country of Belarus to prevent Blitz Team from exercising its legal right to develop *Battle Prime* in that country.  I am also aware that Wargaming appears to be concerned that Blitz Team has used elements of Wargaming's *World of Tanks Blitz* mobile game ("**WOTB**"), including the engine code from the WOTB DAVA Framework Engine, in *Battle Prime*.  My client has asked me to address those concerns with you as Blitz Team itself has some natural concern that Wargaming and/or Game Stream might continue with its litigious course of conduct and wrongfully act to prevent Blitz Team's lawful worldwide release and commercial exploitation of *Battle Prime*.

Given the nature of these ongoing disputes, we feel that it is important to address with you ahead of time some critical elements of *Battle Prime* and its engine code, so that we can

EMANUEL LAW FIRM

Wargaming World Limited
Roman Zanin
July 19, 2019
Page 2

avoid still another potentially damaging and unnecessary conflict.  In particular, we wish to ensure that there is no misunderstanding on your part as to the lawful nature of *Battle Prime*.

As you will immediately see upon *Battle Prime*'s release, its overall elements are noticeably distinct from WOTB.  *Battle Prime* is a 3rd person Hero shooter game, set in the future.  It is not a tank battle game.   It is fast-paced, with characters that can respawn and can use different guns and special abilities.  The characters and weapons are fictional and possess unique abilities.  The monetization is mainly timer-based.  Simply put, what that means is that players can pay to speed up the timers controlling their gameplay.  There is an option for a paid subscription which gives the player unique content.  *Battle Prime* is like many, many other similar combat games that are and have been on the market for years.  Comparing this game to the proprietary elements of WOTB clearly shows no substantial similarities and in fact no proprietary elements of WOTB have been copied in *Battle Prime*.

Further, while our client indubitably has had the right to use the DAVA Framework Engine ever since it was posted as Open Source on GitHub, the Blitz Team nonetheless chose to develop *Battle Prime* with an entirely new engine that is not derived from the DAVA Framework Engine and shares no code therewith.  To be clear, this was not done because our client believes Wargaming's claim that the DAVA Framework Engine had been wrongfully posted to GitHub in an unauthorized manner, but because Blitz Team believed that it could build a better engine than the DAVA Framework Engine by starting their coding process from scratch.

Given this, Wargaming should have no intellectual property concerns about *Battle Prime*.  However, if upon viewing *Battle Prime*, Wargaming has any concerns that *Battle Prime* wrongfully utilizes any proprietary aspects of WOTB, I invite you to contact me immediately with those specific concerns and I will address them with my client and respond to you about them.

All of that said, I must warn you that should Wargaming undertake to interfere with the Blitz Team's contractual or business relationships or any of its other lawful rights to compete in the open worldwide video game market by, for example, making false claims to any third party based in the United States that the Blitz Team has violated Wargaming's copyrights, the Blitz Team will hold Wargaming fully responsible for any and all damages caused to the Blitz Team by virtue of these wrongful claims; damages which we believe, given the success that our client expects for *Battle Prime*, may well amount to millions of dollars per each month that Wargaming wrongfully keeps *Battle Prime* off the market.

EMANUEL LAW FIRM

Wargaming World Limited
Roman Zanin
July 19, 2019
Page 3

      The Digital Millennium Copyright Act provides that a party who makes a knowing, material misrepresentation to a service provider such as Google or Apple that a third party's content infringes its copyrights is liable for damages, including costs and attorneys' fees incurred by that third party if it is injured by the misrepresentation as a result of a service provider relying on such a misrepresentation in removing content from its site. *See,* 17 U.S.C. §512(f); *Lenz v. Universal Music Corp.*, 801 F.3d 1126 (2015); *Automattic Inc. v. Steiner*, 82 F.Supp.3d 1011 (N.D. Cal. 2014). A "knowing, material" misrepresentation occurs when a party actually knew or *should have known if it acted with reasonable care or diligence* that it was making a misrepresentation with respect to infringement. *Online Policy Group v. Diebold, Inc.*, 337 F.Supp.2d 1195, 1204 (N.D. Cal. 2004) (emphasis added).

      Our client has undertaken its new project with care and attention to, and respect for, Wargaming's intellectual property rights. No elements of the *Battle Prime* game or its underlying code infringe on WOTB or any of Wargaming's other games or proprietary intellectual property of which our client is aware. We hope that you will recognize this fact and not take any steps regarding *Battle Prime* which would create unnecessary and damaging conflict and which we caution you, at the end of the day, will very likely be extremely costly to Wargaming.

      This letter does not constitute a complete or exhaustive statement of my client's rights, claims, contentions, or legal theories. Nothing stated in this letter is intended as, nor should it be deemed to constitute, a waiver or relinquishment of any of my client's rights or remedies whether legal or equitable, all of which are expressly reserved.

                Sincerely,

                *Sacha V. Emanuel*

                Sacha V. Emanuel
                EMANUEL LAW FIRM

# EXHIBIT H

**Sheppard**Mullin

Sheppard, Mullin, Richter & Hampton LLP
379 Lytton Avenue
Palo Alto, California 94301-1479
650.815.2600 main
650.815.2601 fax
www.sheppardmullin.com

650.815.2673 direct
hbatts@sheppardmullin.com

August 6, 2019

**VIA ELECTRONIC MAIL**

Sacha V. Emanuel
Emanuel Law Firm
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
semanuel@emanuel.law

Re:     BlitzTeam LLC's Release of *Battle Prime*

Dear Mr. Emanuel:

We write on behalf of our client, Wargaming World Limited, in response to your letter dated July 19, 2019, which you sent on behalf of your client, BlitzTeam LLC.

Wargaming welcomes Blitz Team's willingness to demonstrate that its new mobile game entitled *Battle Prime* does not make unauthorized use of Wargaming's intellectual property.  However, Wargaming disagrees with your letter's suggestion that Wargaming has acted unreasonably in defending its legal and intellectual property rights in Belarus or anywhere else.  Wargaming hopes that Blitz Team's newly stated willingness to assure Wargaming that its intellectual property is being respected means that Blitz Team will be more cooperative with the Belarus authorities and responsive to their inquiries.

Your letter insinuates that Wargaming's concerns are limited to Blitz Team's potential use of the DAVA Framework Engine or the misappropriation of proprietary elements of *World of Tanks Blitz*.  That is not the case.  Wargaming has reason to believe that Blitz Team has misappropriated Wargaming's intellectual property, which includes, but is in no way limited to, the DAVA Framework Engine.

Moreover, Wargaming did not authorize your client's use of "Blitz Team" or "Blitz Engine" in commerce.  Your client's use of "Blitz" is likely to cause confusion among members of the public as to the source of *Battle Prime*, the "Blitz Engine," and any other products or services your client provides in connection with the "Blitz" mark.  Because Blitz Team is not affiliated or authorized by Wargaming to use the "Blitz" mark,

# SheppardMullin

August 6, 2019
Page 2

Wargaming demands that your client cease using the "Blitz" mark to describe itself or any of its products or services.

As you are undoubtably aware, Wargaming also contends that Blitz Team, through its agents and employees, improperly encouraged, induced, or solicited more than thirty Wargaming employees to join Blitz Team. The circumstances surrounding Blitz Team's hiring of Wargaming's employees provide further reason to believe that Blitz Team has misappropriated Wargaming's intellectual property and confidential information.

Wargaming appreciates your client's representation that *Battle Prime* should not raise intellectual property concerns from Wargaming. I am sure that your client appreciates, in return, Wargaming's need to verify the accuracy of that representation, particularly in light of the issues referenced above. In that vein, in your letter, your client represents that *Battle Prime* shares no source code with the DAVA Framework Engine and that *Battle Prime* includes no proprietary elements of Wargaming's *World of Tanks Blitz*. However, we understand that Blitz Team has refused to make its source code available for inspection by the Belarus authorities, and therefore Wargaming is not satisfied by your client's naked assurances that no part of Wargaming's intellectual property has been misappropriated.

If Blitz Team is sincere in its desire to "ensure that there is no misunderstanding on [Wargaming's] part as to the lawful nature of *Battle Prime*," as a starting point Wargaming proposes that Blitz Team make its *Battle Prime* source code (and architecture) available for inspection in the United States under the terms of a suitable non-disclosure agreement. As you know, this is frequently done in software disputes here, and companies typically engage outside source code consultants to conduct the analysis in order to maintain the confidentiality of the source code. We are happy to discuss logistics for such an inspection.

On behalf of Wargaming, we thank you for your letter and look forward to your client's response and cooperation.


Very truly yours,

/s/ Harper S. Batts

Harper S. Batts
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

SMRH:4831-7736-0543.1

# EXHIBIT I

**Screen Shot from Google Play**





**Metal Billiards420**
★ · February 25, 2020

I loved the game at first it has okay graphics, the gameplay was smooth and nice audio, but it seems as soon as I started paying my 4.99 for the weekly sub, now the game crashes and goes to a blank screen during my gameplay. This has been an ongoing issue with this game that I tried to wait out and ...

Full Review

**Vita Indrane**
★★★★★ · February 20, 2020

The game has its flaws and its pros, the pros far outweighing the flaws. Sensitivity is an issue at the start but after a few minutes of tweaking and couple (1 or 2) matches of gameplay they feel natural. Matchmaking is fair as far as I've gone and progression is fast and rewarding, with the loot bo...

Full Review

**READ ALL REVIEWS**

**WHAT'S NEW**
- Improved controls and aiming mechanic.
- Gameplay improvements and optimizations.
- Various connection issues resolved.

**ADDITIONAL INFORMATION**

| Updated | Size | Installs |
|---|---|---|
| March 2, 2020 | Varies with device | 500,000+ |

| Current Version | Requires Android | Content Rating |
|---|---|---|
| 2.3 | 5.0 and up | Teen<br>Violence, Blood<br>Learn More |

| Interactive Elements | In-app Products | Permissions |
|---|---|---|
| Users Interact, In-Game Purchases | $0.99 - $99.99 per item | View details |

| Report | Offered By | Developer |
|---|---|---|
| Flag as inappropriate | BlitzTeam LLC | Visit website<br>support@blitzteam.com<br>Privacy Policy<br>Platonova 49-24, Minsk, Republic of Belarus, 220012 |

## Screen Shot from Apple App Store





‹ Search

Tap to Rate: ☆ ☆ ☆ ☆ ☆   ✍ Write a Review   ❓ App Support

**Amazing, some convenience features n...**   Jan 20
★★★★★   Nytfury2212

I think this game is amazing, with all of the things the game claims to have. However I do have a few requests. Two things involving jumping and   more

**Developer Response**   Jan 23
Hello! Thank you for your feedback. It helps to make Battle Prime better. Currently, we are w   more

**A hidden gem**   Jan 24
★★★★☆   A_M_J_95

I downloaded this game yesterday throughout an instagram ad and I'm glad that the game is everything that the ad promised,the graphics   more

**Developer Response**   Jan 26
Hello! Thank you for your feedback. Please, contact our support team about Internet connection   more

## Information

Seller
BLITSTIM, OOO

Size
1.1 GB

Category
Games: Simulation

Compatibility
Works on this iPad

Age Rating
17+

In-App Purchases
Yes

Copyright
© BLITSTIM, OOO

🧭 Developer Website        ✋ Privacy Policy

## Supports

**Game Center**
Play with friends, track and compare scores and achievements, challenge other players, and compete in multiplayer games.

**Family Sharing**
Up to six family members can use this app with Family Sharing enabled. In-app purchases can't be shared with family members.

## You Might Also Like        See All

Hashiriya Drifter
Tune your Car, and Drift it!        GET
In-App Purchases

Dream League Soccer 2020
FIFPro™ Licensed Soccer        GET
In-App Purchases

World War Heroes: WW2 FPS PVP
First person online shooter        GET
In-App Purchases

Modern Strike Online: PvP FPS
Multiplayer 3D Shooter        GET
In-App Purchases

📅 Today      🚀 Games      ⊛ Apps      🕹 Arcade      🔍 Search

## Screen Shot from BattlePrime.com



## Screen Shot from BlitzTeam.com



**Screen Shot from BattlePrime.com's Terms of Use**



You agree to indemnify, defend and hold BLITZ TEAM (and our officers, directors, agents, subsidiaries, joint ventures and employees) harmless from any threat, claim, demand, damage or other losses, including reasonable attorneys' fees, asserted by any third-party resulting from or arising out of your use of the Service, or any breach by you of these Terms of Use, however the foregoing shall not apply if the same is not attributable to your intentional or negligent behavior.

8. Dispute Resolution and Governing Law

If a dispute arises between you and BLITZ TEAM, we you shall first contact us directly to seek a resolution by going to our customer support site at https://blitzteam.helpshift.com/a/battle-prime/  You agree to exhaust all reasonable resolution efforts with the BLITZ TEAM before seeking dispute resolution elsewhere.   If you are a resident of the United States of America, these Terms of Use and any unresolved material dispute arising out of or related to it or Privacy Policy or the Service shall be governed in all respects by the laws of the state of New York, without regard to conflicts of law provisions. You agree that any unresolved material claim or dispute that you may have against us must be resolved exclusively by a court located in Manhattan, New York.  If you are not a resident of the United States, you agree that all unresolved material disputes between you and us shall be governed by the laws of Belarus without regard to conflict of law provisions.  You agree that any unresolved material claim or dispute you may have against us may be resolved exclusively by a court located in Minsk, Belarus.

If you are a United States resident or otherwise make any claim against us in the United States, you expressly agree that any legal claim, dispute or other controversy between you and BLITZ TEAM arising out of or otherwise relating in any way to Services, including controversies relating to the applicability, enforceability or validity of any provision of these Terms of Use or our Privacy Policy (collectively "Disputes"), shall be resolved in confidential binding arbitration conducted before one commercial arbitrator from the American Arbitration Association ("AAA"), rather than in a court, as described herein. The arbitration will be governed by the AAA's commercial arbitration rules and, if the arbitrator deems them applicable, the supplementary procedures for consumer related disputes (collectively "Rules and Procedures"). You acknowledge that you are voluntarily and knowingly forfeiting your right to a trial by jury and to otherwise proceed in a lawsuit in state or federal court.

Payment of arbitration costs will be governed by the AAA's fee schedule, unless you are able to show that your portion will be prohibitive as compared to litigation costs, in which case BLITZ TEAM will pay as much of your arbitration costs as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive as compared to litigation costs. We also reserve the right in our sole and exclusive discretion to assume responsibility for all arbitration costs imposed by the AAA. Each party agrees to pay its own attorneys' fees and expenses unless there is a governing statutory provision that requires the prevailing party to be paid attorneys' fees and expenses.

The arbitration may be conducted in Manhattan, New York, or, upon your request, in the city closest to you location where AAA maintains an office. The arbitrator's award shall be final and binding on you and BLITZ TEAM and may be entered as a judgment in any court of competent jurisdiction.

For more information on AAA, its Rules and Procedures, and how to file an arbitration claim, you may call AAA at 800-778-7879 or visit the AAA website at www.adr.org.

As an exception to the binding arbitration rule, to the extent the Dispute arises from:

1.   A violation of our intellectual property rights in any manner;

2.   Any claim related to, or arising from, allegations of theft, piracy, unauthorized use or a violation of the United States Computer Fraud and Abuse Act or Section "Code of conduct" of these Terms of Use; and

3.   Any claim for equitable relief;

then both parties agree that a party may seek injunctive remedies in any court with jurisdiction over the other party. In addition to the foregoing, either party may assert an individual action in small claims court for Claims that are within the scope of such court's jurisdiction in lieu of arbitration.

To the extent permissible under applicable law, all Disputes shall be resolved by binding confidential arbitration on an individual basis. You expressly agree that no other Disputes shall be consolidated or joined with your Dispute, whether through class arbitration proceedings or otherwise.  You and BLITZ TEAM agree that there is no right or authority for any dispute to be arbitrated on a class-action basis or to utilize class action procedures, there is no right or authority for any dispute to be brought in a purported representative capacity or as a private